# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| DHRUV POSTIWALA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ARDENT HEALTH, INC., MARTIN J. BONICK, and ALFRED LUMSDAINE,<br><br>Defendants. | **Case No. 3:26-cv-00022-WLC**<br><br>**Judge William L. Campbell, Jr.**<br><br>**<u>CLASS ACTION</u>**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

## TABLE OF CONTENTS


I. SUMMARY OF THE ACTION ..... 2

A. Material Misstatements and Omissions in the Registration Statement ..... 2

B. Defendants Continued to Mislead Investors After the IPO ..... 8

C. When the Truth Was Revealed, Ardent's Share Price Plunged ..... 10

II. JURISDICTION AND VENUE ..... 11

III. PARTIES ..... 12

A. Plaintiffs ..... 12

B. Defendants ..... 12

IV. BACKGROUND ALLEGATIONS ..... 13

A. Company Background ..... 13

B. Ardent's Private Equity Backers Push for Aggressive Financial Results to Fuel a Successful IPO ..... 13

1. Ardent's Senior Management Was Replaced. ..... 14

2. Defendants Outsourced Ardent's Revenue Cycle Operations to Ensemble in Exchange for a Lucrative Board Seat for Bonick. ..... 15

3. Ensemble's Broad Role in Revenue Cycle Management ..... 20

4. Defendants Received Regular Reporting on Denial Rates and Other KPIs from Ensemble and Ardent's In-House Team. ..... 21

5. Ardent and Ensemble Set Unrealistic Revenue Targets and Failed to Execute, While Ignoring Executives Who Voiced Concerns. ..... 25

C. Ardent Raises $208.6 Million in Its July 2024 IPO by Concealing Its Serious Safety, Quality, and Financial Issues from Investors ..... 26

1. Defendants Falsely Touted Ardent's Safe and High-Quality Care While Concealing Material, Unaccrued Malpractice Liability. ..... 27

2. Ardent Faced Rapidly Increasing Payor Denials. ..... 45

3. Ardent's AR Balance Was Inflated with Uncollectible Amounts. ..... 50

D. Defendants Continued to Mislead Investors Following the IPO .......................... 52

1. Ardent Issued Aggressive 2025 Guidance. .............................................. 53

2. Ardent Repeatedly Failed to Update Its Professional Liability Accruals and Continued to Tout Quality of Care.................................................. 54

3. Defendants Lied About Ardent's Worsening Payor Denials. .................. 55

4. Ardent Continued to Report Inflated AR Balances and Failed to Timely Write Off Uncollectible Amounts, While Knowing a $43 Million Writedown Was Required. .................................................. 59

5. Defendants Lied About Ardent's Rapidly Increasing Professional Fees.. 63

6. Ardent Reaffirmed 2025 Guidance Premised on False Assumptions....... 68

7. Ardent Insiders Registered to Unload All of Their Remaining Shares. ... 69

E. The Truth Emerges ......................................................................................... 69

V. FORMER EMPLOYEE ALLEGATIONS ..................................................................... 75

VI. SECURITIES ACT ALLEGATIONS ............................................................................ 94

A. The Registration Statement Contained Material Misstatements and Omissions .. 94

1. Materially False and Misleading Statements Concerning Ardent's Safety, Quality and Professional Liability. ............................................... 94

2. Materially False and Misleading Statements Concerning Accounts Receivable. ......................................................................................... 97

3. Material Omissions in Violation of Item 303. .......................................... 99

B. The Individual Defendants Failed to Perform Reasonable Diligence in Connection with the IPO..................................................................... 105

C. Ardent's Share Price Collapses by the Time of Suit.......................................... 105

VII. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ......................................... 106

COUNT I......................................................................................................................... 106

COUNT II......................................................................................................................... 107

VIII. EXCHANGE ACT ALLEGATIONS............................................................................. 108

A. Exchange Act False and Misleading Statements ............................................... 108

1. Materially False and Misleading Statements Concerning Ardent's Safety, Quality and Professional Liability. .......... 108

2. Materially False and Misleading Statements Concerning Accounts Receivable. .......... 112

3. Materially False and Misleading Statements Concerning Payor Denials. .......... 116

4. Materially False and Misleading Statements Concerning Professional Fees. .......... 119

5. Materially False and Misleading Statements Affirming Guidance. .......... 121

B. Additional Allegations of Scienter .......... 122

1. Former Employee Allegations Support a Strong Inference of Scienter. 124

2. The Individual Defendants Disregarded the Most Current Factual Information Before Making Statements. .......... 124

3. Internal Reports Diverged from Defendants' External Statements on the Same Subjects. .......... 126

4. The Individual Defendants Claimed to Have Specific Personal Knowledge of Ardent's Payor Denials, Professional Fees, Accounts Receivable, and Professional Liability Accruals. .......... 132

5. Defendants Made False Statements Close in Time to the Later Disclosure of Inconsistent Information. .......... 134

6. Defendants Offered False and Misleading Explanations After the Fraud Collapsed. .......... 135

7. The Individual Defendants' Self-Interested Motivation to Secure Additional Compensation and Keep Their Jobs Reinforces the Inference of Scienter. .......... 136

8. The Core Operations Doctrine Supports Scienter. .......... 139

9. The Company's IPO Reinforces the Inference of Scienter. .......... 140

10. Defendants Disclosed Accounting Information in Such a Way that Its Negative Implications Could Only Be Understood by Someone with a High Degree of Sophistication. .......... 141

11. Executive Terminations Support Scienter. .......... 141

12. Corporate Scienter. .......... 142

C. Loss Causation ... 143

D. Presumption of Reliance ... 145

IX. EXCHANGE ACT CLAIMS FOR RELIEF ... 146

COUNT III ... 146

COUNT IV ... 147

X. CLASS ACTION ALLEGATIONS ... 148

XI. INAPPLICABILITY OF STATUTORY SAFE HARBOR ... 150

XII. JURY DEMAND ... 151

XIII. PRAYER FOR RELIEF ... 151

Lead Plaintiff Dhruv Postiwala ("Lead Plaintiff") and Named Plaintiff Jodi Yost ("Yost" and together, "Plaintiffs"), on behalf of themselves and the Class (defined below), allege (i) strict liability and negligence claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), and (ii) fraud-based claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, for a class period of July 18, 2024 to November 12, 2025, both inclusive (the "Class Period"), against Defendants Ardent Health, Inc. ("Ardent"), Martin J. Bonick ("Bonick"), and Alfred Lumsdaine ("Lumsdaine," and with Bonick, the "Individual Defendants").

Plaintiffs, by and through their counsel ("Lead Counsel"), allege the following based upon personal knowledge as to their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief are based upon the investigation of Lead Counsel, which included, among other things, review and analysis of: (1) regulatory filings made by Ardent with the United States Securities and Exchange Commission ("SEC"); (2) wire and press releases published by the Company; (3) transcripts of Ardent's earnings calls and industry conferences with investors and analysts; (4) press releases and media reports concerning the Company; (5) analyst reports concerning Ardent; (6) other public information and data regarding the Company; and (7) interviews with former employees of Ardent and other relevant entities (the "FEs") conducted in Lead Counsel's investigation.[1]

[1] The basis for each FE's knowledge is described in more detail in Section V. Throughout this Complaint, Ardent's quarterly results and reporting are referenced by quarter and the last two digits of the year. For example, the third quarter of 2024 is "3Q24." Unless otherwise stated, all emphasis in bold and italics is added, and internal citations are omitted.

## I. SUMMARY OF THE ACTION

1. This securities class action arises from Defendants' misstatements and actionable omissions in Ardent's July 2024 initial public offering (the "IPO") and during the Class Period.

2. Ardent is a for-profit, private equity-backed hospital operator. To raise over $200 million from investors in the IPO, Ardent, its former CEO Bonick, and its CFO Lumsdaine touted the Company's purportedly safe and high-quality patient care—even as pervasive unsafe practices at multiple Ardent-owned hospitals paralyzed patients, led to infant and maternal deaths and injuries, and infected patients with life-threatening diseases, while Ardent concealed its resulting financial liability of at least $54 million. Defendants also misstated and concealed Ardent's increasing denials from payors that eroded revenue and margins; over $40 million in aging, uncollectible accounts receivable; and increasing professional fees owed to doctors that further pressured Ardent's margins. When the truth emerged, Ardent's share price plunged nearly 34%. CEO Bonick was later terminated.

### A. Material Misstatements and Omissions in the Registration Statement

3. The IPO Registration Statement falsely portrayed Ardent as a safe, high-quality hospital operator with a healthy business. The reality was far different.

4. First, the Registration Statement falsely touted Ardent's safety and quality and concealed the material fact that Ardent faced at least $54 million in liability for patient injuries, deaths, and infections at the time of the IPO.

5. Specifically, the Registration Statement stated that Ardent was "delivering the highest quality patient care," with "safety, quality, and compliance" as "the foundation of [its] platform," backed by "company-wide compliance and quality assurance programs." These statements were false and misleading because Ardent's hospitals lacked basic quality assurance

safeguards and repeatedly provided unsafe, low-quality treatment, resulting in a pattern of patient injuries, deaths, and infections.

6. The Registration Statement also assured investors that Ardent was not a party to any legal proceeding that "could have a material adverse effect." That, too, was false: Ardent faced material liability of at least $54 million from at least five malpractice and wrongful death lawsuits filed against Ardent and its affiliates by the time of the IPO.

7. The federal securities laws and U.S. Generally Accepted Accounting Standards (GAAP) required Ardent to disclose its existing, material liability. Specifically, Item 303 of SEC Regulation S-K ("Item 303") requires disclosure of known, material uncertainties; violations are actionable omissions under Section 11 of the Securities Act. ASC 450, a key provision of GAAP, requires disclosure of and accruals for material loss contingencies. Indeed, citing ASC 450, the SEC directly advised Bonick shortly before the IPO to make "specific disclosures" of "matters that may be material," including "[d]isclosures for the amount or range of reasonably possible loss."

8. Yet Ardent did neither: the Registration Statement made ***no mention*** of Ardent's pending lawsuits or material litigation exposure. And Ardent failed to record ***any*** accrual to reflect its material cost for these claims, which was at least $54 million.

9. Defendants' own admissions demonstrate the materiality of the facts the Registration Statement concealed from investors. After the Class Period, Ardent belatedly increased its accruals by $54 million and attributed the increase primarily to the Company's liability for malpractice committed "between 2019 and 2022 in New Mexico" by "a single provider who the Company no longer employs."

10. That "single provider" was Mark Erasmus, a former neurosurgeon at an Ardent-owned hospital in New Mexico. The hospital hired Erasmus knowing of his lengthy record of

malpractice settlements, then allowed him to injure patients, leaving them wheelchair-bound and quadriplegic. Before Ardent's IPO, Erasmus had already:

- Racked up $19.47 million in 26 malpractice settlements;
- Passed out in the middle of performing a surgery;
- Left a patient paralyzed, then nearly killed another patient who had major complications during surgery, requiring transfer to a non-Ardent hospital;
- Been deemed "UNFIT FOR DUTY" in a February 2023 evaluation; and
- Lost his medical license for "manifest incapacity or incompetence to practice medicine," as determined by the New Mexico Medical Board.

11. At another Ardent-owned hospital in New Mexico, doctors avoided or delayed performing medically necessary C-sections to boost Ardent's profits, causing infant and maternal deaths and severe injuries. One mother said her delivery stretched on for hours without progress, and she "begged" for a C-section but didn't receive it, despite various red flags, including signs of fetal heart issues. Her baby died shortly after he was born.

12. At an Ardent-owned hospital in Idaho, patients suffered a series of serious infections resulting from surgical instruments that were contaminated with tissue fragments and dried blood, ultimately leading the Idaho Department of Health and Welfare to find multiple violations of federal regulatory requirements.

13. None of this was disclosed to investors in the Registration Statement. But at the time of the IPO, Defendants Bonick and Lumsdaine knew about the paralyzed patients, infant and maternal deaths and injuries, and patient infections. Bonick ***personally received*** weekly reports of Ardent's Serious Safety Event Rate and healthcare-associated infections, discussed them in his weekly executive leadership team meetings with Lumsdaine and other senior executives, and "actively monitor[ed] company-wide quality metrics," as Ardent admitted to the SEC.

14. Second, in violation of Item 303, the Registration Statement concealed the known, material, negative trend that insurance and government payors were denying an increasing percentage of Ardent's claims for payment. Defendant Bonick later admitted that a "trend[]" of a "sharp increase in denials" started "in the second quarter of 2024," before Ardent's IPO. Yet the Registration Statement, in violation of Item 303, made ***no mention*** of this known, material trend.

15. Payor denials are highly material because they both eliminate revenue and significantly reduce Ardent's margins, since Ardent still bears the full costs of treatment. Ardent's increasing payor denials were driven by its own failures to properly code and process claims and compounded by issues with Ardent's outsourced revenue cycle management vendor, Ensemble Health Partners ("Ensemble")—a vendor personally affiliated with Defendant Bonick.

16. Notably, Bonick and Lumsdaine hired Ensemble in 2022 even after multiple Ardent executives repeatedly warned them not to do so because of Ensemble's cost and underperformance—including elevated denial rates.

17. Specifically, as FE-1—Ardent's former AVP of Revenue Integrity/Revenue Management—explained, from late 2021 until May 2022, Ardent's Chief of Corporate Operations Brian Walton, VP of Revenue Cycle Peter Henry, and other Ardent executives presented Bonick and Lumsdaine with slides showing that Ensemble was underperforming Ardent's in-house revenue cycle team, including with respect to denial rates. (FE-1.) Indeed, in 2021 and 2022, the two markets managed by Ensemble, New Jersey and Florida, ranked last among Ardent's markets, including with respect to denial rates. (FE-1.)

18. Despite knowing that Ensemble's work led to elevated denial rates, Bonick and Lumsdaine hired Ensemble to manage Ardent's entire revenue cycle. The reasons had nothing to do with merit. Instead, Bonick, Lumsdaine, and Ardent's Operations CFO Richard Haun had

longstanding personal connections to Ensemble's founder and CEO, Judson Ivy. All four executives had worked together at Community Health System ("CHS"). Their ties were so intense that Ardent employees believed Haun was getting kickbacks from Ensemble. (FE-1.) And in return for hiring Ensemble, Bonick received a lucrative quid pro quo: a seat on Ensemble's board of directors that paid him hundreds of thousands of dollars per year.

19. The internal warnings proved correct: after Ardent hired Ensemble, its denial rate significantly increased. The problems started with Ardent's flawed programming and were compounded by Ensemble's hasty work, improper coding, minimal internal review, submission of untimely and incomplete claims, failure to timely follow up on large claim denials, and offshoring to India. (FE-3, FE-4, FE-6, FE-9.) A former Ensemble employee tasked with managing claim denials, FE-9, saw a significant increase in denials that started in mid-to-late 2023, in parallel with Ensemble's use of offshore personnel, and never abated. UnitedHealthcare, whose denials in one of Ardent's largest markets had significantly increased in 2024, explicitly told Ardent that the vast majority of its denials—in the high 80% to low 90% range—were because Ardent repeatedly re-submitted the same denied claims instead of fixing the problems. (FE-5.)

20. Ardent's trend of increasing payor denials was known to management before the IPO. Given their financial significance, Ardent's increasing payor denials were closely tracked internally. Defendant Lumsdaine received weekly dashboards that tracked Ardent's denial rates and other key metrics based on the HFMA MAP Keys. (FE-1.) Denial rates were also tracked in detailed Monthly Operating Review packages accessible to Bonick and Lumsdaine from an Ardent shared drive. (FE-1, FE-6.) Further, as Ardent has admitted to the SEC, Bonick and Lumsdaine received monthly reporting packages and attended monthly close meetings that focused on

"variances" to Ardent's budget and "consolidated trends," while Bonick personally reviewed these "variances" to understand "significant trends."

21. Third, Ardent's accounts receivable—one of its largest balance sheet assets—was materially inflated by at least $43 million in aged, uncollectible amounts.

22. As background, Ardent recognizes revenue in the period services are provided based upon the amounts it is to receive from patients and payors; the portion of revenue not yet collected is recorded as accounts receivable until payment is received.

23. A self-described critical aspect of Ardent's operations is the collection of accounts receivable. This includes the framework by which Ardent determines the collectability of such accounts—*i.e.*, whether they will ultimately be paid or must be written off. Timely writing off uncollectible accounts is crucial because failure to do so overstates Ardent's accounts receivable balance.

24. The Registration Statement reported Ardent's accounts receivable balance as $722.7 million and claimed that Ardent used a rigorous, data-driven process—including "detailed reviews of historical collections"—to calculate and determine the collectability of accounts receivable.

25. Instead, however, the Company's accounts receivable framework "utilized a 180-day cliff at which time an account became fully reserved," as Lumsdaine admitted after the Class Period. This allowed Ardent to report higher amounts of accounts receivable during the Class Period and delay recognizing losses on uncollectible accounts. As a result, Ardent's accounts receivable balance was overstated by at least $43 million in the Registration Statement.

26. Under Section 11 of the Securities Act, Ardent is strictly liable for the misstatements and omissions in the Registration Statement, while Defendants Bonick and Lumsdaine are liable because they signed the Registration Statement and acted negligently.

**B. Defendants Continued to Mislead Investors After the IPO**

27. After the IPO raised over $200 million from investors, to sustain Ardent's inflated share price and maintain the illusion that Ardent was a safe, high-quality provider, Defendants pivoted to fraud. In SEC filings and conference calls during the Class Period, Defendants made further misstatements about the safety and quality of Ardent's care; increasing payor denials; and Ardent's aging, uncollectible accounts receivable.

28. For example, as Ardent's payor denials rapidly increased through the second half of 2024 and 2025, Lumsdaine falsely insisted that "there hasn't been an acceleration in denial activity" (Nov. 7, 2024) and that "denials have not accelerated" (May 7, 2025).

29. These statements were outright false. As denials accelerated, by fall 2024, Ardent became an "escalated" client at Ensemble because of issues with coding, claim denials, and other issues, triggering numerous weekly meetings between Ensemble and senior Ardent executives. (FE-4.) And in April 2025, Ensemble presented to Ardent's Board—with ***Defendants Bonick and Lumsdaine in attendance***—on Ardent's increase in denials. (FE-2.) The April 2025 Board presentation broke down Ardent's denials by quarter and showed a very significant increase in denials, and the data from Ensemble did not indicate that Ardent's denials had stabilized in the first part of 2025. (FE-2.) These facts ***directly contradict*** Lumsdaine's statements—made shortly after the April 2025 presentation—that "***denials have not accelerated***" (May 7, 2025) and that "***we haven't seen a significant acceleration*** [in] denial activity" (May 20, 2025).

30. Defendants also knew that Ardent's accounts receivable balance was materially overstated. In March 2025, Lumsdaine admitted—in a text message to Ensemble's founder Ivy—

that Ardent needed to take a substantial accounts receivable writedown. (FE-2.) This admission prompted Ensemble to make an urgent April 2025 presentation to Ardent's Board that ***quantified the writedown and identified a $43 million gap*** between the accounts receivable calculations by Ardent and its new vendor Kodiak. (FE-2.) Bonick and Lumsdaine both attended the April 2025 presentation, and for months afterward, FE-2 attended ***recorded monthly meetings*** with Lumsdaine to discuss the $43 million writedown.

31. None of this was disclosed to investors at the time. Instead, Ardent's SEC filings—signed by Lumsdaine and certified by both Bonick and Lumsdaine—continued to overstate its accounts receivable balance and falsely claimed that its "bad debt expense" was immaterial. Defendants ultimately ***waited at least seven months*** to take the $43 million writedown.

32. Defendants also lied about Ardent's rapidly increasing professional fees—the amounts Ardent pays to physicians, which comprise its second-largest expense (after salaries). Defendants claimed that professional fees were "moderating," had "normalized," and were "not accelerating," even as they continued to rise at an accelerating rate throughout 2025. By mid-2025 (or earlier), Ardent had already signed contracts that locked in significant increases in professional fees for its largest markets (FE-8)—yet even in September 2025, Bonick falsely claimed that such fees were "coming down."

33. Bonick and Lumsdaine were motivated to commit fraud to boost the value of their stock-based compensation, secure nearly $17 million in Performance Restricted Stock Units ("PRSUs")—which were tied to achieving Ardent's 2024 and 2025 Adjusted EBITDAR and net revenue goals—and protect Bonick's lucrative seat on Ensemble's board of directors.

34. In parallel, Defendants set aggressive earnings guidance for 2025, which Lumsdaine publicly described as "***conservative***," and repeatedly assured investors as late as August 2025 that Ardent was "on track" to meet guidance.

35. Behind this positive façade, however, Ardent's business was faltering. Bonick and Lumsdaine knew the truth from attending weekly executive leadership team meetings and monthly close meetings that focused on consolidated trends and the impact and reasons for any variances from Ardent's budget, and from receiving monthly reporting packages with key performance indicators, actual results for the current month, and forecasts for the next month.

36. Tellingly, in summer 2025, Ardent secretly initiated the first of multiple rounds of layoffs, affecting up to 1,000 employees. (FE-5.) Even after the large-scale layoffs, Bonick falsely insisted on August 6, 2025, that Ardent remained "on track to meet our full year 2025 financial guidance, which we are reaffirming today."

### C. When the Truth Was Revealed, Ardent's Share Price Plunged

37. Events in November 2025 finally exposed the highly material, negative facts that Defendants had misstated and concealed since the IPO.

38. On November 12, 2025, after market hours, Ardent recorded a $54 million increase in professional liability accruals "with respect to recent settlements and ongoing litigation arising from a limited set of claims between 2019 and 2022 in New Mexico for a single provider who the Company no longer employs" (*i.e.*, malpractice liability related to Erasmus) as well as "consideration of broader industry trends, including social inflationary pressures," which Lumsdaine admitted were "not new." The $54 million accrual resulted from the material liabilities that Defendants had concealed since the IPO.

39. On November 12, 2025, after market hours, Ardent also reported a 3Q25 earnings miss and slashed its 2025 adjusted EBITDA guidance by $52.5 million, or 8.8% at the midpoint,

citing "persistent industry-wide cost pressures," including "payer denials" and "professional fees"—the same longstanding negative trends that Defendants had previously denied.

40. Last, Ardent revealed a $43 million decrease in third quarter 2025 revenue from revised determinations of accounts receivable collectability after the Company transitioned to the Kodiak revenue accounting system and purportedly "completed hindsight evaluations of historical collection trends." Ardent claimed that Kodiak provided "additional information to more precisely" determine accounts receivable collectability, including "more timely consideration of payor denial and payment trends," and "recognize[d] reserves earlier in an account's life cycle" compared to the Company's prior collectability framework, which "had utilized a 180-day cliff."

41. On this news, the price of Ardent stock fell $4.75 per share, or nearly 34%, from $14.05 per share on November 12, 2025, to close at $9.30 per share on November 13, 2025, on unusually heavy trading volume.

42. As a result of Defendants' misstatements and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiffs and other Class members suffered significant losses and damages.

## II. JURISDICTION AND VENUE

43. This Court has jurisdiction over the subject matter of this action pursuant to: (i) Section 22 of the Securities Act of 1933 (15 U.S.C. § 77v); and, separately, (ii) Section 27 of the Exchange Act of 1934 (15 U.S.C. § 78aa). In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

44. Venue is proper in this District pursuant to: (i) Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)); and, separately, (ii) Section 27 of the Exchange Act (15 U.S.C. § 78aa). In addition, venue is proper pursuant to 28 U.S.C. § 1391(b) because the acts and transactions giving

rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District. Further, Ardent is headquartered at 340 Seven Springs Way, Suite 100, Brentwood, Tennessee, 37027, and therefore is located within this District.

45. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

46. Lead Plaintiff is Dhruv Postiwala. As set forth in the certification attached as Exhibit A, Mr. Postiwala purchased Ardent common stock during the Class Period, and traceable to the Registration Statement (defined below), and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

47. Named Plaintiff Jodi Yost, as set forth in the certification attached as Exhibit B, purchased Ardent common stock during the Class Period, and traceable to the Registration Statement, and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

### B. Defendants

48. Defendant Ardent is incorporated under the laws of Delaware with its principal executive offices located in Brentwood, Tennessee. Ardent's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "ARDT."

49. Defendant Martin J. Bonick was the Company's CEO from August 2020 until his termination on or around June 2, 2026.

50. Defendant Alfred Lumsdaine was the Company's CFO at all relevant times.

## IV. BACKGROUND ALLEGATIONS

### A. Company Background

51. Ardent is one of the largest for-profit hospital operators in the United States. Ardent is a holding company whose affiliates operate acute care hospitals and other healthcare facilities and employ physicians. Ardent and its affiliates operate in mid-sized urban markets across six states: Texas, Oklahoma, New Mexico, New Jersey, Idaho, and Kansas. The Company delivers care through a system of 30 acute care hospitals, approximately 280 sites of care, and over 1,800 providers that are either employed by or affiliated with Ardent.[2]

52. The Company and its affiliates provide both general and specialty services, including internal medicine, general surgery, cardiology, oncology, orthopedics, and emergency services, within inpatient and ambulatory care settings. Ardent also operates a network of ambulatory facilities and telehealth services, including primary and specialty care clinics, ambulatory surgery centers, urgent care centers, free-standing emergency departments, and diagnostic imaging centers.

### B. Ardent's Private Equity Backers Push for Aggressive Financial Results to Fuel a Successful IPO

53. By 2015, private equity fund Equity Group Investments ("EGI") acquired a controlling stake in Ardent. As EGI described the transaction, "[o]n August 4, 2015, EGI partnered with Ventas, a healthcare REIT, to acquire Ardent. Ventas took ownership of Ardent's real estate, and EGI, along with several capital partners, acquired Ardent's operations and entered into a long-term master lease with Ventas." After these transactions, EGI held majority control of Ardent and

[2] As part of its IPO, Ardent changed its name from Ardent Health Partners LLC to Ardent Health Partners, Inc. On June 3, 2025, Ardent changed its name again to Ardent Health, Inc.

appointed four of its ten directors (including the Board Chair), while Ventas held a 9.9% interest in Ardent, appointed one director, and retained the real estate holdings.

54. After a series of hospital acquisitions, Ardent filed for an IPO in December 2018, seeking to raise $100 million. However, Ardent's financial results at the time were weak. For example, Ardent reported just $774,000 in net income in 2017 and a $103 million loss in 2018.

55. Unsurprisingly, these tepid financial results did not stimulate investor interest. Thus, Ardent announced in January 2020 that it was withdrawing the IPO.

56. Nonetheless, Ardent's private equity sponsor continued to push toward an IPO. In service of this objective, as detailed below, Ardent claimed to report improved financial results while pursuing a relentless agenda to cut costs and reduce patients' quality of care.

**1. Ardent's Senior Management Was Replaced.**

57. The process started with installing new management. In August 2020, Ardent's longtime CEO David Vandewater was suddenly replaced by Bonick.

58. In August 2021, Lumsdaine was installed as CFO. Lumsdaine was previously CFO of Quorum Health ("Quorum"), a for-profit hospital operator. Before Quorum, Lumsdaine was Controller (and later CFO) at Healthways, Inc. ("Healthways").

59. Notably, Lumsdaine's tenures at both Healthways and Quorum were tainted by alleged financial manipulation and failures.

60. Healthways was sued for securities fraud in this District. That suit alleged that Lumsdaine (i) made over $275,000 of insider sales; (ii) knew about negative reports and internal forecasts that were contrary to Healthways' public statements; and (iii) "warned one finance executive that he should not put uncertainties in emails due to the potential for litigation." *Beach v. Healthways, Inc.*, No. 3:08-cv-00569, Dkt. 56, ¶¶ 42, 57, 165 (M.D. Tenn.). After the court denied the defendants' motion to dismiss, the action settled for $23.6 million.

61. Quorum also faced a securities class action in this District stemming from its spinoff from CHS. Investors alleged that CHS issued misleading financial guidance and failed to disclose that its goodwill and long-lived assets were impaired, leading to a $250 million impairment charge. Notably, Bonick was a CHS Division President from 2011 to 2017, encompassing the period at issue in the lawsuit. Judge Crenshaw denied defendants' motion to dismiss, and the case settled for $18 million in June 2020. *See Rao v. Quorum Health Corp.*, No. 3:16-cv-02475, Dkts. 145, 335 (M.D. Tenn.).

62. In April 2020, Lumsdaine drove Quorum into Chapter 11 bankruptcy as its CFO. In a declaration submitted to the United States Bankruptcy Court for the District of Delaware, Lumsdaine attributed Quorum's insolvency in part to poor collections, the accumulation of bad debt, and the company's inadequate revenue cycle management system, demonstrating his knowledge of each issue. As detailed below, the same issues recurred at Ardent. Lumsdaine also testified in the Quorum bankruptcy proceedings, which led the judge to state on June 30, 2020, "I want to be clear that after listening to the testimony of Messrs. Rundell, Lumsdaine, and Shiland, and after reviewing the relevant email correspondence I believe that there was . . . a serious lack of judgment" relating to Quorum's failure to disclose $70 million in COVID-related relief funds.

### 2. Defendants Outsourced Ardent's Revenue Cycle Operations to Ensemble in Exchange for a Lucrative Board Seat for Bonick.

63. In February 2022, Ardent took a $500 million investment from UAE-based Pure Health, after which more than 80% of the Company was owned by EGI, Ventas, and Pure Health.

64. With this new investment and new management at the helm, the conditions were again ripe for Ardent to pursue an IPO.

65. Again, after the failed 2018 IPO, the key to a successful IPO was demonstrating improved financial results. To that end, FE-1 explained that Ardent's private equity sponsor EGI

wanted to take the Company public and therefore set aggressive financial targets. FE-1 noted that EGI's targets were communicated in monthly meetings with Bonick and Lumsdaine, then disseminated to FE-1 and other executives, who were tasked with managing their respective areas to hit the targets. For example, FE-1 budgeted the patient revenue for Ardent's hospitals and indicated that the targets for patient revenue were 30% to 50% higher than what was realistic. FE-1 stated that the targets were impossible to meet given the environment, since Ardent had volume issues, was losing providers, and largely had less desirable Medicare and Medicaid payor contracts.

66. Further, to improve Ardent's claimed financial results in advance of an IPO, in May 2022, Ardent outsourced its entire revenue management cycle to Ensemble—a vendor personally affiliated with Bonick.

67. Ardent had initially engaged Ensemble in 2017 after acquiring LHP Hospital Group, where Ensemble had run the books. However, FE-1 explained that Ensemble significantly underperformed at the New Jersey and Florida hospitals that Ardent acquired from LHP. Specifically:

(1) ***Ensemble used revenue management software called Opera (later renamed to EIQ) that generated inaccurate results***. FE-1's team was forced to use the software and quickly found that it generated inflated revenue and purported to identify "lost" revenue that did not exist. FE-1 raised this disconnect with Haun.

(2) ***Ensemble engaged in overbilling and improper coding***. For example, FE-1 discovered that one hospital alone was claiming $10 million in gross revenue that consisted of supply charges for sutures and other items that should not have been billed. Haun repeatedly expressed to FE-1 that Ardent should bill for everything, and if Ardent was paid in error, the payors could try to reclaim the money.

(3) Further, ***Ensemble attempted to raise prices above payors' contractually specified limits*** by implementing 10% price increases across the board.

68. Ensemble's overbilling, improper coding, and price increases led to increased denials at the former LHP hospitals and a gap between their gross and net revenue. (FE-1.) This

gap was shown in Monthly Operational Review ("MOR") reports and financial reporting from Doug Winnett, which went to Bonick and Lumsdaine. (FE-1.)

69. Further, Ensemble consistently underperformed Ardent's in-house revenue cycle teams. After the LHP acquisition, Ardent was using Ensemble for two of its seven markets (New Jersey and Florida) and using in-house revenue cycle teams for the other five markets. (FE-1.) FE-1 explained that in 2021 and 2022, the New Jersey and Florida markets managed by Ensemble ranked last among Ardent's markets—including with respect to denial rates. FE-1 knew this from receiving MOR reporting that included data by market.

70. Despite this history of underperformance, in May 2022, Ardent suddenly outsourced its entire revenue management cycle to Ensemble.

71. This was far from an arm's-length engagement. Bonick and Ensemble founder and CEO Judson Ivy are both "venture partners" in a Nashville-based venture capital firm, Caduceus Capital Partners. Bonick, Lumsdaine, Haun, and Ivy had all worked together at CHS; FE-1 confirmed that Bonick and Haun had met Ensemble's founder Ivy at CHS and worked together for years.

72. Ensemble's sales pitch to Defendants Bonick and Lumsdaine unfolded over a year. As FE-1 explained, around May 2021, Ensemble CEO Ivy started meeting with Bonick and Lumsdaine to persuade them to engage Ensemble across Ardent's hospitals. FE-1 stated that Ensemble met regularly with Bonick and Lumsdaine, as well as Ardent's Board, and claimed that Ensemble could bring in an additional $100 million in annual net revenue for Ardent and deliver nearly $1 billion in additional revenue over 10 years.

73. However, Ardent's internal revenue cycle executives concluded that Ensemble's annual projection was overstated by $60 to $100 million (*i.e.*, 60 to 100%) and largely based on assumptions of overbilling and improper coding. (FE-1.)

74. Thus, Ardent's revenue cycle executives repeatedly cautioned Bonick and Lumsdaine not to hire Ensemble because of its underperformance—including elevated denial rates. (FE-1.)

75. Specifically, from late 2021 until May 2022, Henry, Walton, and other executives warned Bonick and Lumsdaine that Ensemble's $100 million projection was not valid and presented slides showing that Ensemble was underperforming Ardent's in-house revenue cycle team, including with respect to denial rates. FE-1 personally attended some of the meetings with Lumsdaine and learned about other meetings from Walton and Henry when they reported back after meeting with Bonick and Lumsdaine. Based on their experience with the former LHP hospitals (described above), Walton and Henry informed Bonick about Ensemble's overstatements of actual revenue, across-the-board 10% price increases, and unrealistic forecasts. (FE-1.)

76. During the meetings, Bonick and Lumsdaine were presented with PowerPoint slides with side-by-side comparisons that showed Ardent's in-house revenue cycle team was significantly outperforming Ensemble in the markets they handled, including with respect to billing, cash collections and denial rates, as well as data showing that Ensemble was more expensive than Ardent's in-house cost of collection. (FE-1.) FE-1 participated in preparing slides for FE-1's area, which were then provided to Henry, who assembled the final presentation. FE-1 knew about the contents of the final slides because they were available on Ardent's shared drive and recalled that Henry shared their contents. Henry also conveyed to FE-1 after meetings with Lumsdaine that they had discussed denial rates.

77. Further, FE-1 attended meetings with Lumsdaine, Henry, and Revenue Cycle AVP Mac Franklin that focused on the revenue cycle and comparing Ensemble's reporting to Ardent's raw data. These meetings with Lumsdaine flagged that Ensemble was not using Ardent's Epic system as its data source and that Ensemble's results were significantly different than the results from Ardent's in-house revenue cycle team, as further explained in the slides that were presented to Bonick and Lumsdaine (detailed above).

78. FE-3—a Regional Professional Fee Coding Director at Ardent from August 2021 to July 2022, who then moved to Ensemble and serviced the Ardent account until April 2025—corroborated that Walton and Henry were concerned with Ensemble's unrealistic revenue targets and that Walton raised the issue with Bonick, who was displeased.

79. Despite knowing that Ensemble's work led to elevated denial rates and inflated revenue projections, Bonick and Lumsdaine hired Ensemble anyway. The tight personal relationships between Ardent's leadership and Ensemble led numerous Ardent employees to talk about how Haun was getting kickbacks from Ensemble. (FE-1.) Further, even before Ardent signed the contract with Ensemble, Ardent employees were discussing how Bonick would obtain a seat on Ensemble's Board after Ardent signed. (FE-1.)

80. After Ardent hired Ensemble for the full revenue cycle engagement, Bonick's quid pro quo materialized: in July 2023, Bonick received a lucrative seat on Ensemble's Board of Directors that paid hundreds of thousands of dollars per year. Ensemble's filings for a 2021 IPO (which was canceled at the last second) indicate that Ensemble paid its directors up to $500,000 each in annual cash compensation. Similar compensation for Bonick would amount to approximately half of his salary from Ardent.

81. Given the material financial benefit that Bonick received from Ensemble, he refused to accept any criticism of Ensemble. FE-5—Ardent's AVP of Payer Contracts from before the Class Period until August 2024, and Market VP, Payer Strategies from August 2024 until July 2025—stated that no one at Bonick or Lumsdaine's level wanted to hear criticism of Ensemble; Ardent's senior management insisted that Ensemble was "best in class" and doing everything perfectly. While FE-5 and others knew that was not true, they could not say anything without risking their jobs.

82. Indeed, the executives who had opposed Ensemble's engagement quickly departed or lost their jobs. FE-1 noted that Walton ultimately left Ardent after a heated argument about Ensemble at a Board meeting; Walton was asked to leave the room, and a few days later he resigned. FE-3 likewise recalled Walton being pushed out shortly after he raised his concerns to Bonick. Henry also departed in June of 2022. In total, 10 of Ardent's 12 revenue cycle executives at the AVP level and above left or retired after Ensemble was engaged. (FE-1.)

### 3. Ensemble's Broad Role in Revenue Cycle Management

83. In May 2022, Ardent hired Ensemble for a seven-year initial term (automatically renewable for up to four more years). Under Ardent's Master Services Agreement (the "MSA") and Statements of Work ("SOWs"), Ensemble was responsible for the full range of revenue cycle management ("RCM") at Ardent, including:

- Filing claims for payor reimbursements;
- Tracking and processing payor denials of claims;
- Coding, submitting, and pursuing denial appeals/remittances;
- Collecting cash from payors;
- Calculation of unpaid amounts to be recognized as AR;

- Management of AR collections and roll-forwards;
- Preparing income statement line items;
- Loading and maintaining payor contracts and entering data relating to reimbursements, claims processing, and terms; and
- Providing advisory services on collections to in-network physicians.

84. Demonstrating the materiality of Ensemble's role, the SEC specifically required Ardent to file the Ensemble MSA and SOWs as material agreements in connection with the IPO. Further, in the MSA, Ensemble "acknowledge[d] that" its performance "will directly and significantly impact Client's and the Service Recipients' revenue and reputation." And Ensemble collected over 90% of Ardent's revenue: The Registration Statement stated that "[d]uring the year ended December 31, 2023 and the three months ended March 31, 2024, approximately 90.6% and 90.9% of our total revenue, respectively, was collected via the master service agreement with Ensemble." Bonick and Lumsdaine were fully aware of the terms of Ensemble's engagement: The MSA required that Ensemble provide any contractual notices to Ardent's CEO (Bonick), and Lumsdaine signed the MSA on Ardent's behalf.

85. Both the renewal of Ensemble's contract and its compensation were tied under the MSA and SOWs to its revenue collections posted to Ardent's accounting system, Epic. Specifically, Ensemble's base fee amounted to a percentage of Ardent's revenue collections, translating into a substantial dollar amount that made Ardent one of Ensemble's largest clients. Ensemble was also entitled to additional incentive-based fees for reaching certain KPIs.

### 4. Defendants Received Regular Reporting on Denial Rates and Other KPIs from Ensemble and Ardent's In-House Team.

86. The MSA required Ensemble to provide exhaustive monthly reporting to Ardent on KPIs and reporting metrics. Specifically, Section 11.3 provided that "Ensemble shall provide

reports on the following at Monthly Operational Review (as provided in Appendix A): (i) a description of any Reporting Metric Defaults (as defined in the SOW); (ii) summaries of root cause analyses and corrective action plans; (iii) identification of key risks and mitigation strategies; (iv) descriptions of issues requiring immediate resolution by Client or Ensemble; (v) detailed description of the dependencies, responsibilities or Services (or portions thereof) that were unable to be performed as a result of any acts or omissions of Ensemble or Client . . . ; and (vi) and any follow-up reports from previous Reporting Metric Defaults or other performance issues . . . ." Section 11.3 further provided that "The Parties shall meet monthly and review (i) the Performance Report, (ii) overall KPI performance, (iii) the appropriateness of the then existing metrics, and (iv) whether the Parties agree to modify the KPls in any manner."

87. Notably, Ensemble has stated that its "model for partnership governance" includes monthly meetings with the client CFO (*i.e.*, Lumsdaine) and quarterly meetings with the client CEO and CFO (Bonick and Lumsdaine). The same structure existed at Ardent: the MSA required Ensemble to build a "governance model" with multiple committees, including a "Service Delivery Committee" and "Executive Committee." FE-2 confirmed that Ivy and President and Chief Operating Officer Shannon White from Ensemble held monthly executive meetings with Lumsdaine and also met periodically with Bonick; FE-2 received takeaways from these meetings, usually from Ivy's assistant. Further, Section 9.1 of the MSA required an "Ensemble Relationship Manager" to be located on site at Ardent's Nashville headquarters.

88. Former employees detailed the extensive reporting from Ensemble to Ardent. FE-4—a Senior Director of Client Delivery at Ensemble from April 2024 until October 2025 who trained Ensemble personnel who worked on the Ardent engagement—described weekly and monthly meetings attended by executives from both Ardent and Ensemble and noted that Ensemble

executives (including Carrie Meeker) regularly traveled to Ardent's Nashville headquarters, including for end-of-month reporting.

89. FE-1 and FE-6 described Ardent's MORs. Ardent held hospital-specific MORs attended by executives from both Ardent and Ensemble, which involved detailed presentations prepared by Ensemble. FE-6 confirmed that these presentations—which were approximately 30 pages long—included detailed breakdowns of AR and collections (such as showing the percentages of AR collected within 45 days and 90 days and breaking down the aging of AR by payor) and breakdowns of denial rates by type and payor.

90. Separately, Ardent held regional MORs for each of its eight hospital systems where individual hospitals presented their monthly results, forecasts, headwinds and tailwinds. (FE-1, FE-6.) Ardent executive Richard Haun attended the regional MOR meetings. (FE-6.)

91. FE-1 corroborated that both types of MOR meetings involved MOR packets that were ready a few days in advance, were about 30 pages in length, and addressed collections, denials, and write-offs. These MOR packets were accessible to Bonick and Lumsdaine from a shared drive. FE-1 believed the shared drive folder was titled "Monthly Operating Review packets" and included the reports organized by month.

92. In addition, Lumsdaine received periodic reports that included denial rates and other KPIs. FE-1 was copied on periodic emails to Lumsdaine, typically sent by Franklin or Henry, that compared Ardent's in-house revenue cycle performance to Ensemble's performance. FE-1 believed that these emails were sent weekly to Lumsdaine and recalled that they attached dashboards from PowerBI and tracked denials, collections, receivables, coding, and case management using KPIs that were based on guidelines from the Healthcare Financial Management Association (HFMA) called the MAP Keys.

93. The MAP Keys consist of 29 standardized revenue cycle KPIs defined by HFMA, grouped into five areas: Patient Access, Pre-Billing, Claims, Account Resolution, and Financial Management. Importantly, several of these KPIs are squarely related to metrics and trends that Defendants publicly misstated and concealed. For example, the MAP Keys include:

- **Net Days in Accounts Receivable (FM-1)**
    - Defined as the net patient receivable (net AR) divided by average daily net patient service revenue.
    - HFMA indicates that this metric is a "[t]rending indicator of overall A/R performance" that "[i]ndicates revenue cycle (RC) efficiency."
- **Aged A/R as a Percentage of Total Billed A/R (AR-1)**
    - Defined as the total billed AR in each aging category (0-30 days; 31-60 days; 61-90 days; 91-120 days; >120 days) divided by total billed AR.
    - HFMA indicates that this metric is a "[t]rending indicator of receivable aging and collectability" that "[i]ndicates revenue cycle effectiveness at liquidating A/R."
- **Remittance Denial Rate (AR-5):**
    - Defined as the total number of claims denied divided by total number of claims remitted.
    - HFMA indicates that this metric is a "[t]rending indicator of % of claims denied" that "[i]ndicates provider's ability to comply with payer requirements and payers' ability to accurately pay the claim; efficiency and quality indicator."
- **Denial Write-Offs as a Percentage of Net Patient Service Revenue (AR-6)**
    - Defined as net dollars written off as denials divided by average monthly net patient service revenue.
    - HFMA indicates that this metric is a "[t]rending indicator of final disposition of lost reimbursement where all efforts of appeal have been exhausted or provider chooses to write off expected payment amount" that "[i]ndicates provider's ability to comply with payer requirement[s] and payer's ability to accurately pay the claim."

94. The Ardent-Ensemble SOWs confirm that Ardent maintained a series of databases with exhaustive, real-time information about Ardent's business, including "Fiscal Intermediary Standard System (FISS), including DDE; Core HIS platform, Practice Management Systems, Data Warehouse (as required for data extraction); Clarity, Claims clearinghouse, 835/837 storage, financial systems (GL/AP) and ancillary systems that support the revenue cycle." Notably, "837" and "835" refer to detailed claims and remittance information exchanged with payors, confirming that Ardent maintained this data, which was available to the Individual Defendants.

95. Ardent also retained access to information from its Epic system. FE-3 noted that Ardent had real-time access to payor denials through Epic. FE-4 indicated that data on Ardent's revenue, aged and outstanding amounts, and collections was obtained from Epic and reviewed in Ardent's end-of-month meetings with Ensemble.

### 5. Ardent and Ensemble Set Unrealistic Revenue Targets and Failed to Execute, While Ignoring Executives Who Voiced Concerns.

96. After Ensemble was engaged in May 2022, it quickly set unrealistic revenue targets in line with its sales pitch to Ardent—dovetailing with Ardent's desire to boost its purported financial results before an IPO. To that end, Ardent's regional CFOs pushed Ensemble for higher monthly revenue and submitting more claims. (FE-3.) However, Ensemble did not achieve any revenue increase for Ardent. (FE-3.)

97. Rather, Ardent consistently failed to meet the revenue growth targets it set for itself on payor contracts. For example, for new contracts across FE-5's markets, FE-5 was given a target to achieve overall rate increases that averaged to about 6%, and understood the target was set by Lumsdaine and Senior VP for Payer Strategies, Robert Coscione. However, actual revenues were almost always lower than the expected amounts. FE-5 explained that Ardent analyzed its expected and actual revenue from payor contracts as follows:

a. First, Ardent modeled the expected "revenue lift" from a new contract by analyzing the proposed contract terms in light of various historical data points, including utilization and payor denial rates from the prior year. FE-5 indicated that this modeling of expected revenue lift was performed by Director of Payer Analytics Johnna Elmore and her team.

b. Second, once the contract was in place, Ensemble tracked the actual revenue from the contract and whether it matched the expected revenue lift. FE-5 stated that actual revenues were almost always lower than the expected amounts. FE-5 learned of this divergence when other Ardent personnel highlighted it to FE-5's contracts team.

98. Ensemble's inability to correctly code claims, follow up on appeals, and timely collect cash from payors (detailed further below) played a large role in creating the gap between Ardent's expected and actual revenue.

**C. Ardent Raises $208.6 Million in Its July 2024 IPO by Concealing Its Serious Safety, Quality, and Financial Issues from Investors**

99. With new management and Ensemble in place, Ardent boosted its purported financial results, reaching $265 million in net income in 2022 and $129 million in 2023—a dramatic increase from Ardent's $103 million in losses in 2018. Net patient service revenue per adjusted admission also reached $16,307 in 2023, a 35% increase from $12,064 in 2018.

100. At this point, Defendants took Ardent public. The Registration Statement for Ardent's IPO was declared effective by the SEC on July 18, 2024, and Ardent common stock began trading on the NYSE under "ARDT" that day.

101. Ardent's July 2024 IPO raised $192 million from selling 12 million shares at $16 per share. Ardent also offered the IPO underwriters a 30-day greenshoe option to purchase an

additional 1.8 million shares at the $16 offering price, which was exercised in full on July 30, 2024. After deducting underwriting discounts and commissions and offering expenses, Ardent received $208.6 million from the IPO.

102. The Registration Statement misstated and concealed highly material, negative facts and trends going to the heart of Ardent's business, as detailed below. Specifically, at the time of the IPO, Ardent provided unsafe, low-quality treatment to patients—and faced material, undisclosed, and uninsured liabilities as a result. At the same time, Ardent suffered from a declining financial profile due to a series of operational missteps by both Ardent and Ensemble, resulting in significant problems with payor denials and aging, uncollectible accounts receivable.

#### 1. Defendants Falsely Touted Ardent's Safe and High-Quality Care While Concealing Material, Unaccrued Malpractice Liability.

103. Safe, high-quality patient care is the most critical aspect of Ardent's business and highly material to investors. Indeed, the word "safety" appears 56 times—and "quality" appears 172 times—in the Registration Statement.

104. Any safety or quality violation not only harms patients, but risks significant malpractice liability for Ardent. Such malpractice liability is highly material to investors because it inflicts reputational damage and directly erodes Ardent's financial performance. Specifically, while Ardent maintains $100 million in third-party insurance coverage, that coverage is generally subject to a $7.5 million self-insured retention per occurrence. Thus, for every malpractice claim, Ardent is directly responsible for paying the first $7.5 million in liability, which is not covered by insurance, as well as any amounts in excess of coverage.

105. The Registration Statement contained four types of actionable misstatements and omissions related to Ardent's purported safety, quality, and lack of material malpractice liability.

106. First, the Registration Statement boasted that Ardent was "a leading provider of healthcare services in the United States" and touted Ardent's safe, high-quality care, stating:

- "At Ardent, culture, ***safety, quality, and compliance represent the foundation of our platform***."
- "Over our more than 20 years of experience, we have developed a core competency for efficiently and effectively operating healthcare facilities and physician groups to provide ***high-quality patient care that exceeds CMS benchmarks***."
- "***Commitment to delivering the highest quality patient care in a consumer-centric ecosystem.*** Our consumer-centric ecosystem drives better patient experience by improving safety of care, readmission, and mortality rates and ensuring the patient is seen at the appropriate site of care."
- "We maintain ***company-wide compliance and quality assurance programs*** and use patient care evaluations and other ***assessment methods*** to support and monitor quality of care standards and meet accreditation and regulatory requirements."

107. Contrary to these statements, as detailed below, Ardent's hospitals repeatedly provided unsafe, low-quality treatment—including by paralyzing patients, killing and injuring infants and mothers in New Mexico, and infecting patients in Idaho with life-threatening diseases—in service of a profit-driven strategy by Ardent and its private equity backers.

108. Second, the Registration Statement expressly denied that Ardent had any material litigation exposure, stating that Ardent was not a "party to any proceeding that, either individually or in the aggregate, in the opinion of management, could have a material adverse effect on the business, financial condition, results of operations or liquidity."

109. That was false. Ardent's management knew the pattern of patient injuries, deaths, and infections had created material legal liability for the Company—including at least five material malpractice and wrongful death lawsuits pending at the time of the IPO, which carried at least $54 million in liability for Ardent. The Registration Statement concealed these material lawsuits.

110. Third, the Registration Statement stated that Ardent's "professional and general liability accrual for asserted and unasserted claims was $278.5 million," purportedly "representing

the estimated ultimate costs of all reported and unreported claims incurred and unpaid through the respective balance sheet dates, which includes the costs of litigating or settling claims." But in violation of GAAP, Defendants failed to book ***any*** accruals for Ardent's material malpractice and wrongful death lawsuits, and thus understated Ardent's accruals by at least $54 million.

111. Fourth, in violation of Item 303, the Registration Statement omitted the known uncertainty of Ardent's material liability for the safety and quality violations detailed below.

a. Mark Erasmus Seriously Injured Numerous Patients and Generated Large Malpractice Liability.

112. After the Class Period, Ardent belatedly increased its professional liability accruals by $54 million and attributed the increase primarily to the Company's liability for malpractice committed "between 2019 and 2022 in New Mexico" by "a single provider who the Company no longer employs"—Mark Erasmus, a former neurosurgeon at Lovelace Medical Center, a large Ardent-owned hospital in New Mexico.

113. Lovelace employed Erasmus despite knowing that he had racked up dozens of malpractice settlements, passed out during surgery, left victims paralyzed and as quadriplegics, and nearly killed a patient. By the time of Ardent's IPO, the New Mexico Medical Board had stripped Erasmus of his medical license and ***$19.47 million*** in 26 malpractice settlements had been paid on Erasmus's behalf.

114. Ardent's long affiliation with Erasmus started in 2003, when Ardent acquired Lovelace Health System, the operator of several hospitals in New Mexico, which acquired Erasmus's medical practice. By 2007, Erasmus had moved to another hospital system but remained credentialed at Lovelace and regularly performed procedures there. While credentialed at Lovelace, Erasmus was sued repeatedly for malpractice, with millions paid out in settlements.

115. Despite these red flags, Lovelace re-hired Erasmus as an employee in 2019. Lovelace knew of Erasmus's long history of malpractice settlements but chose to hire him anyway. Federal law requires hospitals to query the National Practitioner Data Bank—a national database of malpractice settlements—when physicians apply for appointment and every two years thereafter. 45 C.F.R. § 60.17 (2013).

116. By 2019, when Erasmus joined Lovelace, he was 67 years old and facing visual degradation from his long-term struggle with diabetes. Erasmus had long suffered from diabetic retinopathy and had experienced bilateral retinal hemorrhages.

117. Erasmus's health issues worsened at Lovelace. Four months after starting at Lovelace in 2020, Erasmus went on a one-year medical leave of absence following a diagnosis of lymphoma, for which he was still being treated as of June 2021. He also contracted COVID and had "long COVID" complications during this time.

118. Despite Erasmus's increasing age—he was now 69 years old—and his cancer diagnosis, ongoing chemotherapy, visual degradation, and troubling history of malpractice settlements, Ardent immediately allowed Erasmus back to work in June 2021.

119. This was a profit-driven strategy to continue lucrative neurosurgeries—one of the most profitable practice areas for hospitals. A 2024 academic study concluded that "it is undeniable that the role of an operating neurosurgeon holds significant value for hospital systems."[3] The study found that the median hospital-employed neurosurgeon who performed

[3] *The value of a neurosurgeon: is neurosurgical compensation proportional to value added? A systematic review of the literature and an update on a changing healthcare economy*, JOURNAL OF NEUROSURGERY, Vol. 142: Issue 4 (Nov. 29, 2024).

spinal procedures—like Erasmus—generated an ***additional $4.6 million*** in annual profit compared to general medical admissions.[4]

120. The profit-driven decision to allow Erasmus back to work quickly led to severe patient injuries as he continued to commit malpractice. In January 2022, Erasmus passed out in the middle of performing a surgery. Nurses had to catch him before he hit the ground and place him in a wheelchair while another doctor closed up the patient (who was never notified).

121. After Erasmus passed out during surgery, Lovelace did nothing to notify patients or suspend Erasmus' credentials. Shortly thereafter, in February 2022, Erasmus performed spinal fusion surgery on a 52-year-old mother named Diane Gutierrez. The botched surgery left Ms. Gutierrez paralyzed and unable to walk, leading to a malpractice lawsuit filed in February 2023.

122. After paralyzing Ms. Gutierrez, in September 2022, Erasmus nearly killed another patient who had major complications during surgery.

123. Only at this point did Lovelace finally force Erasmus to undergo fitness-for-duty and neuropsychological evaluations. A September 2022 letter from Lovelace Medical System Chief Medical Officer Sandoval to Erasmus described serious questions about Erasmus's safety and competence to practice based on the incident where Erasmus passed out during surgery and the patient who had major complications and had to be transferred to another hospital.

124. Both evaluations found Erasmus unfit to practice. The fitness for duty evaluation from the PACE program at UC San Diego (dated February 6, 2023) specifically found Erasmus to be "UNFIT FOR DUTY" (emphasis in original), meaning that illness "interferes with the physician's ability to safely perform most or all of the duties of his or her job. The physician presents a ***significant risk*** to patients, self, and others."

---

[4] *Id.* Table 2.

125. Between 2021 and 2023, Erasmus was sued nine more times for medical malpractice. In total, by September 2023, $19.47 million had been paid on Erasmus's behalf in 26 malpractice settlements.

126. The New Mexico Medical Board (the "Medical Board") initiated a complaint in January 2023 against Erasmus based on the number of medical malpractice cases against him and the large amount of settlement payments. In September 2023, the Medical Board notified Erasmus that he was "not fit to practice medicine" and that his license was subject to revocation.

127. Nonetheless, Erasmus disputed the Board's notice, forcing an evidentiary hearing on December 7, 2023. On April 15, 2024, the Medical Board revoked Erasmus's medical license and found "by a preponderance of the evidence that Respondent [Erasmus] exhibits manifest incapacity or incompetence to practice medicine as a licensee in the State of New Mexico."

b. Other Ardent Doctors Killed and Injured Babies and Mothers in New Mexico.

128. Tragically, Ardent's disregard of patient safety also led to a series of infant and maternal deaths and severe injuries at Ardent-owned Lovelace Women's Hospital in New Mexico, which avoided or delayed performing medically necessary C-sections to boost Ardent's profits.

129. In one case filed before the IPO, the mother, Domonique Llamas, "begged" for a C-section during an hours-long delivery but was not given one, leading to her baby dying shortly after birth. Llamas sued Ardent (under its corporate name at the time, Ardent Health Partners LLC) and four of its subsidiaries. In January 2026, the *Santa Fe New Mexican* reported an interview with Ms. Llamas:

> In an interview Friday, Llamas said she felt powerless and left in the dark during her delivery, which stretched on for hours without progress, and she "begged" for a C-section and didn't receive it. Her medical records showed various red flags which should've prompted a C-section, Hacsi said, including signs of fetal heart issues.

> It was Llamas' first delivery, and she and the baby's father, Jeremy Cleage, had gone to the hospital expecting it to go smoothly. Her baby was born without a cry.
>
> "It made me angry," Llamas said through tears. "I mean, they're still making the same mistakes and almost right after each other, too. ... There's just too many babies dying at the hospital."

130. Another case, filed in December 2025 against Ardent and four subsidiaries, plus Ardent-owned Lovelace Women's Hospital, arose from the hospital's delay in administering a C-section during extended labor, despite the baby's rising heart rate. The baby was born without a pulse, requiring 12 minutes of resuscitation and two doses of epinephrine to restore his heartbeat, and he suffered oxygen deprivation and severe brain damage as a result. The case is currently pending against both Ardent and Lovelace entities and is in the midst of discovery. The lawsuit alleges that "Ardent Health Services receives the profits derived from Lovelace procuring a low C-section rate at the expense of the health and safety of its patients."

131. Concerningly, the lawsuit also alleges that Lovelace Women's Hospital silences and retaliates against nurses and other whistleblowers who speak up, obscuring the true extent of the problem: "Lovelace has also systematically disenfranchised, intimidated, and ignored nurses who report concerns regarding the safety of women in labor or their babies."

132. Lovelace Women's Hospital has also been implicated in maternal deaths prior to the IPO. In November 2023, Ashley Griego, a 32-year-old mother, died two days after giving birth when Lovelace Women's Hospital allegedly gave her a large dose of the wrong medicine, which led to amniotic fluid entering her bloodstream, abnormal blood clotting, and severe liver damage. Ultimately, Ms. Griego's heart stopped and she died.

133. The unsafe conditions for mothers and babies at Lovelace Women's Hospital predate these lawsuits. In total, at least 23 lawsuits have been filed against Lovelace Women's Hospital's labor and delivery unit since 2011. Further, a 2021 investigation revealed that

extremely premature babies at Lovelace Women's Hospital died at twice the rate of those at nearby Presbyterian Hospital. The same report found that compared to Presbyterian, Lovelace Women's Hospital had to transfer more than three times as many infants to the University of New Mexico Medical Center, reflecting its inability to provide adequate care. Practitioners from Lovelace Women's Hospital told investigators that those transfers were often made much later than they should have been.

c. Pervasive Contamination and Patient Infections in Idaho.

134. Ardent's emphasis on profit over safety included hospitals outside of New Mexico. In Idaho, patients at Ardent-owned Portneuf Medical Center ("PMC") suffered a series of infections resulting from surgical instruments that were ***contaminated with tissue fragments and dried blood and not properly sterilized***.

135. Lawsuits filed in 2026 detailed these unsafe practices and alleged that PMC silenced and retaliated against employees who had raised concerns. For example, one action (filed in 2026) alleges that in 2021 and 2022, Dr. Jonathan Morgan began noticing a ***sharp increase in post-operative infections among neurosurgical patients*** and multiple irregularities in operating-room procedure, including damaged instrument wrappers, punctured pan covers, and ***visibly unclean surgical instruments***—which he reported internally—and that Dr. Morgan continued raising concerns about PMC's contaminated trays, unexplained infections, cancelled culture orders, and unsafe staffing throughout 2022 and 2023. *See Morgan v. Ardent Health Partners, Inc.*, No. 03:26-cv-00276, Dkt. 1, ¶¶ 31-33 (Idaho Dist. Ct., Bannock Cty.).

136. Concerns about contamination were repeatedly escalated to PMC leadership to no avail. By March 2025, Dr. Morgan met with PMC Chief Medical Officer Dr. Roger Passmore and other administrators to discuss unsafe staffing and infection control. After the meeting, however, ***multiple neurosurgical patients developed severe post-operative infections*** caused by organisms

such as MRSA (methicillin-resistant *Staphylococcus aureus*), Serratia, Enterobacter, Acetobacter, and Pseudomonas, which Dr. Morgan described as aggressive, deep infections requiring washouts, prolonged IV antibiotics, and in some cases emergency re-operations.

137. In response, PMC leadership retaliated and tried to bury the contamination issue. When Dr. Morgan ordered microbial cultures of surgical instrument trays to determine whether contamination originated in the Sterile Processing Department, Dr. Passmore personally cancelled the orders. However, Dr. Morgan ultimately obtained cultures from PMC's hospital laboratory that returned ***positive for Staphylococcus aureus (including MRSA) and Streptococcus species***, the same organisms found in numerous post-operative infections. In May 2025, Dr. Morgan observed that ***surgical instruments labeled "sterile" contained visible biological residue***; photographic documentation was submitted to PMC administration. *Id.* ¶¶ 78-79, 93.

138. A second action, filed in 2026 by Dallin Caudle, similarly alleges that around the beginning of 2023, Dr. Morgan and other surgical staff at PMC noticed significant problems with the sterilization of tools and items used on or in patients. Caudle noticed ***visible residue, caked-on blood***, and incomplete disassembly of medical implements, tools, and devices. Caudle further alleges that in late spring of 2025, after a surgery involving a young immuno-compromised trauma patient, Caudle discovered ***bioburden and dried blood*** inside an instrument that had been certified as sterile. Approximately ***seventy percent of instrument pans tested returned positive*** for waterborne bacteria. *See Caudle v. Ardent Health Partners, Inc.*, No. 03:26-cv-00199, Dkt. 4, ¶¶ 34, 66, 79 (Idaho Dist. Ct., Bannock Cty.).

139. Corroborating these unsafe practices, in September 2025, the Idaho Department of Health and Welfare investigated PMC and found that surgical instruments were contaminated with tissue fragments, leading to patient infections. The Department found that "Incident reports

revealed there were numerous discoveries of bioburden (tissue fragments) on surgical instruments that were supposed to be clean and sterile. Additionally, the infection control officer noticed an increase in surgical site infections."

140. The Department transmitted these findings to PMC's CEO, Nate Carter, and included a Statement of Deficiencies/Plan of Correction Form CMS-2567, the form used to document violations of health and safety regulation requirements for Medicare certification. Carter signed and acknowledged the Department's findings on September 29, 2025. The Form CMS-2567 found three specific deficiencies at PMC.

141. First, PMC violated patients' "right to receive care in a safe setting" because a patient "experience[d] prolonged anesthesia time due to hospital error and without a documented benefit to the patient. This had the potential to affect all patients receiving services at the hospital."

142. Specifically, after the incision was made, a technician informed the surgeon that the surgical instrument contained "biological material [tissue fragment]," requiring additional "processing for appropriate cleansing and sterilization." The patient then remained under anesthesia for several hours (from 8:23 AM to 12:00 PM) while the instruments were reprocessed. When the surgery was finally restarted, the patient experienced "significant hypotension" (low blood pressure), such that the surgery could not be completed, requiring a second surgery one week later. The patient ultimately stayed in the hospital for twelve days.

143. Notably, the Department identified a misstatement in PMC's medical records: the surgeon claimed that the patient "tolerated the procedure well" and "there were no complications," but in reality, "the procedure had to be aborted prior to completion due to extreme hypotension."

144. Second, PMC "failed to maintain a clean and sanitary environment to avoid sources and transmission of infection. This failure had the potential to impact all patients receiving surgery

in the hospital placing patients at risk for infection." The Department identified a "white substance accumulated on" a "commercial cart washer" in the "sterile processing area," with a staff member stating that "it was difficult to clean."

145. Third, PMC "failed to ensure adherence to its infection control policies and procedures by allowing a physician to utilize IUSS [Immediate-Use Steam Sterilization] for a surgical instrument outside of emergency circumstances. Additionally, the facility failed to follow recognized standards of practice for reprocessing of surgical instruments."

146. Specifically, PMC "failed to ensure IUSS was used for emergency situations only." Because IUSS poses an increased risk of patient infection, its use is strictly limited. However, PMC "permitted the use of IUSS for convenience," allowed a physician to use IUSS without an emergency, and failed to "provide evidence of documented reeducation or corrective action." "This failure to enforce infection control standards and staff accountability placed future patients at risk for surgical site infections."

147. PMC also failed to follow "[p]roper precleaning guidelines for surgical instruments." In particular, the Department observed "3 containers each containing ***multiple surgical instruments which were visibly soiled with dried blood***" and not kept moist, as required, "between use in the OR and decontamination." PMC also used "the incorrect concentration of enzymatic cleaner to water" to clean the soiled instruments.

148. While the Department's investigation of PMC concluded in 2025, and thus focused on recent examples of unsafe practices, the *Morgan* and *Caudle* lawsuits discussed above make clear that the same violations began as early as 2021 and occurred continuously thereafter.

d. <u>Defendants Knew About the Patient Deaths, Serious Injuries and Infections.</u>

149. Defendants Bonick and Lumsdaine, and other senior Ardent executives, knew about the patient deaths, serious injuries and infections detailed above.

150. Ardent told the SEC on April 26, 2024, that CEO Bonick "***actively monitors company-wide quality metrics and discusses these metrics in his weekly executive leadership meetings***," and "***key metrics are reported to the CEO on a weekly basis***. Such quality metrics reported to the CEO [Bonick] include ***Healthcare-associated infections ("HAI") Rollup,*** Employee Safety and ***the Serious Safety Event Rate***, which are at a consolidated entity level."

151. The Serious Safety Event Rate (SSER) measures the number of "Serious Safety Events" per 10,000 adjusted patient days over the previous 12 months.[5] Serious Safety Events are "events occurring from a ***deviation from generally accepted performance standards and resulting in moderate to severe patient harm or death***." Erasmus's paralysis of patients at Lovelace and the deaths and serious injuries of infants and mothers at Lovelace Women's Hospital constitute Serious Safety Events included in Ardent's SSER.

152. Healthcare-associated infections (HAIs) are "infections that patients get while or soon after receiving health care," which "are a ***serious threat to healthcare safety***."[6] The infections at PMC—caused by using surgical instruments contaminated with biological residue and dried blood—were HAIs.

153. From Bonick's active monitoring, weekly reporting of the SSER and HAIs at Ardent-owned hospitals, and weekly executive leadership discussions, Bonick and Lumsdaine knew in near-real time about the misconduct that paralyzed Ms. Gutierrez and other victims of

---

[5] https://dl.icdst.org/pdfs/files4/870b0f29a989bc0aadb758876423f054.pdf

[6] https://www.cdc.gov/healthcare-associated-infections/about/index.html

Erasmus, killed and injured babies and mothers at Lovelace Women's Hospital, and infected patients at PMC.

154. Further, Ardent used "Trideo as a serious reportable event workflow and alert system," as Ardent told the SEC in April 2024. Trideo's event reporting module provides reporting of "adverse events, near misses and unsafe conditions," with "[a]utomated alerts and notifications," "comprehensive aggregate reports," and the ability to "[d]rill down to occurrence details to easily determine causal factors[.]"[7] "[A]ll event related data" is accessible "on Trideo's web-based platform," "analytics features" can "drill down to specific event categories, severity levels," or "departments," and "key information" from Trideo can be shared with "executives" and "committees" by "exporting data to Excel or through print-friendly report summaries."[8]

155. Ardent's leadership at the hospital level also knew about the deaths and serious injuries described above. For example, hospitals in the Lovelace system had a so-called Quality Assurance Performance Improvement (QAPI) Council and a Medical Executive Committee, both of which were required to discuss "[u]nanticipated deaths," "[a]dverse events," and "near misses." A July 2022 CMS inspection report for Lovelace UNM Rehabilitation Hospital cited QAPI Council minutes stating that "Grievances, Unanticipated deaths and Adverse events/near misses are discussed," including "19 adverse events" in one month alone—although "[t]he minutes show no discussion of the issues of concern or ongoing plan for dealing with issues." Minutes from the hospital's Medical Executive Committee state that "***Trideo (Incident Reporting System) reporting events have gone up***."

[7] https://www.trideosystems.com/event-rpt.html

[8] *Id.*

156. Further, Lovelace Women's Hospital was operating under an April 2024 settlement that required it to (1) maintain monthly data on fetal demise to determine whether delay in C-sections was impacting fetal death, and (2) pay $10 million.

157. Confirming that Ardent's senior leadership was aware of the serious safety and quality failures detailed above, hospitals in all of Ardent's networks were accredited by the Joint Commission, a healthcare organization whose "Sentinel Event Policy" explicitly requires the "***[n]otification of organization leaders***" and "[i]mmediate investigation" of so-called "sentinel events."

158. Under the Sentinel Event Policy, a "sentinel event is a patient safety event (not primarily related to the natural course of a patient's illness or underlying condition) that ***reaches a patient and results in death, severe harm*** (regardless of duration of harm), ***or permanent harm*** (regardless of severity of harm)." Notably, the "[u]nanticipated death of a full-term infant"—such as the infant deaths at Lovelace—is specifically identified as a sentinel event.

159. The Policy also requires Ardent's hospitals to "complete a thorough comprehensive systematic analysis (most commonly a root cause analysis) to determine why the event occurred," and to "create a corrective action plan to prevent similar events from happening again, implement the plan, and monitor its effectiveness." These required steps underscore that patient deaths and serious injuries at Ardent's hospitals were extensively documented and known to leadership.

e. <u>Patient Deaths and Harm Resulted from Ardent's Consistent Lack of Effective Safety, Quality Assurance, and Compliance Programs.</u>

160. The abuses detailed above were the result of a strategy by Ardent and its private equity backers to cut costs, maximize short-term profits, and inflate Ardent's share price. They resulted from the absence of basic safety, quality assurance, and compliance controls, including to

test doctors' fitness to practice; perform C-sections when medically necessary; and properly sterilize surgical instruments.

161. The absence of such safeguards was consistent at each Ardent-owned hospital and dictated by Ardent's corporate leadership. As the Registration Statement explained, Ardent maintains "***systematic policies and procedures*** at each hospital we acquire," including "quality assurance," "safety and compliance programs," and "personnel management"; "[t]hese ***uniform policies and procedures*** are designed to provide [Ardent] with consistent management and financial reports for all our facilities and facilitate the performance evaluation of each facility."

f. Ardent Failed to Disclose Loss Contingencies and Record Professional Liability Accruals in Violation of ASC 450.

162. By the time of its July 2024 IPO, Ardent faced material liability from Erasmus's botched procedures, the infant and maternal deaths and injuries at Lovelace Women's Hospital, and pervasive contamination issues in Idaho, as detailed above.

163. To ensure that potential losses are disclosed to investors, ASC 450 is a GAAP provision that requires disclosure and accruals for loss contingencies. Specifically, ASC 450-20 required Ardent to (1) disclose "reasonably possible" losses, including the "nature of the contingency" and an "estimate of the possible loss or range of loss" (FASB ASC 450-20-50-2; 450-20-50-4), and (2) accrue a liability for loss contingencies that are "probable" and "can be reasonably estimated" (FASB ASC 450-20-25-2).[9]

164. Ardent violated both requirements.

[9] A contingency is defined as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." (FASB ASC 450-20, Glossary.) A loss is "reasonably possible" when "[t]he chance of the future event or events occurring is more than remote but less than likely" and "probable" when "[t]he future event or events are likely to occur." (*Id.*)

165. First, the Registration Statement did not disclose ***any*** loss contingency related to Erasmus, infant and maternal mortality, or patient infections—and made ***no mention*** of the five lawsuits that had already been filed at the time of the IPO. At minimum, these loss contingencies were "more than remote," and ASC 450 required disclosure of their existence and the possible loss or range of loss. (FASB ASC 450-20-50-2.) SEC staff have noted that "[v]ague or overly broad disclosures that speak merely to litigation, tax, or other risks in general, without providing any information about the specific loss contingencies being evaluated are not sufficient."[10]

166. To be clear, Defendants had no factual basis to conclude that Ardent's liability was "remote" or immaterial. As detailed above, the underlying facts were known to Ardent's leadership. Bonick received weekly reports on serious safety events and infections and actively monitored those metrics, while Bonick and Lumsdaine discussed them in weekly executive leadership meetings. Ardent's Trideo system catalogued adverse events and provided automated alerts, notifications, and analytics. Adverse events were tracked and monitored by hospital leadership, and Lovelace Women's Hospital was specifically required to track fetal deaths. And the Sentinel Event Policy required Ardent's hospitals to notify leadership, immediately investigate, and comprehensively analyze all safety events that caused death or severe patient harm.

167. By the time of the IPO, at least five lawsuits arising from the Erasmus and Lovelace mortality issues were pending, and in each case, Ardent was directly responsible for paying the first $7.5 million in liability under its self-insured retention. Several lawsuits had reached an advanced stage before the IPO. For example, the lawsuit brought by Ms. Gutierrez—whom Erasmus had paralyzed and left unable to walk—had been pending for 17 months; the court had

---

[10] SEC Staff, Remarks at the University of Southern California Leventhal School of Accounting SEC and Financial Reporting Conference, May 27, 2004.

denied Ardent's motions to dismiss; and the plaintiffs had filed multiple motions to compel, taken several fact depositions, and moved for summary judgment. A lawsuit filed in March 2022 by Cornelius Foster, another Erasmus victim, had been pending for over 27 months, and a special master had issued four discovery orders. And Ms. Llamas—whose baby died due to Lovelace's delay in performing a C-section—had sued Ardent and four of its subsidiaries, including Lovelace Health System, and the case was actively proceeding, with Lovelace serving discovery responses. These lawsuits were subject to disclosure (and accrual) under ASC 450.

168. Ardent also knew additional lawsuits were likely based on the number of victims harmed or killed at its hospitals, Erasmus's long history of malpractice lawsuits and high-dollar settlements—he was sued nine times for medical malpractice between 2021 and 2023 alone, and by September 2023, $19.47 million had been paid on his behalf in 26 malpractice settlements—and New Mexico's three-year statute of limitations.

169. Second, Defendants failed to record ***any*** accrual to reflect the cost to Ardent of these claims—which was at least $54 million—despite the fact that the loss contingencies were both probable and reasonably estimable.

170. Again, several of the pending cases had reached advanced stages at the time of the IPO; as detailed above, Erasmus had a history of large malpractice settlements; and the facts of patients' paralysis and the infant mortality at Lovelace were not seriously in dispute. Ardent was also directly responsible for the first $7.5 million in liability in each case.

171. Demonstrating that Ardent failed to accrue any amounts for the pending cases, when it suddenly recorded a $54 million increase in professional liability accruals after the Class Period, Ardent also revealed that it had paid "premiums and retention costs" of $64.2 million in 3Q25—a $39.9 million increase from the prior quarter. The close match between these increased

payments and Ardent's increased accrual indicates that both the accrual and payments (a) reflected self-insured amounts that Ardent owed directly, with no insurance, and (b) were primarily for cases where Ardent had accrued nothing before settlement.

172. To be clear, Ardent's probable and reasonably estimable liability did not suddenly increase from zero to $54 million in a single quarter. Instead, Ardent simply waited to record any accrual until it had already settled the cases for substantial sums.

173. The purpose of ASC 450 is to prevent such blindsiding. As PricewaterhouseCoopers has stated, "[t]he SEC staff also cautions reporting entities that ***the recording of a material accrual for a contingent liability should typically not be the first disclosure regarding the material contingency.*** A foreshadowing disclosure that precedes an accrual for a material contingent liability is typically expected."[11] Ardent made no foreshadowing disclosure, leaving investors in the dark about the Company's material, unaccrued liability.

174. Ardent's failure to disclose ***any*** loss contingencies, failure to disclose an estimate of the possible loss or range of losses, and failure to record any accrual are particularly egregious because the SEC specifically cautioned Defendants to comply with ASC 450 shortly before the IPO. In an April 12, 2024 comment letter addressed directly to Bonick, the SEC stated:

> Please revise your disclosures to clearly state whether you are subject to any claims, litigation matters or other matters that are probable and/or reasonably possible of materially impacting your results of operations, financial position, or liquidity either individually or in the aggregate. ***If there are matters that may be material to your results of operations, financial position, or liquidity, provide specific disclosures for these matters. Disclosures for the amount or range of reasonably possible loss in the aggregate, or that you are unable to reasonably estimate the amount or range, should also be provided***, noting that ASC 450-20-50-4 does not

[11]https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/financial_statement_/financial_statement___18_US/chapter_23_commitmen_US/234_contingencies_US.html

require the amount or range of reasonably possible loss to be estimated with precision or certainty.

175. Ardent made no such disclosure. To the contrary, in the Registration Statement (and in every quarterly and annual report during the Class Period), Defendants stated that "the Company does not believe that it is party to any proceeding that, either individually or in the aggregate, in the opinion of management, could have a material adverse effect on the business, financial condition, results of operations or liquidity."

176. This purported "opinion" had no factual basis and omitted the material facts that (1) Erasmus had already been sued dozens of times for malpractice, with $19.47 million in settlements paid out; passed out in the middle of surgery; left a patient paralyzed and nearly killed another; been deemed "UNFIT FOR DUTY" in a third-party evaluation; and lost his license to practice medicine for "manifest incapacity or incompetence"; (2) Ardent and Lovelace had been sued for delaying medically necessary C-sections at Lovelace Women's Hospital, leading to infant deaths and injuries; (3) concerns about contaminated surgical instruments and resulting patient infections at Ardent's PMC facility in Idaho were documented and reported to hospital leadership; and (4) at least five material cases were pending at the time of the IPO, yet Ardent failed to accrue any amounts for those cases, or even disclose their existence, both in violation of ASC 450.

**2. Ardent Faced Rapidly Increasing Payor Denials.**

177. Ardent's revenue is primarily comprised of net patient service revenue, which the Company purportedly recognizes in the period in which it provides services and based upon the amounts it expects to receive from patients and third-party payors.

178. A key factor impacting Ardent's revenue is the rate of payor denials. When payors (either commercial entities such as Aetna and Blue Cross Blue Shield, or government payors like Medicare and Medicaid) deny Ardent's claims for payment, Ardent loses the revenue from those

claims. Even if Ardent successfully appeals the denial—which is relatively uncommon—at minimum, any payment to Ardent is significantly delayed. And because Ardent still bears the full costs of treatment even if payors refuse payment, denials significantly reduce Ardent's margins.

179. Before the July 2024 IPO, Ardent's payor denials sharply increased. Indeed, after the Class Period (on November 13, 2025), Bonick belatedly admitted that Ardent had experienced "a ***sharp increase in denials beginning in the second quarter of 2024***"—before the IPO. Ardent's related earnings presentation likewise admitted "***a significant step-up in denials beginning in 2Q24***." On November 18, 2025, Bonick reiterated that Ardent had experienced "***elevated trends*** [in denials] that started roughly in late Q2 of last year [2024]." And on June 10, 2026, Lumsdaine admitted that Ardent "saw a ***big step-up***" in payor denials "in the ***first half of 2024***." Yet the July 2024 Registration Statement, filed over two weeks after the second quarter ended, made ***no mention*** of this material, negative trend that existed at the time of the IPO.

180. Former employees confirmed that Ardent's increase in payor denials started well before the second quarter of 2024. As detailed above, in May 2022, Ensemble assumed responsibility for Ardent's claims submissions to payors (including appeals of claims denials). FE-3 stated that Ensemble ran things "like a bull in a china shop" and merely offshored a large portion of coding work to overseas vendors at much cheaper rates.

181. FE-3 described several problems at Ardent and Ensemble that led to improperly coded claims and ultimately drove higher payor denials.

182. <u>First</u>, a flaw in Ardent's programming led to incomplete diagnosis information and Ensemble's process prevented correct coding of claims. For example, FE-3 explained that when doctors ordered EKGs for chest pain, the coding team needed to review the EKGs to determine

the actual diagnosis and code it. However, to keep costs down, Ensemble decided to code based only on the ordering diagnosis and submit claims without reviewing the actual EKG records.

183. Second, Ensemble instructed its coders to upcode Ardent's claims for sick visits as part of Medicare annual wellness appointments. FE-3 recalled that this practice started in late 2022; FE-3 raised concerns about this upcoding with Ensemble's VP of Coding Services, Julie Appleton, leading to FE-3 being transferred to cardiology.

184. Third, FE-3 explained that payors typically require claims to be filed within 90 days and deny claims filed late. However, many of Ardent's claims were close to—or past—the 90-day deadline during Ensemble's work. This led to hasty efforts to push out incomplete, improperly coded claims with no review.

185. The result of the flawed coding was increased payor denials for Ardent. FE-3 could tell that Ardent's denial rates were increasing based on the flawed and unreviewed coding submitted to payors. FE-3 noted that Ardent had real-time access to payor denials through the Epic platform.

186. FE-3 explained that Ensemble pushed coders to "just work the edit and get it out the door," while ignoring other defective codes that often led to rejection. For example, FE-3 observed claims where Ensemble fixed one issue, but the claim also included five other defects that were not corrected. As FE-3 remarked: "You knew this is a denial coming because nothing is being looked at."

187. FE-3 regularly talked to other directors outside the cardiology area, who reported similar issues with claims. Due to Ensemble's tactics and the volume of defective claims, the team under Ardent's Compliance Director, Cindy Willis, had to perform an extreme amount of audits and file many corrective claims, requiring them to hire more auditors.

188. Similarly, FE-9—an Accounts Receivable Denials Specialist at Ensemble who worked on the Ardent account from 2022 until 2025—observed a significant increase in Ardent's denials that started in mid-to-late 2023, in parallel with Ensemble's use of offshore personnel. For example, FE-9 covered most of Ardent's hospitals in Texas and had a queue of about 1,000 to 1,500 denials, but by mid-to-late 2023, the denials increased by ***200 to 300 additional claims per day*** for FE-9's hospitals alone.

189. These additional denials were transferred to an Ensemble offshore team in India, but the offshore team was ineffective at resolving the payor denials. For example, the offshore workers were supposed to call payors to follow up on denials, but in practice, they never called due to the difference in time zones: as FE-9 explained, the offshore workers were working in the middle of the night in the U.S., when the payors were not open.

190. The result was that Ardent's denials continued to increase, with any denials that were processed being replaced at a faster rate by new ones. For FE-9's hospitals, throughout 2024 and 2025, the sum of outstanding denials between FE-9's queue and the denials transferred to the offshore team continued to increase, and there was no period of time with a decrease in this number.

191. FE-9 also indicated that coding errors were the most frequent reason for payor denials and, corroborating FE-3, stated that Ensemble instructed coders to fix only one error at a time, even if other errors were apparent on the face of the claim. This predictably led to another denial. Ensemble also instructed denial personnel to resubmit denied claims to payors. (FE-9.)

192. Corroborating these accounts, FE-5 confirmed that Ardent experienced a significant increase in denials from UnitedHealthcare in Oklahoma, one of Ardent's largest markets. FE-5 met with UnitedHealthcare in mid-to-late 2024 to discuss trends in Oklahoma and

learned that Ardent was re-submitting the same denied claims repeatedly instead of fixing the problems that led to the denials. UnitedHealthcare explained to FE-5 and the other attendees that duplicative claims accounted for the vast majority of Ardent's denials—in the high 80% to low 90% range for 2024 year-to-date.

193. However, when FE-5 raised the issue with Ensemble and asked them to confirm or deny it, there was a long silence—and the Ensemble personnel hung up and never followed up with FE-5. After the 2024 meeting with UnitedHealthcare, FE-5 did not see any improvement in denial rates.

194. Notably, other health systems saw ***decreasing*** denial rates in the period leading up to Ardent's IPO. In a July 2024 KPI Scorecard, Kodiak Solutions—a healthcare services company—reported denial rates from more than 1,850 hospitals and more than 250,000 physician users of the Kodiak Solutions Benchmarking Intelligence Program.

195. Across this broad national data set, Kodiak reported that denial rates had either decreased or held constant on both a month-over-month and year-over-year basis as of May 2024. Specifically, Kodiak reported:

| KPI | April 2024 | May 2024 | Month-over-month change | Year-over-year change |
|---|---|---|---|---|
| Initial denial rate | 11.9% | 11.5% | 3.4% | 0.0% |
| Initial denial rate (prior authorization/precertification) | 1.4% | 1.4% | 0.0% | 17.6% |
| Final denial write-offs (% of net patient service revenue) | 2.7% | 2.5% | 7.4% | 19.4% |

196. Ardent's ***increasing*** denial rate before its IPO was directly contrary to these industry trends and materially reduced the value of Ardent's business. Yet the Registration Statement said nothing about this highly material trend.

### 3. Ardent's AR Balance Was Inflated with Uncollectible Amounts.

197. Another critical aspect of Ardent's operating performance is accurately calculating and collecting accounts receivable ("AR") from payors.

198. The amount and collectability of Ardent's AR is highly material to investors. Accounts receivable comprised one of the largest assets on Ardent's balance sheet at the time of the IPO (reported as $722.7 million as of March 31, 2024), and Ardent stated that the "collection of accounts receivable, primarily from Medicare, Medicaid, managed care payors, other third-party payors, and patients, is critical to our operating performance."

199. To assure investors of the integrity of Ardent's reported AR, the Registration Statement emphasized that Ardent's management followed a rigorous, data-driven process to calculate and determine the collectability of AR. For example, it stated: "We ***routinely review accounts receivable balances*** by monitoring historical cash collections as a percentage of trailing net operating revenue, as well as by analyzing current period revenue and admissions by payor, aged accounts receivable by payor, days revenue outstanding, and the composition of self-pay receivables."

200. The Registration Statement further stated that to determine the collectability of accounts receivable, Ardent "reli[ed]" on a "hindsight analysis" that involved "detailed reviews of historical collections . . . utilizing twelve-month rolling accounts receivable collection data" as "a primary source of information." And it claimed that Ardent's "management determines [when an] account is uncollectible, at which time the account is written off."

201. But Ardent did not do any of this. Instead, at the time of the IPO, Ardent calculated its accounts receivable using a crude "180-day cliff," as Defendants finally acknowledged after the Class Period.

202. Under the 180-day cliff approach, Ardent simply included the ***entire amount*** of accounts in its AR for 180 days—regardless of actual collectability and despite evidence that Ardent had historically failed to collect a substantial portion of these amounts. Thus, for example, Ardent treated AR that was aged 120-180 days as ***100% collectible***. This materially inflated Ardent's accounts receivable with aged, uncollectible amounts and allowed Ardent to delay recognizing losses for amounts that were never collected.

203. The 180-day cliff inflated Ardent's AR because collectability drops rapidly after 90 days. For example, one authority noted:

> The collectibility of a medical claim follows a predictable decay curve. Within the first 30 days, you can expect to collect roughly 95% to 98% of what you billed (after contractual adjustments). Between 30 and 60 days, collectibility drops modestly to around 90% to 93%. From 60 to 90 days, you are at 80% to 85%. ***Then the cliff arrives. Past 90 days, collectibility drops approximately 0.5% for every additional day the claim sits unpaid.***[12]

204. Thus, by 90 days, Ardent's AR was only 85% collectible (at best), and between 90 and 179 days, collectability dropped another ***45%***. But Ardent's 180-day cliff approach wrongly treated all of these amounts as 100% collectible and materially overstated Ardent's AR.

205. Former employees corroborated the problems with Ardent's AR and collections. FE-4 noted that receivables get sketchy after 120 days, undermining Ardent's practice of treating AR as fully collectible up to 180 days. Further indicating that Ardent included a substantial amount of aged, denied claims in its AR, FE-9 noted that the denials Ensemble was working on were typically five to six months old and believed that 80% of the claims were older than 180 days.

---

[12] https://nstarfinance.com/resources/medical-practice-accounts-receivable-management

206. Even after AR passed 180 days (*i.e.*, went over the "cliff"), Ardent did not promptly write off the amounts. FE-4 recalled discussion of Ardent's aged accounts receivable, with a bucket of about $10 million that was close to 365 days old but not yet written off.

207. The Individual Defendants were aware that Ardent was using a 180-day cliff—and including significant uncollectible amounts in AR as a result. On November 13, 2025 (after the Class Period), Lumsdaine admitted that Ardent had used an "internally developed model which had utilized a 180-day cliff, at which time an account became fully reserved," demonstrating his knowledge of the 180-day cliff.

208. Moreover, the Registration Statement—which Lumsdaine and Bonick signed—states: "We routinely review accounts receivable balances by monitoring historical cash collections as a percentage of trailing net operating revenue, as well as by analyzing current period revenue and admissions by payor, aged accounts receivable by payor, days revenue outstanding, and the composition of self-pay receivables." Such review of "historical cash collections," "aged accounts receivable," and "days revenue outstanding" made clear to the Individual Defendants that the 180-day cliff was inflating Ardent's AR with material amounts that were never collected.

209. Former employees confirmed that Ardent's executive leadership received reporting and were personally involved with accounts receivable. FE-4 stated that Ardent's executive team was rude and put a lot of pressure on Ensemble to clean up Ardent's problems with coding, denials, and aged accounts receivable. Further, FE-4 stated that Ardent and Ensemble held end-of-month meetings to review Ardent's revenue, aged and outstanding amounts, and collections based on data from Ardent's Epic system, which provided robust reporting and dashboards.

**D. Defendants Continued to Mislead Investors Following the IPO**

210. After raising over $200 million from investors on false pretenses in Ardent's IPO, Defendants needed to keep the illusion going.

211. As a result, Defendants pivoted to fraud. During the Class Period, Defendants continued to deny any material litigation exposure while failing to accrue at least $54 million in liability. Defendants continued to overstate Ardent's AR by $43 million—even after Lumsdaine told Ensemble in March 2025 that Ardent needed to take a substantial writedown. And Defendants repeatedly re-affirmed Ardent's aggressive 2025 guidance while falsely insisting that payor denials "have not accelerated" and that professional fee increases were moderating. None of that was true.

**1. Ardent Issued Aggressive 2025 Guidance.**

212. Ardent issued aggressive financial guidance for 2025, which CEO Bonick personally approved. As Ardent explained to the SEC in April 2024, "[t]he CEO's involvement in the preparation of the Company's consolidated budget and forecast consists of determining the consolidated financial targets (i.e., Revenue, Revenue Growth, EBITDA, EBITDA Margin, etc.), which are then communicated down to the Company's FP&A group, which assists in the bulk of the preparation. The CEO reviews and approves the final consolidated budget and forecast, which is then presented to the Board for approval."

213. On February 26, 2025, Ardent issued its 2025 guidance, including projected revenue growth of 6% and adjusted EBITDA growth of 19%. On the Company's earnings call the next day, Bonick declared that Ardent would "deliver another strong year of financial performance. As you saw in yesterday's press release, we issued 2025 financial guidance including revenues of $6.2 billion to $6.45 billion and adjusted EBITDA of $575 million to $615 million. At the guidance midpoints, that represents 2025 revenue growth of 6% and adjusted EBITDA growth of 19%."

214. As detailed below, Ardent's 2025 guidance ignored the Company's known, material liabilities, overstated AR, worsening payor denials, and other negative facts and trends.

### 2. Ardent Repeatedly Failed to Update Its Professional Liability Accruals and Continued to Tout Quality of Care.

215. After the IPO, Ardent continued to face known, material liabilities stemming from malpractice by Erasmus, infant and maternal deaths and injuries at Lovelace Women's Hospital, and pervasive contamination issues in Idaho.

216. These facts did not improve—much less disappear—with time. By January 2025, Ardent and/or Lovelace entities were being sued by four of Erasmus's former patients—three of whom were wheelchair users or quadriplegic—in New Mexico state court.

217. Contrary to ASC 450, Defendants failed to disclose these material loss contingencies or accrue any amount for them—even as the number of lawsuits increased and Ardent's liability became increasingly clear and imminent. SEC staff "has noted that disclosures related to loss contingencies should be continually evaluated over time as facts and circumstances change."[13]

218. By accruing nothing for these claims during the Class Period, Ardent underreported its accruals by at least $54 million. For example, Ardent's 2024 Form 10-K, filed on February 27, 2025, reported an accrual of $240.0 million. This amount was at least $54 million, or 18.4%, too low. The $54 million that Ardent failed to accrue was highly material; indeed, it amounted to over 41% of Ardent's net income for 2023 and 18% for 2024.

219. Further, Ardent's Class Period SEC filings continued to falsely deny that Ardent was "party to any proceeding that, either individually or in the aggregate, in the opinion of management, could have a material adverse effect on the [sic] business, financial condition, results

[13] https://dart.deloitte.com/USDART/home/publications/deloitte/additional-deloitte-guidance/roadmap-sec-comment-letter-considerations/chapter-2-financial-statement-accounting-disclosure/2-3-contingencies

of operations or liquidity." Again, Ardent's management knew the Company was party to numerous claims and exposures that required a material increase of at least $54 million to Ardent's liability accruals. None of these loss contingencies was even disclosed, much less accrued.

220. Defendants also continued to make false and misleading statements about Ardent's quality of care and safety, despite Erasmus's paralyzed and wheelchair-bound patients; the infant and maternal deaths and injuries at Lovelace Women's Hospital; and the contaminated instruments and infections at PMC in Idaho. For example, Ardent's 2024 Form 10-K falsely claimed that "culture, safety, quality, and compliance represent the foundation of our platform," that Ardent had a "[c]ommitment to delivering the highest quality patient care," and that Ardent maintained "company-wide compliance and quality assurance programs."

### 3. Defendants Lied About Ardent's Worsening Payor Denials.

221. After the IPO, Ardent's payor denials continued to rapidly increase through the second half of 2024 and into 2025, contrary to Defendants' public statements.

222. By September or October 2024—just a few months after the IPO—Ardent became an "escalated" client at Ensemble because of Ardent's high amount of AR and underlying issues with its coding, claim denials, and backlog, according to FE-4.

223. As FE-4 explained, Ardent's escalation triggered more frequent meetings between Ensemble and Ardent, including 14-15 weekly meetings with Ardent senior leadership, including Haun; Ardent's President of Hospital Operations David Schultz; SVP of Finance Elliott Brown; VP of Reimbursement Tim Miner; AVP of Strategic Growth and Health Services Analytics Jeremy Luttrell; Americas Region CFO Todd Huffman; and SVP FP&A Bracey Halbrook. The weekly meetings covered Ardent's coding and claims denials, among other topics. (FE-4.) Notably, Schultz reported directly to CEO Bonick and regularly updated him on Ardent's "operating

performance," "including during weekly executive leadership team meetings," as Ardent told the SEC in April 2024.[14]

224. Despite the escalation and numerous meetings starting in fall 2024, Ardent's issues did not improve. (FE-4.) As FE-4 explained, one key issue was a flaw in Ardent's coding, which persisted over multiple months. This coding error led to a series of problems: (1) it triggered a large amount of claims denials; (2) the excessive denials increased Ardent's backlog and impacted its revenue; and (3) the coding issue led to accounts receivable that were not being worked, including a $10 million bucket that was close to 365 days old. (FE-4.)

225. Further, Ensemble was unable to timely resolve many payor denials because they required medical records to review, but Ardent failed to provide the necessary records in a timely manner. (FE-4.) FE-6 also described a noticeable pattern whereby Ensemble failed to timely follow up on payors' denials of large claims of over $100,000.

226. Ardent had full visibility into its increasing payor denials, both from its own data and Ensemble's explicit reporting of denials to Ardent executives. As detailed above, Ardent's monthly MOR meetings for every hospital included detailed presentations from Ensemble that broke down Ardent's denial rates by type and payor.

227. Bonick and Lumsdaine knew about Ardent's increasing payor denials each month—and how they were impacting financial performance—because they received monthly reporting packages with detailed financial information, including actual results for the current month, forecasts for the next month, and the reasons for any variances to the budget.

[14] While Ardent stated that Bonick's "weekly executive leadership meetings" involve "the COO," Ardent clarified to the SEC in June 2024 that Ardent's COO title "recently was changed to the President of Hospital Operations" (*i.e.*, Schultz).

228. As Ardent told the SEC in April 2024, "***the CEO is informed of budget to actual variances at the consolidated level during a monthly close meeting***" where "the CEO is ***informed by the CFO and COO*** of the ***reasons*** for the variance and ascertains the ***impact*** to the overall consolidated entity budget." The "***consolidated variances are reviewed by the CEO*** to understand macro drivers, significant trends, etc., to determine entity-wide performance and make potential entity-wide adjustments. The monthly meetings are focused on consolidated trends, drivers, and necessary responsive actions or opportunities."

229. On June 3, 2024, Ardent further advised the SEC that Bonick "is ***provided consolidated financial information on a monthly basis***, including key performance indicators, the consolidated profit and loss statement, Adjusted EBITDAR to forecast, capital expenditures to plan, cash flows, net working capital trends, and forecasts of metrics for the next month. This information is reviewed and discussed during his monthly close meetings with the President and CFO." The same monthly reporting package went to all members of Ardent's executive leadership team: "[r]egional and market level budget versus actual financial information is included in the appendix of the Company's ***single reporting package, which is distributed to all members of the executive leadership team*** as well as regional, market and facility leadership on a monthly basis."

230. Underscoring his personal knowledge of Ardent's increasing payor denials, Bonick assured investors that he was "watching" Ardent's denials "***very closely***."

231. Further demonstrating Defendants' awareness of the increasing denials, in August 2024, Ardent's leadership approved an initiative to reduce payor denials, as FE-10—a Business Relationship Manager at Ardent from August 2024 to September 2025—explained. John Latina, a senior Ardent executive who reported directly to Lumsdaine, was involved in the initiative—although it still had not started by September 2025, over a year later. (FE-10.)

232. Despite knowing of Ardent's increasing payor denials throughout the Class Period, Defendants repeatedly misled investors by downplaying or denying the increasing denials. For example, on November 7, 2024, Lumsdaine asserted that "***there hasn't been an acceleration in denial activity***," and Bonick stated that the "denials activity ***did not accelerate*** during the third quarter." On May 7, 2025, Lumsdaine vaguely cited "a continuation of a slowdown in payments even on clean claims," but again insisted—falsely—that "***denials have not accelerated***."

233. These statements denying any "acceleration" in Ardent's claim denials were outright false. In truth, Ardent had experienced "a ***sharp increase*** in denials beginning in the second quarter of 2024"—as Defendants admitted after the Class Period—and the denials continued to increase in fall 2024 and through summer 2025. Those accelerating denials were driven by Ardent's flawed coding, untimely and incomplete claims, and failures to provide necessary documentation, plus Ensemble's hasty work, minimal internal review, and failure to timely follow up on denials of large claims, as detailed above.

234. By April 2025, Bonick and Lumsdaine had inescapable personal knowledge of Ardent's increasing denials. ***Both Defendants attended an April 2025 presentation by Ensemble to Ardent's Board that included extensive discussion on Ardent's increase in denials.*** (FE-2.) FE-2 recalled that the April 2025 Board presentation broke down Ardent's denials by quarter and showed a very significant increase in both first pass denials and level of care denials, which was causing a significant slowdown in Ardent's cash collections. Crucially, FE-2 confirmed that the data from Ensemble did ***not*** indicate that Ardent's denials had stabilized in the first part of 2025.

235. The increasing denials and lack of stabilization reported to Ardent's Board ***directly contradict*** Lumsdaine's statements—made shortly after the April 2025 presentation—that "denials have not accelerated" (May 7, 2025) and that "we haven't seen a significant acceleration

[in] denial activity" (May 20, 2025). As detailed above, Ensemble had just told Ardent's Board, Lumsdaine, and Bonick the exact opposite.

236. Notably, Ardent's "sharp increase" in payor denials in 2Q24 and further increase in the first half of 2025 stand out as worse than its competitors. For example, the CFO of HCA Healthcare—the largest for-profit hospital operator—stated in January 2025 that "we are not seeing growth in denials being a material impact for the company at this point." And in June 2025, Universal Health Services' CFO stated that "what payers are doing in terms of denials and nonpayment and delays" had not "changed dramatically in the last year."

### 4. Ardent Continued to Report Inflated AR Balances and Failed to Timely Write Off Uncollectible Amounts, While Knowing a $43 Million Writedown Was Required.

237. After the IPO, Ardent continued to report inflated AR using its 180-day cliff approach and failed to write off amounts over 180 days.

238. During the Class Period, Ardent overstated its AR balance as follows:

| Period | AR Balance Reported | Actual AR Balance | Overstatement | Overstatement Percentage |
|---|---|---|---|---|
| **2Q24** | $720,989,000 | $677,989,000 | **$43,000,000** | **6.34%** |
| **3Q24** | $705,747,000 | $662,747,000 | **$43,000,000** | **6.48%** |
| **4Q24** | $743,031,000 | $700,031,000 | **$43,000,000** | **6.14%** |
| **1Q25** | $776,519,000 | $733,519,000 | **$43,000,000** | **5.86%** |
| **2Q25** | $758,641,000 | $715,641,000 | **$43,000,000** | **6.01%** |

239. Each AR figure above was materially overstated because it included substantial aged amounts that were uncollectible and could never be turned into cash. Specifically, Ardent's AR was inflated by ***$43 million***, or ***5.9-6.5%***, as indicated above.

240. Moreover, in the limited instances when Ardent belatedly wrote off certain AR, Ardent obscured the write-offs by misclassifying them in a catch-all category (such as Other

Operating Expenses) or deducting them from total revenue (which was reported on a net basis), such that investors were unable to discern the amount of write-offs. Thus, in each quarter above, Ardent falsely claimed that its "bad debt expense" for the period was immaterial.

241. During the Class Period, ***Defendants Bonick and Lumsdaine knew that Ardent's reported AR was inflated by at least $43 million—then concealed that information from investors for at least seven months***.

242. As background, prior to November 2024, Ardent started to implement the Kodiak system. (FE-2.) As part of the project implementation, Kodiak generated monthly reports that indicated the expected AR amount under the Kodiak system. (FE-2.)

243. FE-2 believed that around March 2025, Lumsdaine saw a monthly Kodiak report with a significantly lower AR number than Ardent was currently calculating. FE-2 learned about the Kodiak reports from Ensemble's VP of Revenue Cycle Wes Cranford and Chief Revenue Cycle Officer Jason Pritchard.

244. This prompted Lumsdaine to text Ensemble's founder Ivy on a Sunday in March 2025 indicating that Ardent needed to take a substantial AR writedown. (FE-2.) Cranford notified FE-2 by text about Lumsdaine's Sunday message.

245. Lumsdaine's Sunday text prompted immediate activity at Ensemble. FE-2 coordinated getting Ensemble's leadership on site at Ardent's offices in Nashville, and FE-2, Ivy, Shannon White, and Pritchard traveled to Nashville and met in Ardent's "Board room," which was located on the fifth floor adjacent to the CEO and CFO offices. FE-2 drove to Nashville nearly every week to be on site at Ardent.

246. <u>First</u>, FE-2, Cranford, and other Ensemble personnel prepared a presentation for Ardent's Board that ***identified a $43 million gap*** between the AR calculations from Ardent and

Kodiak. FE-2 saw the final presentation and worked on about seven slides that focused on explaining the gap of approximately $43 million between the Kodiak and Ardent AR calculations and why Ardent was experiencing degradation in its collections.

247. Second, in April 2025, Ivy and White from Ensemble presented the slides to Ardent's Board in Nashville; Bonick and Lumsdaine attended the presentation. (FE-2.) FE-2 received an email, likely from Ivy's assistant, that summarized the discussion during the Board meeting and contained a list of follow-up items, including items that Ensemble would present to Ardent each month going forward.

248. Lumsdaine was intimately involved with the $43 million writedown. FE-2 attended two types of monthly meetings with Lumsdaine and believed both types were recorded.

249. First, after the April 2025 Board presentation, FE-2 attended monthly senior leadership meetings with Lumsdaine, Latina, Haun, and David Byers (Ardent's SVP and Chief Accounting Officer) about Ardent's writedown and switch to Kodiak. These meetings were held in person in Nashville, although Ensemble used Teams so that optional attendees could be called in by video if needed. Ensemble used Teams to record the meetings.

250. During these meetings, the attendees discussed Ardent's $43 million writedown. FE-2 recalled that there was no real debate about the need for a writedown, although the participants discussed how it was calculated and whether the writedown (a) related to "real dollars" or "inflated AR," meaning money that Ardent was not truly owed, or (b) overlapped with amounts that Ardent was pursuing from payors.

251. FE-2 noted that Ensemble provided PowerPoint presentations and detailed spreadsheets for the senior leadership meetings, including several that quantified and explained the $43 million figure. These materials were saved to a shared Teams site. (FE-2.)

252. Second, FE-2 attended monthly MOR meetings with Latina, Haun, Lumsdaine, and Ardent's regional CFOs where they discussed the performance of Ardent's projects resulting from the April 2025 Board meeting. FE-2 noted that Lumsdaine usually attended these MOR meetings, and when he didn't, Ensemble sent an email summary of the decisions made and follow-up items. During the monthly meetings, Ensemble provided breakdowns of the amounts that were disputed between Ardent and payors (discussed below). The monthly MOR meetings were held via Teams and lasted up to two hours, although towards the end of FE-2's tenure they were shortened to one hour. Ensemble provided slides for the MOR meetings that included about 10 slides on projects and over 100 slides on operational status, which were emailed to Lumsdaine and others and also saved as PDFs to the Teams drive. (FE-2.)

253. While Ardent attempted to claw back the dollars that needed to be written off—primarily through actions against large payors—these efforts were unsuccessful. FE-2 explained that Ardent's $43 million writedown included approximately $35 million that Ardent was trying to recover from large payors. FE-2 participated in weekly calls about these recovery efforts and discussed them in monthly meetings with Lumsdaine, but the approximately $35 million figure did not decline throughout 2025.

254. Corroborating FE-2, FE-4 noted that by April 2025, Ardent was internally discussing a write-off of aged accounts receivable, with a bucket of about $10 million that was close to 365 days old. (FE-4.) However, at the time of FE-4's departure from Ensemble in October 2025, six months later, the write-off remained in the action plan because the aged AR still had not been written off.

255. None of this was disclosed to investors at the time. Instead, while Bonick and Lumsdaine knew that a $43 million AR write-off was required, Ardent's SEC filings—signed by

Lumsdaine and certified by both Bonick and Lumsdaine—continued to overstate its AR balance and falsely claimed that its "bad debt expense" was immaterial.

256. Underscoring the fraudulent nature of Defendants' inflated AR, Ensemble adjusted its cash collection goals by July 2025 to reflect Ardent's writedown (FE-2)—even as Ardent itself delayed taking the writedown by four more months.

### 5. Defendants Lied About Ardent's Rapidly Increasing Professional Fees.

257. A key factor affecting Ardent's financial performance is the amount it pays in professional fees to physicians. Such professional fees comprise Ardent's second-largest expense each quarter, and higher professional fees directly reduce Ardent's net income, EBITDA and margins.

258. During the Class Period, Defendants repeatedly assured investors that Ardent's professional fees were "moderating" and had "normalized." Ardent's 2025 earnings guidance also wrongly assumed that professional fees would only experience "[h]igh single digits" growth in 2025. But professional fees had already increased to 9% by the end of the second quarter, indicating that double-digit growth was highly likely in the second half of the year.

259. On January 14, 2025, at the J.P. Morgan Healthcare Conference, Lumsdaine stated that professional fee growth was "***not accelerating*** beyond what we saw in 2024," and that "a continued pressure for the types of increases we saw in 2024 . . . ***will be embedded in our guidance***." Lumsdaine emphasized: "We do want to be ***conservative*** as it's our first full year as a public company establishing guidance."

260. J.P. Morgan analyst Benjamin Rossi asked "you mentioned that the professional fees, the growth there has not been accelerating. But is it fair to think of them as being like a

high single digits, low double digits kind of increase at this stage?" Lumsdaine responded that the Company was expecting "[h]igh single digits" growth.

261. At the May 20, 2025 RBC Global Healthcare Conference, Bonick stated that "[w]e talk coming into the year about the headwind of physician subsidies that Q1 year-over-year, I think we're up about 6%, which actually has been a ***slowdown in the rate of growth***. We are still expecting that to be a headwind. But again . . . ***it's certainly*** within, ***well within our expectations so far***."

262. Contrary to Bonick's positive assurances that Ardent's growth in professional fees was slowing down and "well within our expectations," Ardent's professional fee growth—particularly for radiologists—was rapidly accelerating. In the second quarter of 2025—which was more than halfway complete at the time of Bonick's May 20, 2025 statements—Ardent's professional fees increased at least 9%, representing a 50% increase from the first quarter.

263. This rapid, accelerating increase meant that only halfway through the year, Ardent's professional fee growth had already reached or exceeded the upper limit assumed in its guidance. As such, Ardent's 2025 guidance was hardly "conservative."

264. Still, Defendants made no mention of the fact that professional fee growth had already reached or exceeded the upper limit of Ardent's guidance. Instead, Defendants misleadingly continued to portray the professional fees as moderating and "coming down." As late as September 4, 2025, when asked about "pressure" Ardent was experiencing in "professional fees" and Ardent's "professional fee expectations," Bonick responded, "[p]hysician services, as you mentioned, is still elevated compared to normal inflationary levels, but moderating from that peak in 2023 where we did see about 130 basis point drag on the business. ***That's been coming***

***down.*** We expect that to continue to be a bit of a headwind, but a ***lessening headwind*** compared to what it's been over the last couple of years."

265. Bonick's statement was false because Ardent's professional fee growth was not "coming down." Instead, it had continued to accelerate—and already exceeded what Ardent's guidance assumed. As Defendants later admitted, in the third quarter of 2025—which was about 70% complete at the time of Bonick's statement—Ardent's professional fees had further increased by at least ***11%***, well above the "[h]igh single digits" assumed in Ardent's 2025 guidance.

266. Bonick and Lumsdaine knew about Ardent's accelerating professional fees each month—and how they were impacting financial performance—from receiving monthly reporting packages, which included actual results for the current month, forecasts for the next month, and the reasons for any variances to the budget, as described above.

267. After the Class Period, Bonick admitted that an increase in radiology professional fees accounted for the bulk of Ardent's higher professional fees and claimed that Ardent had lacked "visibility" into these increases until late in 3Q25.

268. However, former employees explained how Ardent entered new contracts that provided for large increases in radiology professional fees during 2024 and the first part of 2025, refuting the notion that Ardent was surprised by a sudden, large increase late in 3Q25.

269. FE-7—the Director of Diagnostic Imaging at an Ardent-owned hospital in New Mexico from before the Class Period until June 2025—called any notion of surprise "baloney" and indicated that Ardent knew well before 2025 that higher professional fees for radiologists were going to be an issue. FE-7 explained that Ardent's Lovelace system in New Mexico lost most of its radiologists in 2024, creating an urgent staffing need. In summer 2024, that led Ardent to quickly sign on a large national provider of radiology services, Radiology Partners, which FE-7

said "cost them a pretty penny." FE-7 believed Lovelace's switch to Radiology Partners was mentioned to Ardent's VP of Diagnostic Services, Adam Mattox, at a meeting of Ardent's company-wide Imaging Advisory Council.

270. FE-8—the Vice President of Urgent Care at Ardent from August 2023 to December 2025—confirmed that in late 2024 and the first half of 2025, Ardent renewed its contracts with its radiology providers in most markets at significantly higher cost. FE-8 was privy to Ardent's negotiations with radiology providers in all markets because the urgent care clinics under FE-8's purview used the same radiology providers as Ardent's hospitals.

271. FE-8 explained that Ardent's contracts with radiology providers were renegotiated in its various markets in 2024 and 2025, with Ardent's largest markets locked in by mid-2025 (or earlier), and the results made clear that Ardent's radiology professional fees were going up significantly. Specifically:

a. For Texas, Ardent's contract negotiations with radiology providers were finished in late 2024 or early 2025.

b. For Oklahoma and New Mexico, Ardent's contract negotiations with radiology providers were completed in the first half of 2025 or earlier.

c. By the midpoint of 2025, only Idaho still had open negotiations with Ardent's radiology providers.

272. As FE-8 noted, in each case, the renewed radiology contracts had terms of at least three years and specified the professional fees and subsidies that Ardent was required to pay each provider, which were a significant increase from the prior contracts. Texas, Oklahoma and New Mexico—where Ardent's radiology contracts had been renegotiated by the first half of 2025 (or earlier)—comprised 76.2% of Ardent's revenue (as of 2024). Thus, the vast majority of Ardent's radiology professional fee increases were locked in by mid-2025 (or earlier).

273. FE-8 further explained that Ardent knew what the contracts said in terms of radiology professional fees, and Ardent had the ability to incorporate the known fee increases into its financial modeling. Specifically, the new contracts required Ardent to pay higher fees per Relative Value Unit, which was straightforward to incorporate into Ardent's financial modeling and forecasting. (FE-8.)

274. Consistent with FE-8's account, FE-7 questioned the idea that Ardent was surprised by higher professional fees and subsidies in 2025 because radiology contracts typically have three-year terms and require 90 to 120 days' notice before termination. As a result, FE-7 indicated that any negotiations about raising fees would typically start at least several months before a contract terminated, and because of the contracts' multi-year length, it should not be a surprise that radiologists would want more money to enter a new contract when their contracts expire.

275. Similarly, FE-6 questioned Ardent's public claim of a sudden increase in radiology subsidies in 3Q25, noting that such large increases do not appear overnight. FE-6 noted that the MOR meetings discussed headwinds and tailwinds, and contentious renewal meetings with Ardent's radiology providers would be discussed as a headwind.

276. Given these facts, Ardent did not suddenly learn late in 3Q25 about a material increase in radiology professional fees across multiple geographies. Instead, Ardent's radiology professional fees were fixed and known to Ardent for the next several years. As described above, by mid-2025 (or earlier), Ardent had entered multi-year contractual commitments to pay increased radiology fees covering 76.2% of its business, and was able to incorporate the known increases into its financial modeling. And to the extent any other provider terminated its contract to negotiate higher fees, the termination was known to Ardent at least three months in advance.

### 6. Ardent Reaffirmed 2025 Guidance Premised on False Assumptions.

277. Despite Ardent's large, undisclosed (and unaccrued) litigation exposure, worsening payor denials, inflated AR, and rapidly increasing professional fees, Defendants re-affirmed Ardent's 2025 guidance throughout the year to prop up the Company's stock price.

278. On Ardent's May 7, 2025 1Q25 earnings call, Bonick stated that Ardent was "***firmly on track*** to meet our full year 2025 financial guidance, which we are reaffirming today."

279. On Ardent's August 6, 2025 2Q25 earnings call, Bonick concluded his opening remarks by stating "[a]ll of this ***puts us on track*** to meet our full year 2025 financial guidance, which we are ***reaffirming today***."

280. But Ardent was not "on track." As described above, in April 2025, Bonick and Lumsdaine attended Ensemble's urgent presentation to Ardent's Board that highlighted Ardent's increase in payor denials and crystallized the need to write off $43 million in AR (FE-2)—none of which was disclosed to investors at the time. Bonick and Lumsdaine also knew the truth from the monthly close meetings described above, which focused on the "impact" of and "reasons for the variance[s]" to Ardent's budget. From these monthly close meetings, Bonick and Lumsdaine knew the "reasons" for Ardent's material "budget to actual variances": material, unaccrued liability from paralyzed patients, infant and maternal deaths and injuries, and patient infections; increasing payor denials; substantial aged, uncollectible AR; and accelerating professional fees.

281. Ardent also told the SEC in April 2024 that if its forecasts are inaccurate or require changes, approving such changes was Bonick's responsibility as CEO: "[i]f the consolidated budget and forecast was inaccurate or requires changes throughout the year, the CEO approves changes to the consolidated budget and forecast, which is then communicated to the relevant region leadership by the CFO and COO . . . ." However, Bonick decided to reaffirm Ardent's aggressive guidance despite knowing it was inaccurate.

282. Demonstrating Defendants' awareness that Ardent was not "on track" to meet its 2025 guidance, behind the scenes, Dave Caspers—who had for a pool care company before becoming Ardent's Chief Operating Officer in March 2025—quickly initiated layoffs. FE-5 was laid off in the first wave, in June 2025, and heard that 1,000 people were laid off at the same time and that three or four more waves of layoffs have followed. FE-5 noted that an organization on track to meet its numbers does not act like Ardent did and lay off large numbers of employees.

### 7. Ardent Insiders Registered to Unload All of Their Remaining Shares.

283. On August 25, 2025, Ardent filed a prospectus for the sale of common stock by its private equity backers and certain current and former executives. The SEC declared the corresponding registration statement effective the same day. Each insider (with one minor exception) registered to sell all the stock it owned in the Company—amounting to more than 80% of the Company's shares—as follows:

| Name of Selling Stockholder | Shares of Common Stock Beneficially Owned | | Shares of Common Stock That May be Sold Hereunder | Shares of Common Stock Beneficially Owned After Sale of All Common Stock That May be Sold Hereunder[1] | |
|---|---|---|---|---|---|
| | Shares | Percentage | | Shares | Percentage |
| EGI-AM[2] | 77,246,499 | 54.0% | 77,246,499 | — | — |
| Pure Health[3] | 30,262,664 | 21.1% | 30,262,664 | — | — |
| Ventas[4] | 9,342,501 | 6.5% | 9,342,501 | — | — |
| David Vandewater[5] | 1,767,959 | 1.2% | 1,767,959 | — | — |
| Stephen C. Petrovich[6] | 1,051,089 | * | 1,043,423 | 7,666 | * |
| Neil Hemphill[7] | 790,596 | * | 790,596 | — | — |

284. Unknown to investors, this proposed sale was the insiders' attempt to capitalize on the Company's inflated share price by unloading their shares before the share price collapsed.

## E. The Truth Emerges

285. Finally, events on November 12 and 13, 2025, exposed the highly material, negative facts Defendants had misstated and concealed since the IPO.

286. Professional Liability Accruals: On November 12, 2025, after market hours, Ardent recorded a $54 million increase in professional liability accruals "arising from a limited set

of claims between 2019 and 2022 in New Mexico for a single provider who the Company no longer employs" as well as "consideration of broader industry trends, including social inflationary pressures." On the November 13, 2025 earnings call, Lumsdaine confirmed that the increase in professional liability accruals "relates to the New Mexico market where we have seen significant social inflationary pressure in medical malpractice cases the past several years." Admitting that Ardent had long known about the trend that required higher accruals, Lumsdaine stated that "this is not new. There has been an increasing dynamic year-over-year of increasing premiums, increasing costs in the New Mexico market." Lumsdaine further stated that the accrual "represents our best estimate for our liability for this market, for the adjustment for those pressures, and for an individual provider who was with Ardent between 2019 and 2022, and who is no longer employed by Ardent [*i.e.*, Erasmus] and for whom the statute of limitations has expired." The increased accruals were driven by Ardent's malpractice liability from Erasmus and the other misconduct detailed above.

287. Reduced Guidance and Increased Professional Fees and Payor Denials: On November 12, 2025, after market hours, Ardent reduced its 2025 adjusted EBITDA guidance from $575 million – $615 million to $530 million – $555 million, a cut of $52.5 million, or about 8.8%, at the midpoint. The hit to net income was even more extreme: Ardent slashed its 2025 net income guidance from $342 million – $386 million to $207 million – $234 million, a cut of $143.5 million, or ***39.4%***, at the midpoint.

288. Ardent also reported weak 3Q25 earnings, including revenue of $1.577 billion—down 4.1% from $1.645 billion in the prior quarter—and adjusted EBITDA of $143 million, down 15.9% from $170 million in the prior quarter. Reflecting the impact of higher professional fees and payor denials, Ardent's adjusted EBITDA margin for 3Q25 dropped to 9.1%, compared to

10.3% in the prior quarter. Further, Ardent's GAAP net income for 3Q25 was just $1.2 million—down ***98.9%*** from $95.7 million in the prior quarter.

289. During Ardent's November 13, 2025 earnings call, Bonick attributed the guidance reduction to "industry-wide cost pressures, particularly those around professional fees and payer denials that have proven more durable than anticipated." Ardent's earnings presentation similarly stated that higher professional fees and payor denials "are creating an earnings shortfall."

290. With respect to payor denials, Bonick stated: "After a sharp increase in denials beginning in the second quarter of 2024, trends largely stabilized through the first half of 2025, consistent with our outlook. However, these payer pressures moved higher again in the third quarter, and our updated adjusted EBITDA guidance reflects the development of this trend throughout the second half of 2025."

291. As detailed above, however, Ardent's payor denials did not stabilize in the first half of 2025, then suddenly increase in the third quarter of 2025. Rather, Ardent's payor denials had sharply increased even before the July 2024 IPO, and continued to do so throughout the rest of 2024 and 2025, leading to Ardent becoming an "escalated" client at Ensemble—although the escalation failed to fix the denials. In April 2025, Ensemble told Bonick, Lumsdaine, and Ardent's Board that Ardent's payor denials had experienced a very significant increase, and the data from Ensemble did not indicate that Ardent's denials had stabilized in the first part of 2025. (FE-2.)

292. Bonick also claimed that professional fees were "expected to moderate further this year" but their growth "accelerated to 11% in the third quarter. We now expect second half growth in the low double-digits versus the high single-digits previously assumed." In response to an analyst, Bonick suggested that radiology was responsible for much of the increase.

293. But Ardent's professional fees did not suddenly increase in the third quarter of 2025. Rather, by mid-2025 (or earlier), Ardent had already entered multi-year contractual commitments to pay increased radiology fees covering 76.2% of its business and locked in the vast majority of its radiology professional fee increases. Pursuant to those existing contracts, Ardent's professional fees had continuously increased throughout 2025 at an increasing rate each quarter, pressuring Ardent's purported assumption of "high single-digits" well before the third quarter. Bonick and Lumsdaine knew about Ardent's accelerating professional fees from receiving monthly reporting packages, and contractual notice provisions ensured that any upcoming termination (and the prospect of higher fees) was known to Ardent at least three months in advance.

294. Revenue Decline from AR Write-Offs: Last, on November 12, 2025, after market hours, Ardent revealed a $43 million decrease in third quarter 2025 revenue.

295. Ardent claimed that the decrease resulted from revised determinations of accounts receivable collectability after the Company transitioned to a new revenue accounting system and cited "recently completed hindsight evaluations of historical collection trends." The new system—the Kodiak RCA net revenue platform, which is widely used in Ardent's industry—purportedly provided management with "additional information to more precisely" determine accounts receivable collectability, including "more timely consideration of payor denial and payment trends." During the 3Q25 earnings call, Lumsdaine revealed that the new system "recognizes reserves earlier in an account's life cycle" compared to the Company's prior collectability framework, which "had utilized a 180-day cliff at which time an account became fully reserved."

296. These admissions revealed that Ardent's prior AR balance was significantly overstated due to the "180-day cliff" approach. They also called into question Defendants' prior

statements that Ardent had conducted regular "hindsight analysis" on its AR balance and "routinely review[ed] accounts receivable balances by monitoring historical cash collections."

297. To be sure, Ardent did not suddenly realize in November 2025 that $43 million in AR was uncollectible and needed to be written off. Instead, Ardent simply acknowledged the $43 million quantum of aged AR that had long been uncollectible. Lumsdaine himself had acknowledged the need for a substantial AR writedown in his March 2025 text message to Ensemble, and Ensemble's April 2025 presentation to Ardent's Board indicated that Ardent needed to take a $43 million AR writedown. (FE-2.) Despite this knowledge, Defendants waited at least seven months to take the $43 million writedown.

298. On this news, the price of Ardent stock fell $4.75 per share, or nearly 34%, from $14.05 per share on November 12, 2025, to close at $9.30 per share on November 13, 2025, on unusually heavy trading volume.

299. <u>Analysts Attributed Ardent's Stock Drop to Its Disclosures of New, Negative Company-Specific Information</u>: Analysts recognized that Ardent had significantly underperformed expectations for 3Q25. Bank of America reported on November 13, 2025 that: "ARDT missed Q3 consensus results by 2%, but the company indicated that the miss vs expectations was actually larger than that due to $15-$20m of earnings that it achieved in Q3 that it previously expected to recognize in Q4 (including the timing of recognition of SDP). ***This implies that the Q3 miss was closer to 14% ($20-$25m)***." Morgan Stanley called out Ardent's AR write-off and increased professional liability accruals, writing on November 12, 2025, that "[o]f note, Q3 was impacted by a change in accounting estimates, resulting in a negative $43mn in revenue charge, as well as an increase in professional liability reserve of $54m not included in adjusted results."

300. Analysts also highlighted that Ardent's substantial 2025 guidance cut indicated that 4Q25 results would be well below expectations. On November 12, 2025, Morgan Stanley noted that "[t]he implied Q4'25 EBITDA guidance of $131mn is below the Street at $186mn due to higher professional fees and higher denials from payors."

301. Analysts explicitly attributed Ardent's immediate, large share price decline to the new, negative information revealed on November 12 and 13. For example, on November 12, 2025, Guggenheim cited Ardent's "***3Q25 Miss & Hefty Guide Down***," citing the "***higher denial development (which the company previously suggested should have comped this quarter)***." Similarly, on November 14, 2025, RBC Securities wrote that "Ardent shares declined nearly 34% after elevated professional fees and payer denial activity caused the company to lower its 2025 adjusted EBITDA guidance." RBC cut its price target from $21.00 to $16.00.

302. Ardent's stock drop resulted from new, negative Company-specific information, not any market-wide or industry-wide factors. Thus, RBC's November 14, 2025 report highlighted Ardent's "***higher professional fees and payer denials than peers***." Similarly, on November 14, 2025, Morgan Stanley downgraded Ardent and slashed its price target from $22.00 to $12.00, writing that Ardent's "[u]pdated EBITDA guidance is a ***material setback*** and ***compares unfavorably to the performance at hospital peers***." Morgan Stanley called out Ardent's dramatic negative guidance revision as an outlier compared to peers that had raised guidance in 2025:

**Exhibit 1:** Ardent has seen negative estimate revisions despite a strong backdrop for hospitals




## V. FORMER EMPLOYEE ALLEGATIONS

303. Former Ardent and Ensemble employees (the FEs) provided information on a confidential basis that supports the false and misleading nature of Defendants' public statements and material omissions. Each FE was in a position to have personal knowledge of the information they conveyed. The FEs' accounts corroborate one another and the additional facts alleged herein.

304. FE-1 was an AVP of Revenue Integrity/Revenue Management at Ardent for nearly 20 years until June 2022. FE-1's role involved oversight of the "chargemaster" system, chart reviews, and audits for all of Ardent's hospitals. FE-1 reported to VP of Revenue Cycle, Peter Henry, who reported to Chief of Corporate Operations, Brian Walton; in turn, Walton reported to Bonick. According to FE-1, based on personal knowledge:

i. **Ardent's Private Equity Backer Set Aggressive Financial Targets:** FE-1 explained that Ardent's private equity sponsor, EGI, wanted to take the Company public and therefore set aggressive financial targets communicated in monthly meetings with Bonick and Lumsdaine. FE-1 heard about the meetings afterward and learned about EGI's targets because they were disseminated to FE-1 and other executives, who were tasked with managing their respective areas to hit the targets.

   a) For example, FE-1 budgeted the patient revenue for Ardent's hospitals and indicated that the targets for patient revenue were 30% to 50% higher than what was realistic. FE-1 stated that the targets were impossible to meet given the environment, since Ardent had volume issues, was losing providers, and largely had less desirable Medicare and Medicaid payor contracts.

ii. **After Acquiring Hospitals That Used Ensemble, Ardent Quickly Learned of Ensemble's Inflated Billing, Improper Coding, Extracontractual Price Increases, and Elevated Denials:** FE-1 explained that when Ardent acquired LHP, Ensemble was handling LHP's billing and collections for its hospitals in New Jersey and Florida. Ardent initially continued using Ensemble in these markets because terminating the contract would have been more expensive than continuing it, but intended to bring the acquired hospitals into Ardent's internal revenue cycle once the Ensemble contract expired.

a) However, Ensemble significantly underperformed at the New Jersey and Florida hospitals. FE-1 identified three issues:

i. First, Ensemble used revenue management software called Opera (later renamed to EIQ) that generated inaccurate results. FE-1's team was forced to use the software and quickly found that it generated inflated revenue and purported to identify "lost" revenue that did not exist. FE-1 raised this disconnect with Haun. Ardent stopped using the Opera tool because of its flaws, only to find out later that Ensemble purchased the program and rebranded it as an internal proprietary tool.

ii. Second, Ensemble engaged in overbilling and improper coding. For example, FE-1 discovered that one hospital alone was claiming $10 million in gross revenue that consisted of supply charges for sutures and other items that should not have been billed. Haun repeatedly expressed to FE-1 that Ardent should bill for everything, and if Ardent was paid in error, the payors could try to reclaim the money.

iii. Third, Ensemble attempted to raise prices above payors' contractually specified limits by implementing 10% price increases across the board.

b) The overbilling, improper coding, and price increases led to increased denials at the former LHP hospitals and a gap between their gross and net revenue. This gap was shown in MOR reports and financial reporting from Director of Financial Operations, Doug Winnett, which went to Bonick and Lumsdaine.

c) In 2021 and 2022, the two markets managed by Ensemble, New Jersey and Florida, ranked last among Ardent's markets—including with respect to denial rates. FE-1 knew this from receiving MOR reporting that included data by market.

iii. **Despite Ensemble's Underperformance and Internal Warnings, Bonick, Lumsdaine, and Haun Hired Ensemble Based on Inflated Revenue Projections:** Despite Ensemble's underperformance at the former LHP hospitals, around May 2021, Ensemble CEO Judson Ivy started meeting with Bonick and Lumsdaine to persuade them to engage Ensemble across Ardent's hospitals. FE-1 explained that Ensemble met regularly with Bonick and Lumsdaine, as well as Ardent's Board, and claimed that

Ensemble could bring in an additional $100 million in annual net revenue for Ardent and deliver nearly $1 billion in additional revenue over 10 years.

a) However, Ardent's internal revenue cycle executives concluded that Ensemble's annual projection was overstated by $60 to $100 million (*i.e.*, 60 to 100%) and largely based on assumptions of overbilling and improper coding. FE-1 emphasized that Ensemble did not have access to Ardent's Epic system to obtain actual data, and instead was simply assuming that Ardent could bill and collect additional amounts, which Ensemble treated as if they were actual cash.

b) Thus, starting in late 2021, Henry, Walton, and other executives warned Bonick and Lumsdaine that Ensemble's $100 million projection was not valid and presented slides showing that Ensemble was underperforming Ardent's in-house revenue cycle team, including with respect to denial rates. These meetings continued until Ensemble was engaged in May 2022. FE-1 personally attended some of the meetings with Lumsdaine and learned about other meetings from Walton and Henry when they reported back after meeting with Bonick and Lumsdaine.

i. Walton and Henry were particularly vocal in raising concerns to Bonick. Specifically, as Walton and Henry explained to FE-1, based on their experience with the former LHP hospitals, they informed Bonick about Ensemble's overstatements of actual revenue, across-the-board 10% price increases, and unrealistic forecasts.

ii. Bonick and Lumsdaine were presented with PowerPoint slides with side-by-side comparisons that showed Ardent's in-house revenue cycle team was significantly outperforming Ensemble in the markets they handled, including with respect to billing, cash collections and denial rates, as well as data showing that Ensemble was more expensive than Ardent's in-house cost of collection. FE-1 participated in preparing slides for FE-1's area, which were then provided to Henry, who assembled the final presentation. FE-1 knew about the contents of the final slides because they were available on Ardent's shared drive and recalled that Henry shared their contents. Henry also conveyed to FE-1 after meetings with Lumsdaine that they had discussed denial rates.

iii. FE-1's meetings with Lumsdaine (which also included Henry and Mac Franklin) focused on the revenue cycle and comparing Ensemble's reporting to Ardent's raw data. These meetings with Lumsdaine flagged that Ensemble was not using Ardent's Epic system as its data source and that Ensemble's results were significantly different than the results from Ardent's in-house revenue cycle team, as further explained in the slides that were presented to Bonick and Lumsdaine (described above).

c) Nonetheless, Bonick and Haun's personal relationships to Ensemble prevailed, and they decided to engage Ensemble. FE-1 confirmed that Bonick and Haun

had met Ensemble's founder Ivy at CHS and worked together for years. FE-1 also recalled numerous Ardent employees talking about how Haun was getting kickbacks from Ensemble. Further, even before Ardent signed the contract with Ensemble, Ardent employees were discussing how Bonick would obtain a seat on Ensemble's Board after Ardent signed.

iv. **Key Ardent Executives Left:** FE-1 confirmed that 10 of Ardent's AVP-level and above revenue cycle executives, including Henry, left or retired after Ensemble was engaged. Further, Walton left Ardent after a heated argument about Ensemble at a Board meeting; Walton was asked to leave the room, and a few days later he resigned.

v. **Ardent's Monthly Operating Reviews:** FE-1 confirmed that Ardent held regional and hospital-specific Monthly Operating Review, or MOR, meetings, and that the MOR reports were accessible to Bonick and Lumsdaine.

a) Specifically, for each meeting, there was an MOR packet—which was about 30 pages in length and addressed collections, denials, and write-offs—ready a few days before the meeting.

b) These MOR packets were accessible to Bonick and Lumsdaine from a shared drive. FE-1 believed the shared drive folder was titled "Monthly Operating Review packets" and included the reports organized by month.

vi. **Lumsdaine Received Regular Reporting on Denial Rates and Other KPIs:** FE-1 was copied on periodic emails to Lumsdaine, typically sent by Franklin or Henry, that compared Ardent's in-house revenue cycle performance to Ensemble's performance.

a) FE-1 believed that these emails were sent weekly to Lumsdaine and recalled that they attached dashboards from PowerBI and tracked denials, collections, receivables, coding, and case management using KPIs that were based on guidelines from the Healthcare Financial Management Association (HFMA) called the MAP Keys.

305. FE-2 was a VP Partnership Success at Ensemble from April 2024 until March 2026 and worked on the Ardent account from November 2024 to March 2026. FE-2 reported to VP of Revenue Cycle Wes Cranford, who reported to Senior VP of Client Delivery Janel Harmon; Harmon reported to President and Chief Operating Officer Shannon White. FE-2's role at Ensemble exclusively involved the Ardent account starting in November 2024. According to FE-2, based on personal knowledge:

i. **By March 2025, Ardent Decided to Write Down $43 Million in AR:** FE-2 explained that Ardent's $43 million AR writedown was first discussed in approximately March 2025. Specifically:

a) Even before FE-2 began to work on the Ardent account in November 2024, Ardent had started to implement the Kodiak system. As part of the project implementation, Kodiak generated monthly reports that indicated the expected AR amount under the Kodiak system.

b) FE-2 believed that around March 2025, Lumsdaine saw a monthly Kodiak report with a significantly lower AR number than Ardent was currently calculating. FE-2 learned about the Kodiak reports from Cranford and Chief Revenue Cycle Officer Jason Pritchard.

c) This prompted Lumsdaine to text Ensemble's founder, Judson Ivy, on a Sunday in March 2025 indicating that Ardent needed to take a substantial AR writedown. Cranford notified FE-2 by text about Lumsdaine's Sunday message.

   i. FE-2 noted that Ivy engaged in regular text message communications with Lumsdaine, Richard Haun, and John Latina.

d) Lumsdaine's Sunday text prompted immediate activity at Ensemble. FE-2 coordinated getting Ensemble's leadership on site at Ardent's offices in Nashville, and FE-2, Ivy, Shannon White, and Jason Pritchard traveled to Nashville and met in Ardent's "Board room," which was located on the fifth floor adjacent to the CEO and CFO offices. FE-2 drove to Nashville nearly every week to be on site at Ardent.

e) <u>First</u>, FE-2, Cranford, and other Ensemble personnel prepared a presentation for Ardent's Board. FE-2 worked on about seven slides of the presentation that focused on explaining the gap of approximately $43 million between the Kodiak and Ardent AR calculations and why Ardent was experiencing degradation in its collections.

f) <u>Second</u>, in April 2025, Ivy and White from Ensemble presented the slides to Ardent's Board in Nashville. Bonick and Lumsdaine attended the presentation.

   i. FE-2 saw the final Ensemble Board presentation. In addition to FE-2's slides explaining the gap between the Kodiak and Ardent AR calculations, other slides focused on denials, with a matrix that identified the financial impact of various items and how Ensemble would try to collect them. The Board presentation also contained extensive discussion about Ardent's increasing payor denials (discussed below).

   ii. FE-2 also received an email, likely from Ivy's assistant, that summarized the discussion during the Board meeting and contained a

list of follow-up items, including items that Ensemble would present to Ardent each month going forward.

g) Third, after the April 2025 Board presentation, Ardent launched various revenue cycle initiatives in an effort to claw back the dollars that needed to be written off. FE-2 stated that these initiatives included efforts to recover money from payors (discussed below), self-pay initiatives, and initiatives focused on denials.

ii. **Ardent's Increasing Payor Denials Were Presented to the Board in April 2025:** Ensemble's April 2025 presentation to Ardent's Board (described above) included extensive discussion on Ardent's increase in denials. As indicated above, Bonick and Lumsdaine attended the Board presentation.

a) FE-2 explained that Ardent suffered from increasing payor denials that significantly increased its time to collect, which reached up to 18 months. For example, after a complex cardiac procedure, payors might pay Ardent a minimal amount for the patient's emergency room visit but refuse to pay for the expensive cardiac procedure itself.

b) FE-2 recalled that the April 2025 Board presentation broke down Ardent's denials by quarter and showed a very significant increase in both first pass denials and level of care denials, which was causing a significant slowdown in Ardent's cash collections. FE-2 confirmed that the data from Ensemble did not indicate that Ardent's denials had stabilized in the first part of 2025.

iii. **Ardent Unsuccessfully Tried to Recover $35 Million from Payors:** FE-2 noted that Ardent's $43 million writedown included approximately $35 million that Ardent was trying to recover from large payors. FE-2 participated in weekly calls about these recovery efforts and discussed them in monthly meetings with Lumsdaine (discussed below), but the approximately $35 million figure did not decline throughout 2025.

iv. **Lumsdaine Received Updates in Recorded Monthly Meetings:** FE-2 participated in two types of monthly meetings with Lumsdaine. FE-2 believed both types of monthly meetings were recorded.

a) First, after the April 2025 Board presentation (described above), FE-2 participated in monthly senior leadership meetings with Lumsdaine, Latina, Haun, and David Byers (Ardent's SVP and Chief Accounting Officer) about Ardent's writedown and switch to Kodiak. These meetings were held in person in Nashville, although Ensemble used Teams so that optional attendees could be called in by video if needed. Ensemble used Teams to record the meetings.

i. During these meetings, the attendees discussed Ardent's $43 million writedown. FE-2 recalled that there was no real debate about the need for a writedown, although the participants discussed how it was calculated and whether the writedown (a) related to "real dollars" or

"inflated AR," meaning money that Ardent was not truly owed, or (b) overlapped with amounts that Ardent was pursuing from payors.

ii. Ensemble provided PowerPoint presentations and detailed spreadsheets for the senior leadership meetings, including several that quantified and explained the $43 million figure. These materials were saved to a shared Teams site.

b) Second, FE-2 attended monthly MOR meetings with Latina, Haun, Lumsdaine, and Ardent's regional CFOs where they discussed the performance of Ardent's projects resulting from the April 2025 Board meeting. FE-2 noted that Lumsdaine usually attended these MOR meetings, and when he didn't, Ensemble sent an email summary of the decisions made and follow-up items.

i. During the monthly MOR meetings, Ensemble provided breakdowns of the disputed amounts.

- Within the $35 million, the largest payors included Blue Cross Blue Shield, Cigna, and United.

- The primary reasons for the payor disputes included stop-loss provisions (where payors owed Ardent additional amounts if certain thresholds are met), partial payments, and level of care downgrades (where payors reduced Ardent's billing codes to lower-paying categories).

- The amounts in dispute related to claims submitted as early as 2018.

ii. The monthly MOR meetings were held via Teams and lasted up to two hours, although towards the end of FE-2's tenure they were shortened to one hour.

iii. Ensemble provided slides for the MOR meetings that included about 10 slides on projects and over 100 slides on operational status. These slides were emailed to Lumsdaine and others and also saved as PDFs to the Teams drive.

v. **Ensemble Reflected Ardent's Writedown in Its Performance Goals by July 2025:** FE-2 learned in July 2025 that Ardent was taking the $43 million writedown because Ensemble needed to reflect the writedown in its cash collection goals. Cranford or Pritchard explained to FE-2 that Ensemble needed to make the adjustment, which increased the amount of cash that Ensemble needed to collect. Ensemble recorded the adjustment as of June 2025.

vi. **Lumsdaine and Bonick Attended Regular Executive Meetings with Ensemble:** FE-2 noted that Ivy and White from Ensemble held monthly executive meetings with

Lumsdaine and also met periodically with Bonick; FE-2 received takeaways from these meetings, usually from Ivy's assistant.

306. FE-3 worked at Ardent as a Regional Professional Fee Coding Director from August 2021 to July 2022, then moved to Ensemble when Ardent outsourced its RCM function to Ensemble. At Ardent, FE-3 reported to AVP, Hospital and Professional Coding Jeff Lewis. At Ensemble, FE-3 was the Director of Physician Coding from July 2022 to April 2025 and serviced the Ardent account during that entire time. At Ensemble, FE-3 reported to Senior Director of Coding Amber Bartlett, who reported to VP of Coding Services, Julie Appleton; Appleton reported to President and Chief Operating Officer Shannon White. According to FE-3, based on personal knowledge:

i. **FE-3's Role:** At Ensemble, FE-3 oversaw multiple managers and supervisors and led a team of more than 50 coders responsible for ensuring the accuracy of professional fees and billing for Ardent and 17 other clients. FE-3's team covered cardiology, which was a large percentage of each client's business. FE-3 estimated that cardiology was about one-third of Ardent's total business.

ii. **Ensemble Overpromised and Mishandled the Account, Leading to Errors, Increased Claim Denials, and Lost Revenue:** Ensemble's selling point to Ardent was that it would increase Ardent's revenue; Appleton stated to FE-3 that this was part of Ensemble's contract. However, Ensemble did not achieve any revenue increase for Ardent. Instead, Ensemble ran things "like a bull in a china shop" and merely offshored a large portion of coding work to overseas vendors at much cheaper rates.

a) FE-3 described several problems at Ardent and Ensemble that led to improperly coded claims and ultimately drove higher payor denials.

i. First, a flaw in Ardent's programming led to incomplete diagnosis information and Ensemble's process prevented correct coding of claims. For example, FE-3 explained that when doctors ordered EKGs for chest pain, the coding team needed to review the EKGs to determine the actual diagnosis and code it. However, to keep costs down, Ensemble decided to code based only on the ordering diagnosis and submit claims without reviewing the actual EKG records.

ii. Second, Ensemble instructed its coders to upcode Ardent's claims for sick visits as part of Medicare annual wellness appointments. FE-3 recalled that this practice started in late 2022; FE-3 raised concerns

about this upcoding with Appleton, leading to FE-3 being transferred to cardiology.

iii. Third, FE-3 explained that payors typically require claims to be filed within 90 days and deny claims filed late. However, many of Ardent's claims were close to—or past—the 90-day deadline during Ensemble's work. This led to hasty efforts to push out incomplete, improperly coded claims with no review.

b) FE-3 regularly talked to other directors outside the cardiology area, who reported similar issues with claims. The result of the flawed coding was increased payor denials for Ardent. FE-3 explained that Ensemble pushed coders to "just work the edit and get it out the door," while ignoring other defective codes that often led to rejection. For example, FE-3 observed claims where Ensemble fixed one issue, but the claim also included five other defects that were not corrected. As FE-3 remarked: "You knew this is a denial coming because nothing is being looked at."

c) FE-3 could tell that Ardent's denial rates were increasing based on the flawed and unreviewed coding submitted to payors. FE-3 noted that Ardent had real-time access to payor denials through the Epic platform.

d) FE-3 noted that due to Ensemble's tactics and the volume of defective claims, the team under Ardent's Compliance Director, Cindy Willis, had to perform an extreme amount of audits and file many corrective claims, requiring them to hire more auditors.

e) By the time of FE-3's departure from Ensemble in April 2025, Ensemble's relationship with Ardent was strained as a result of these issues.

iii. **Ardent Was Made Aware of Issues at Ensemble and Certain Executives Raised Concerns:** FE-3 explained that both Appleton and Ardent's regional CFOs pushed Ensemble for higher monthly revenue and submitting more claims. For example, Ardent's regional CFOs monitored revenue and could see that Ensemble had outstanding claims, prompting them to email FE-3 to state that cash was low for the month, question why the claims hadn't been submitted, and push for submitting them by month-end. FE-3 noted that the regional CFOs for Ardent's health systems in Oklahoma; Pocatello, Idaho; and Tyler, Texas sent these emails most frequently.

a) FE-3 understood that multiple Ardent executives—Brian Walton, former Chief of Corporate Operations, and Peter Henry, former VP of Revenue Cycle—raised concerns internally about Ensemble during FE-3's tenure at Ardent. Specifically, Walton and Henry were concerned with Ensemble's unrealistic revenue targets. FE-3 understood that Walton raised this to Bonick, who was displeased. To FE-3's knowledge, these concerns were not appreciated or acted upon. FE-3 recalled Walton being pushed out shortly after raising these concerns.

307. FE-4 was a Senior Director of Client Delivery at Ensemble from April 2024 until October 2025. FE-4's role included training Ensemble's client delivery personnel who worked on the Ardent engagement. FE-4 reported to Administrative VP for Client Integration, Courtney Cook, who reported to Client Delivery Executive, Carrie Meeker ("Meeker"). According to FE-4, based on personal knowledge:

i. **By 2024, Ardent Was an "Escalated" Ensemble Client, Triggering Senior Executive Involvement:** Within five or six months after FE-4 started (i.e., by September or October 2024), Ardent became an "escalated" client at Ensemble because of Ardent's high amount of AR and underlying issues with Ardent's coding, claim denials, and backlog.

   a) Ardent's escalation triggered more frequent meetings and the involvement of more senior executives on both the Ardent and Ensemble sides. FE-4 sat in on weekly calls between Ardent and the Ensemble client delivery personnel. FE-4 explained that Ensemble had two client delivery employees dedicated to Ardent, and turnover in these positions was extremely high because the escalation made Ardent a particularly demanding client.

ii. **Ensemble Held Extensive Meetings with Ardent Executives:** FE-4 described two types of regular meetings between Ensemble and Ardent executives:

   a) First, Ardent and Ensemble held various weekly meetings via Teams. Each meeting focused on a specific topic, such as Ardent's coding, charges, and claim denials. FE-4 attended these meetings and believed they were all recorded, which was Ensemble's practice. FE-4 explained that Ensemble typically had 6-7 weekly meetings with each client, but as a result of Ardent's escalation, Ensemble held 14-15 weekly meetings, plus additional working sessions, with Ardent. Ardent attendees at the weekly meetings included President of Hospital Operations David Schultz; Operations CFO Richard Haun; SVP of Finance Elliott Brown; VP of Reimbursement Tim Miner; AVP of Strategic Growth and Health Services Analytics Jeremy Luttrell; Americas Region CFO Todd Huffman; and SVP FP&A Bracey Halbrook.

   b) Second, Ardent and Ensemble held end-of-month meetings to review Ardent's revenue, aged and outstanding amounts, and collections. FE-4 indicated that this data was obtained from Ardent's Epic system, which provided robust reporting and dashboards. In connection with these monthly meetings, FE-4 recalled that Ensemble's team, including Meeker, went on site to Ardent's Tennessee headquarters to prepare end-of-month reports. FE-4 noted that Meeker spent significant amounts of time at Ardent's Tennessee location.

iii. **Despite the Escalation, Ardent's Issues with Coding, Denials, and Aged Accounts Receivable Remained Unresolved for Over a Year:** FE-4 explained that despite the numerous meetings starting in fall 2024, the issues at Ardent did not improve. FE-4 stated that Ardent's executive team was rude and put a lot of pressure on Ensemble to clean up Ardent's problems with coding, denials, and aged accounts receivable, as detailed below. However, these issues did not improve—and Ardent remained escalated—at the time of FE-4's departure from Ensemble in October 2025.

a) One key issue was a flaw in Ardent's coding, which persisted over multiple months. FE-4 recalled that Ardent blamed Ensemble for the coding error, arguing that as the subject matter experts, Ensemble should have caught Ardent's error. FE-4 indicated that Ardent did not want to take responsibility for its error. FE-4 stated that as a result of the coding error, the issues spiraled and snowballed.

i. First, the coding error caused a large amount of claims denials.

ii. Second, the excessive denials increased Ardent's backlog and impacted its revenue.

iii. Third, the coding issue led to accounts receivable that were not being worked. FE-4 recalled discussion of Ardent's aged accounts receivable, with a bucket of about $10 million that was close to 365 days old. FE-4 noted that receivables get sketchy after 120 days and become truly uncollectible after 180 days.

b) In response, Ensemble's operations team was tasked with developing an action plan, but the deadlines in the action plan were not met, in part because Ardent did not timely provide medical records. FE-4 explained that many denials required medical records to review, but because of Ardent's delay in providing the records, Ensemble could not timely work the denials, which added to Ardent's backlog.

c) Ardent's failure to provide medical records also hindered Ensemble's ability to clean up the accounts receivable that required medical records to resolve. The aged accounts receivable continued to accrue on a daily basis because Ardent did not provide Ensemble with the necessary records to resolve them.

d) FE-4 noted that writing off Ardent's aged accounts receivable was discussed by approximately April 2025 and was always part of the action plan. However, at the time of FE-4's departure from Ensemble in October 2025, the write-off remained in the action plan because the aged AR still had not been written off.

308. FE-5 was Ardent's AVP of Payer Contracts from before the Class Period until August 2024, and Market VP, Payer Strategies from August 2024 until July 2025. FE-5 reported

to Senior VP for Payer Strategies, Robert Coscione, who reported to Lumsdaine. According to FE-5, based on personal knowledge:

i. **FE-5's Role:** FE-5 negotiated Ardent's contracts with payors in two of Ardent's largest markets, Oklahoma and New Mexico. These contracts collectively involved nearly $2 billion in annual revenue and included all payors in both markets, ranging from large payors like UnitedHealthcare, Cigna, Aetna, Humana and Blue Cross Blue Shield plans to regional and local payors.

ii. **Ardent's Rate Increase Target:** For new contracts across FE-5's markets, FE-5 was given a target to achieve overall rate increases that averaged to about 6%, and understood the target was set by Lumsdaine and Coscione.

iii. **Actual "Revenue Lift" Consistently Fell Below Ardent's Expectations:** FE-5 explained that Ardent analyzed its expected and actual revenue from payor contracts as follows:

a) <u>First</u>, Ardent modeled the expected "revenue lift" from a new contract by analyzing the proposed contract terms in light of various historical data points, including utilization and payor denial rates from the prior year. FE-5 indicated that this modeling of expected revenue lift was performed by Director of Payer Analytics Johnna Elmore and her team.

b) <u>Second</u>, once the contract was in place, Ensemble tracked the actual revenue from the contract and whether it matched the expected revenue lift. FE-5 stated that actual revenues were almost always lower than the expected amounts. FE-5 learned of this divergence when other Ardent personnel highlighted it to FE-5's contracts team.

iv. **In 2024, UnitedHealthcare Flagged Ardent's Duplicate Claims as a Major Cause of Denials:** FE-5 indicated that UnitedHealthcare was significantly increasing its denials of Ardent's claims in Oklahoma, and in 2024, advised Ardent that the vast majority of its denials were because Ardent was submitting duplicative claims. Specifically:

a) In mid-to-late 2024, FE-5 (with others from Ardent) met with UnitedHealthcare leadership and data personnel to discuss trends in Oklahoma, one of Ardent's largest markets—in particular, why Ardent's actual revenues were not meeting its expectations.

b) The UnitedHealthcare personnel explained that based on their analysis, UnitedHealthcare was primarily denying Ardent's claims because they were duplicates. They indicated that the percentage of Ardent's denied claims that were duplicates was in the high 80% to low 90% range. FE-5 believed this figure was based on data from 2024.

c) At the meeting, the UnitedHealthcare personnel indicated that the percentage of duplicate denials was so high because Ardent appeared to be re-submitting the same denied claims repeatedly instead of fixing the problems that led to the denials. In short, Ardent was submitting the same claims over and over.

d) Because Ensemble was not in the meeting with UnitedHealthcare—and had not advised Ardent of the large percentage of claims being denied as duplicates—FE-5 conveyed UnitedHealthcare's analysis to Ensemble. However, when FE-5 called and asked Ensemble to confirm or deny the issue, there was a long silence—and the Ensemble personnel hung up and never followed up with FE-5.

e) After the 2024 meeting with UnitedHealthcare, FE-5 did not see any improvement in denial rates.

v. **Ardent's Senior Management Defended Ensemble:** FE-5 stated that no one at Bonick or Lumsdaine's level wanted to hear criticism of Ensemble; Ardent's senior management insisted that Ensemble was "best in class" and doing everything perfectly. While FE-5 and others knew that was not true, they could not say anything without risking their jobs.

vi. **Monthly Leadership Calls:** Throughout FE-5's tenure, FE-5 attended monthly "leadership calls" with Bonick, Lumsdaine and other executives, which lasted approximately 60 to 90 minutes. FE-5 indicated that prior to the IPO, these calls discussed company performance, while after the IPO, the focus shifted to more general topics and issues like upcoming analyst meetings, recent acquisitions, and new HR policies.

vii. **Ardent Commences Significant Layoffs in June 2025:** FE-5 stated that Dave Caspers, who became Ardent's Chief Operating Officer in March 2025, quickly initiated layoffs. FE-5 was laid off in the first wave, in June 2025, and heard that 1,000 people were laid off at the same time. FE-5 also heard that since those initial layoffs, three or four more waves of layoffs have followed. FE-5 noted that an organization on track to meet its numbers does not act like Ardent did and lay off large numbers of employees.

309. FE-6 was the CFO of an Ardent-owned hospital from May 2025 to October 2025. FE-6 reported to regional CFO Cynthia Gray, who reported to Ardent's Operations CFO, Richard Haun. According to FE-6, based on personal knowledge:

i. **Ensemble Failed to Timely Address Large Claim Denials:** FE-6 described a noticeable pattern whereby Ensemble failed to timely follow up on payors' denials of large claims of over $100,000. FE-6 believed that Ensemble was understaffed and its largely remote staff was not working at full efficiency.

a) Ensemble's lack of timely follow-up was apparent in Ensemble's MOR meetings (discussed below), where FE-6 often asked about the status of these large denied claims, only to learn that Ensemble had not made any progress.

b) FE-6 also understood from discussing with other Ardent executives that Ensemble's lack of follow-up on large claims also persisted at other Ardent hospitals.

ii. **Ardent's Monthly Operating Reviews Provided Detailed Reporting of Denial Rates and Other Key Metrics:** FE-6 attended two types of monthly MOR meetings:

a) First, FE-6 attended monthly regional MOR meetings with Richard Haun, Cynthia Gray, and the CEOs and CFOs for the nine hospitals in FE-6's region. These meetings were held in-person at a central location within the region. FE-6 stated that presentations of approximately 30 pages each—covering current numbers, forecasts, headwinds and tailwinds—were provided in advance of each meeting. The information for each presentation was submitted to Gray's assistant, who collated it into the final set of slides emailed to the attendees. During the meetings, Haun asked questions; Haun also mentioned other regions' results and processes to compare and contrast with FE-6's region, indicating that Haun attended the MOR meetings for each region.

b) Second, FE-6 attended monthly MOR meetings with Ensemble focused on FE-6's hospital. These meetings were attended by an Ensemble relationship executive, Chad Smith, as well as the hospital's CEO, CFO, and CMO.

i. For these hospital-specific meetings, Ensemble provided detailed presentations (also approximately 30 pages in length) on each hospital's collections, payor denials, and other metrics. Chad Smith emailed the presentations.

ii. FE-6 noted that Ensemble's presentations included detailed breakdowns of AR and collections, such as showing the percentages of AR collected within 45 days and 90 days, breaking down the aging of AR by payor, and comparing these figures to trends and industry benchmarks.

iii. The presentations also included detailed reporting on denial rates, including breakdowns into "soft" denials (requests for medical records) and "hard" denials (outright refusals to pay) by each payor. FE-6 noted that the presentations called out Ardent's increasing denials from UnitedHealthcare after United's CEO was killed in December 2024.

iii. **FE-6 Questioned a Sudden Increase in Radiology Subsidies:** FE-6 questioned Ardent's public claim of a sudden increase in radiology subsidies in 3Q25, noting that such large increases do not appear overnight. FE-6 noted that the MOR meetings discussed headwinds and tailwinds, and contentious renewal meetings with Ardent's radiology providers would be discussed as a headwind.

310. FE-7 was the Director of Diagnostic Imaging at an Ardent-owned hospital in New Mexico from before the Class Period until June 2025. FE-7 managed the operations of the hospital's radiology department, which included budgeting, business development outreach to providers, coordinating with other department heads, and managing internal projects. FE-7 typically reported to the CEO of his hospital, although he sometimes reported to the hospital's Chief Nursing Officer given frequent CEO turnover. The hospital's CEO reported to Lovelace Health System's regional executives, who reported to Ardent's Operations CFO, Richard Haun, and President of Hospital Operations, David Schultz. According to FE-7, based on personal knowledge:

i. **Ardent's Increase in Radiology Professional Fees Was Foreseeable:** FE-7 said that any suggestion that Ardent was caught off-guard by increases in radiology professional fees in 2025 was "baloney." FE-7 indicated that Ardent knew well before 2025 that higher professional fees for radiologists were going to be an issue, as detailed below.

ii. **The Failed 2024 Negotiations with Radiologists in New Mexico:** In summer 2024, Lovelace lost most of its radiologists for refusing to increase their compensation, creating an urgent staffing need.

a) FE-7 stated that the bulk of Lovelace Health System's imaging services were performed by approximately 12 radiologists affiliated with the group Zia Diagnostic Imaging.

b) In early 2024, the Zia radiologists approached Lovelace and requested an increase in compensation.

c) FE-7 was privy to these radiologists' negotiations with Lovelace. FE-7 believed that Ardent corporate personnel were also involved in the negotiations with Zia given the dollar amount in question. FE-7From reviewing revenue reports for the Lovelace hospitals, FE-7 estimated that imaging (including radiology) generated over $100 million in annual net revenue for the Lovelace system.

d) However, Lovelace did not appear to understand the importance of radiology and the difficulty in finding new radiologists. The negotiations failed, and in summer 2024, the Zia radiologists left and stopped providing services for Lovelace.

iii. **In Summer 2024, Ardent Brought in Radiology Partners at High Cost:** Without Zia, Lovelace was in dire need of radiologists. Ardent had to quickly sign on a large national provider of radiology services, which FE-7 said "cost them a pretty penny."

a) While Ardent contacted multiple radiology groups to provide services for Lovelace, only Radiology Partners—a large national provider—was willing and able to take the job.

b) FE-7 stated that the other radiology groups were unable to meet Lovelace's staffing needs given an ongoing national shortage of radiologists, which FE-7 indicated was not a new development. FE-7 believed that the absence of competition and the urgent need to engage radiologists gave Radiology Partners substantial leverage and allowed them to charge high fees.

iv. **Radiology Contracts Have Multi-Year Terms and Require Advance Notice Before Termination or Rate Increases:** FE-7 questioned the idea that Ardent was surprised by higher professional fees and subsidies in 2025 because radiology contracts typically have three-year terms and require 90 to 120 days' notice before termination. As a result, FE-7 indicated that any negotiations about raising fees would typically start at least several months before a contract terminated.

a) FE-7 noted that because of the contracts' multi-year length, it should not be a surprise that radiologists would want more money to enter a new contract when their contracts expire, and that hospitals budget for those increased fees.

b) FE-7 was privy to numerous contracts between hospital systems and radiology providers, including Lovelace's contract with Zia. FE-7 was also generally aware of the terms of the Radiology Partners contract.

v. **Ardent's Imaging Advisory Council Discussed Radiology Trends:** FE-7 was an inaugural member of Ardent's company-wide Imaging Advisory Council, which was formed in early 2024 for radiology leaders across Ardent to discuss strategic issues.

a) All of Ardent's other Imaging Directors were invited to the Council, along with Ardent's VP of Diagnostic Services, Adam Mattox. There was a "core group" of approximately 12 who regularly attended Council meetings, including FE-7.

b) The members of the Imaging Advisory Council discussed volume increases and radiology staffing. FE-7 believed Lovelace's switch from Zia to Radiology Partners was mentioned to Mattox at a Council meeting.

311. FE-8 was the Vice President of Urgent Care at Ardent from August 2023 to December 2025. FE-8 was in charge of building out Ardent's urgent care network across all markets, which reached 55 locations by the end of 2025. According to FE-8, based on personal knowledge:

i. **Significant Increases to Ardent's Radiology Professional Fees Were Locked In Well Before 3Q25:** FE-8 was privy to Ardent's negotiations with radiology providers in all markets because the urgent care clinics under FE-8's purview used the same radiology providers as Ardent's hospitals. FE-8 explained that in late 2024 and the first half of 2025, Ardent renewed its contracts with its radiology providers in most markets at significantly higher cost. Specifically:

   a) Ardent's VP of Physician Services, Shane Olivier, handled negotiations with radiology providers. FE-8 corresponded regularly with Olivier about the negotiations, including in-person and by text and email. FE-8 understood that Olivier reported on the negotiations to Ardent's Executive Leadership Team, which included Bonick and Lumsdaine, as well as regional executives.

   b) FE-8 learned the results of the negotiations because FE-8 needed to ensure that each urgent care clinic was able to provide radiology services and needed the Relative Value Units (RVUs) that Ardent had agreed to pay the radiology providers to model the urgent care network's costs per X-ray.

   c) FE-8 explained that Ardent's contracts with radiology providers were renegotiated in its various markets in 2024 and 2025, with Ardent's largest markets locked in by mid-2025 (or earlier), and the results made clear that Ardent's radiology professional fees were going up significantly. Specifically:

      i. For Texas, Ardent's contract negotiations with radiology providers were finished in late 2024 or early 2025.

      ii. For Oklahoma and New Mexico, Ardent's contract negotiations with radiology providers were completed in the first half of 2025 or earlier.

      iii. By the midpoint of 2025, only Idaho still had open negotiations with Ardent's radiology providers.

   d) In each case, the renewed radiology contracts had terms of at least three years and specified the professional fees and subsidies that Ardent was required to pay each provider, which were a significant increase from the prior contracts. FE-8 explained that the radiologists demanded drastically higher fees and had leverage over Ardent because of an ongoing radiologist shortage.

ii. **Ardent Had Visibility into Higher Professional Fees for Its Financial Modeling:** FE-8 explained that Ardent knew what the contracts said in terms of radiology professional fees, and Ardent had the ability to incorporate the known fee increases into its financial modeling. Specifically, the new contracts required Ardent to pay higher fees per RVU, which was straightforward to incorporate into Ardent's financial modeling and forecasting.

   a) FE-8 noted that Ardent's financial forecasting was initially performed at the regional or market level, then rolled up to the corporate level, and that the

regional CFOs (such as Cynthia Gray in Texas) were directly involved in the rate negotiations and knew the higher per-RVU rates in Ardent's contracts.

b) FE-8 noted that radiology providers take time to bill, and payors may take time to pay Ardent, so Ardent may ultimately pay the radiology fees to providers 90-120 days after the date of service. However, the higher fees themselves are specified in Ardent's contracts and known well in advance of the actual payments, as explained above.

312. FE-9 was an Accounts Receivable Denials Specialist at Ensemble from before the Class Period until May 2025 and worked on the Ardent account from 2022 to May 2025. FE-9 reported to Director Accounts Receivable, Sheila Sweeney, who reported to Director Lisa Moa; Moa reported to Senior VP Michelle Brown. FE-9's role involved managing claim denials for at least 10 of Ardent's hospitals in Texas, as well as hospitals in the Lovelace Health System in New Mexico and certain hospitals in New Jersey. According to FE-9, based on personal knowledge:

i. **Ensemble Began to Offshore the Ardent Denial Teams in 2023:** FE-9 explained that in mid-to-late 2023, Ensemble began to use offshore personnel in India to manage Ardent's payor denials.

ii. **Ardent's Denials Significantly Increased from 2023 Through 2026:** FE-9 saw a significant increase in denials that started in mid-to-late 2023, in parallel with Ensemble's use of offshore personnel.

a) Specifically, FE-9 had a queue of about 1,000 to 1,500 denials for the hospitals FE-9 worked on.

b) However, by mid-to-late 2023, the denials increased by 200 to 300 additional claims per day for FE-9's hospitals alone. These additional denials were transferred to the offshore team to the extent the denied claims were below a dollar threshold (which was initially $500, and then increased over time).

c) Throughout 2024 and 2025, the sum of outstanding denials between FE-9's queue and the denials transferred to the offshore team continued to increase, and there was no period of time with a decrease in this number. FE-9 reiterated that any denials that were processed were replaced at a faster rate by new ones. As FE-9 stated, Ensemble was always playing catch-up.

d) FE-9 noted that Ensemble had four teams handling Ardent's denials, each comprised of 6 to 7 people. FE-9's colleagues (on both FE-9's own team and the other teams) had similar volumes of denials and observed the same trend of increasing denials.

iii. **Ardent's Increasing Denials Were Not Resolved:** FE-9 explained that the offshore team was ineffective at resolving the payor denials, so the number continuously increased.

a) For example, FE-9 noted that the offshore workers were supposed to call payors to follow up on denials, but in practice, they never called due to the difference in time zones. As FE-9 explained, the offshore workers were working in the middle of the night in the U.S., when the payors were not open.

b) Further, FE-9 was instructed to fix only the single discrete error initially identified by a payor in its denial, even if other errors were apparent on the face of the claim. This predictably led to another denial. Ensemble also instructed denial personnel to resubmit denied claims to payors.

c) FE-9 was required to categorize each denial by reason so Ensemble could break it down for reports to Ardent.

i. FE-9 recalled that the most frequent types of denials related to improper coding and lack of prior authorization. FE-9 estimated that 60% of denials were for improper coding.

d) FE-9 noted that the denials Ensemble was working on were typically five to six months old and believed that 80% of the claims were older than 180 days.

313. FE-10 was a Business Relationship Manager at Ardent from August 2024 to September 2025. FE-10's role involved business strategy within hospital operations and physician services, including creating "charters" with strategic recommendations on areas of interest identified by Ardent's leadership. FE-10 reported to VP, IT Strategy and Operations, Jess Botros, who reported to Chief Digital and Transformation Officer, Anika Gardenhire; Gardenhire reported to Bonick. According to FE-10, based on personal knowledge:

i. **Ardent Created a Key Initiative to Reduce Payor Denials in August 2024:** FE-10 explained that in August of each year, Ardent management, which FE-10 believed included Bonick, decided on a set of key initiatives for the following year.

a) FE-10 stated that one key initiative for 2025 and beyond was to reduce payor denials. Specifically, FE-10 was assigned to work with Ardent's then-Chief of Enterprise Services, John Latina, to write a charter for reducing payor denials.

b) FE-10 indicated that the initiative was to focus on inpatient denial categories, especially on medical necessity denials and level of care downgrades. FE-10 recalled that the initial goal was finding a way to decrease denials by 2-3%, although that was later revised to a dollar amount of about $4-5 million.

c) FE-10 recalled that the charter was due in March 2025. However, FE-10 was forced to submit the charter nearly a month late because FE-10 was unable to get data about denials from Latina. FE-10 made numerous requests to Latina for data on Ardent's denials, but explained that it was like pulling teeth.

d) Around April 2025, the charter was completed. FE-10 submitted it to Latina for review.

ii. **The Denial-Reduction Initiative Still Had Not Started by September 2025:** When FE-10 left Ardent in September 2025, the denial-reduction initiative in the 2025 charter had not yet started. When other projects were implemented from charters FE-10 drafted, FE-10 was informed, wrote further business cases for them upon commencement, and created monthly reports tracking them against the charters. FE-10 also noted that the projects were supposed to be assigned to a project manager for execution. However, at the time of FE-10's departure, none of that had occurred for the denial-reduction initiative.

# VI. SECURITIES ACT ALLEGATIONS

## A. The Registration Statement Contained Material Misstatements and Omissions

314. On June 21, 2024, the Company filed a registration statement for its IPO with the SEC on Form S-1, which, after amendments dated July 8, 2024, July 10, 2024, and July 15, 2024, was declared effective on July 17, 2024 (the "Registration Statement"). The Registration Statement was signed by Defendants Bonick and Lumsdaine. On July 18, 2024, Ardent filed a final prospectus on Form 424B4, which was incorporated into and formed part of the Registration Statement.

315. The misstatements and omissions that Plaintiffs allege to be actionable under the Securities Act are included in this section.

### 1. Materially False and Misleading Statements Concerning Ardent's Safety, Quality and Professional Liability.

316. The Registration Statement stated: "At Ardent, culture, ***safety, quality, and compliance represent the foundation of our platform***."

317. The Registration Statement also stated: "Over our more than 20 years of experience, ***we have developed a core competency*** for efficiently and effectively operating healthcare facilities and physician groups to ***provide high-quality patient care that exceeds CMS benchmarks***."

318. The Registration Statement also stated (emphasis in original): "***Commitment to delivering the highest quality patient care in a consumer-centric ecosystem***[.] Our consumer-centric ecosystem drives better patient experience by improving safety of care, readmission, and mortality rates and ensuring the patient is seen at the appropriate site of care."

319. The Registration Statement also stated: "We maintain ***company-wide compliance and quality assurance programs*** and use patient care evaluations and other ***assessment methods*** to support and monitor quality of care standards and meet accreditation and regulatory requirements."

320. The Registration Statement also stated that "[w]e maintain professional malpractice liability insurance and general liability insurance in amounts we believe are ***sufficient to cover claims arising out of the operations of our facilities***."

321. The Registration Statement stated that "***[a]t March 31, 2024, our professional and general liability accrual for asserted and unasserted claims was $278.5 million***, of which $223.9 million was included in self-insured liabilities and $54.6 million was included in other accrued expenses and liabilities in the condensed consolidated balance sheet" and that "***[w]e provide an accrual representing the estimated ultimate costs of all reported and unreported claims incurred and unpaid*** through the respective balance sheet dates, which ***includes the costs of litigating or settling claims***."

322. The Registration Statement stated: "***The Company records accruals for such contingencies to the extent that the Company concludes it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated***."

323. The Registration Statement stated: "Apart from the Cybersecurity Incident, ***the Company does not believe that it is party to any proceeding that, either individually or in the aggregate, in the opinion of management, could have a material adverse effect*** on the business, financial condition, results of operations or liquidity."

324. The statements identified in Paragraphs 316-323 were materially false because:

(1) Patients suffered from serious, pervasive "safety, quality, and compliance" violations at multiple Ardent-owned hospitals across different states, including patients who were paralyzed or nearly killed by Erasmus; infants and mothers who were killed or brain-damaged at Lovelace Women's Hospital; and patients who were infected by contaminated surgical instruments at PMC in Idaho;

(2) Ardent did not "provide high-quality patient care," deliver "the highest quality patient care," or "improv[e] safety of care, readmission, and mortality rates," but instead repeatedly cut corners and disregarded patient safety;

(3) Ardent lacked adequate "company-wide compliance and quality assurance programs" and "assessment methods," including as to testing doctors' fitness to practice, performing medically necessary C-sections, and sterilizing surgical instruments;

(4) Ardent did not maintain professional malpractice liability insurance in amounts "sufficient to cover claims arising out of [its] operations";

(5) Ardent did not "provide an accrual representing the estimated ultimate costs of all reported and unreported claims incurred and unpaid," and its "professional and general liability accrual for asserted and unasserted claims" was at least $54 million too low, because Ardent accrued nothing to cover its large legal liability resulting from Erasmus, infant and maternal mortality, and patient infections, including in multiple pending malpractice and wrongful death lawsuits, in violation of ASC 450;

(6) Ardent failed to record at least $54 million in accruals when it was "probable that a liability ha[d] been incurred and the amount of the loss [could] be reasonably estimated"; and

(7) Ardent was a party to multiple legal proceedings that "could have a material adverse effect on [its] business, financial condition, results of operations or liquidity" but

were neither disclosed nor reflected in Ardent's professional liability accruals, both in violation of ASC 450.

325. The statements identified in Paragraphs 316-323 were also materially misleading because they emphasized Ardent's safety, quality, compliance, quality assurance, and the adequacy of the Company's accruals and the disclosure of all material legal proceedings, while omitting these existing, material, negative facts, which were necessary to make the statements not misleading in the context in which they were made.

### 2. Materially False and Misleading Statements Concerning Accounts Receivable.

326. The Registration Statement stated:

> We rely on the results of detailed reviews of historical collections at facilities that represent a majority of our revenues and accounts receivable (the "hindsight analysis") as a primary source of information in estimating the collectability of our accounts receivable. We perform the hindsight analysis utilizing twelve-month rolling accounts receivable collection data.

327. The Registration Statement stated:

> We routinely review accounts receivable balances by monitoring historical cash collections as a percentage of trailing net operating revenue, as well as by analyzing current period revenue and admissions by payor, aged accounts receivable by payor, days revenue outstanding, and the composition of self-pay receivables.

328. The Registration Statement further stated:

> Our collection procedures are followed until such time that management determines the account is uncollectible, at which time the account is written off.

329. The Registration Statement also stated that: "The Company manages its patient accounts receivable by regularly reviewing its accounts and contracts and by providing appropriate allowances for uncollectible amounts."

330. The Registration Statement further described Ardent's accounts receivable collectability analysis in a section titled "Risks related to our business and industry." There, the Registration Statement stated that "[s]ignificant changes in payor mix, business office operations, economic conditions or trends in federal and state governmental healthcare coverage ***may affect*** our collection of accounts receivable ***and are considered***" in accounts receivable collectability.

331. The Registration Statement included Condensed Consolidated Balance Sheets that provided the Company's accounts receivable as of March 31, 2024 as follows:

| | March 31, 2024(1) | December 31, 2023(1) |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 372,766 | $ 437,577 |
| Accounts receivable | 722,677 | 775,452 |

332. The Registration Statement also explained that "[s]ubsequent adjustments that are determined to be the result of an adverse change in the patient's or the payor's ability to pay are recognized as bad debt expense. ***Bad debt expense for the years ended December 31, 2023, 2022, and 2021 [and the three months ended March 31, 2024 and 2023] was not material to the Company***."

333. The statements identified in Paragraphs 326-332 were materially false because:

(1) Ardent did not "rely on the results of detailed reviews of historical collections" based on "twelve-month rolling accounts receivable collection data" in determining collectability of accounts receivable, but instead admittedly "utilized a 180-day cliff" policy that simply treated all accounts receivable as fully collectible for 180 days, regardless of historical collections or any other factors;

(2) Ardent did not determine its accounts receivable "by monitoring historical cash collections as a percentage of trailing net operating revenue" or "by analyzing current period revenue and admissions by payor, aged accounts receivable by payor, days revenue outstanding, and the composition of self-pay receivables," but instead admittedly "utilized a 180-day cliff" policy that simply treated all accounts receivable as fully collectible for 180 days, regardless of historical collections or any other factors;

(3) Ardent's "management" did not "determine[] [when an] account [wa]s uncollectible, at which time the account is written off" or "provid[e] appropriate allowances for uncollectible amounts," but instead treated all accounts as fully collectible for 180 days;

(4) Ardent did not "consider[]" any "changes in payor mix, business office operations, economic conditions or trends in federal and state governmental healthcare coverage" in determining the collectability of accounts receivable;

(5) Ardent materially overstated its accounts receivable, which were inflated with aged, uncollectible amounts;

(6) Bad debt expense was "material to the Company," and the 180-day cliff policy allowed Ardent to delay recognizing losses on amounts that should have been written off as bad debt; and

(7) Ardent needed to take a substantial AR writedown, as Lumsdaine later admitted to Ensemble (FE-2).

334. The statements identified in Paragraphs 326-332 were also materially misleading because they touted various procedures that Ardent purportedly used to determine its accounts receivable while omitting the existing, material, negative facts that were necessary to make the statements not misleading in the context in which they were made, including that (1) Ardent did not use such procedures; (2) Ardent's "180-day cliff" policy simply treated all accounts receivable as fully collectible for 180 days, regardless of historical collections or any other factors; and (3) Ardent needed to take a substantial AR writedown, as Lumsdaine later admitted to Ensemble (FE-2).

### 3. Material Omissions in Violation of Item 303.

335. In addition to the materially false and misleading statements detailed above, the Registration Statement omitted known, material trends and uncertainties in violation of Item 303. The failure to disclose a material trend or uncertainty in violation of Item 303 is an omission that is actionable under the Securities Act.

336. Item 303 required Ardent to disclose known trends or uncertainties that have had, or that are reasonably likely to have, a material favorable or unfavorable impact on its net sales or revenues or income from continuing operations. As relevant here, Item 303 required Ardent to:

> Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

337. The SEC's May 18, 1989 interpretive release (No. 33-6835) provides a two-step test to determine whether disclosure under Item 303 is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

338. In violation of Item 303, the Registration Statement omitted two trends and uncertainties known to Ardent's management that were reasonably likely to have a material effect on Ardent's financial condition or operations.

a. <u>Ardent's Known, Material Trend of Increasing Payor Denials.</u>

339. The Registration Statement omitted the known, material trend of Ardent's increasing payor denials.

340. Defendants' own admissions confirm that they knew a trend of increasing payor denials existed before the July 2024 IPO. After the Class Period, Bonick admitted that Ardent experienced "a ***sharp increase in denials beginning in the second quarter of 2024***," and Ardent's related earnings presentation admitted "***a significant step-up in denials beginning in 2Q24***."

341. The second quarter ended on June 30, 2024, and Ardent's July 18, 2024 IPO was 18 days later. Thus, Defendants admittedly knew about Ardent's "sharp increase in denials" over two weeks before the IPO (at the latest). Bonick even called the higher denials a "***trend***[]" that started in 2Q24: on November 18, 2025, he admitted that Ardent had experienced "***elevated trends [in denials] that started roughly in late Q2 of last year*** [2024]." And on June 10, 2026, Lumsdaine admitted that Ardent "saw a ***big step-up***" in payor denials "in the ***first half of 2024***."

342. Former employees confirmed that Ardent's increase in payor denials started well before the second quarter of 2024. (FE-1, FE-3, FE-5, FE-9.) For example, FE-9 saw a significant increase in denials that started in mid-to-late 2023, at least seven months before Ardent's IPO.

343. Confirming that Ardent's management knew about the trend of increasing denial rates, Defendant Lumsdaine received weekly dashboards that tracked Ardent's denial rates and other metrics based on the MAP Keys. (FE-1.) Those metrics included Ardent's remittance denial rate and denial write-offs as a percentage of net patient service revenue.

344. Further, Defendants and other senior Ardent executives received regular reporting on denial rates from Ensemble, including in: (1) multiple weekly meetings with Ardent's Operations CFO, Richard Haun; President of Hospital Operations, David Schultz; SVP of Finance, Elliott Brown; and other executives (FE-4); (2) monthly hospital-specific and regional MOR meetings attended by Haun and others, with detailed, 30-page presentations emailed in advance and accessible to Bonick and Lumsdaine from a shared drive (FE-1, FE-6); and (3) monthly

meetings with Lumsdaine and quarterly meetings with Bonick and Lumsdaine. Ardent also had real-time access to payor denials through its Epic system (FE-3). In addition, Bonick personally reviewed "variances" to Ardent's budget to understand "***significant trends***," Bonick assured investors that he reviewed Ardent's denials "***very closely***," and Bonick and Lumsdaine participated in weekly executive leadership team meetings with Schultz and other key executives, as well as monthly close meetings that "focused on consolidated ***trends***," confirming their knowledge of Ardent's trend of increasing denial rates.

345. Under the two-step test above, Item 303 required disclosure.

346. First, because Ardent's management knew about the trend of increasing payor denials, it was "likely to come to fruition"—and had already done so by the time of the IPO. Thus, management had no basis to determine "that it is not reasonably likely to occur."

347. Second, objectively evaluating its consequences, the known trend of increasing payor denials "had" (and was "reasonably likely to have") a material impact on Ardent's financial condition because denials reduce the Company's revenues dollar-for-dollar and shrink its margins. Confirming materiality, the higher denials that Defendants finally revealed after the Class Period significantly contributed to the large decline in share price that immediately followed Ardent's November 2025 disclosures.

348. Nonetheless, in violation of Item 303, the Registration Statement made ***no mention*** of Ardent's known, material, negative trend of increasing payor denials.

b. Ardent's Known, Material Uncertainty of Liability for Malpractice and Other Misconduct That Caused Serious Patient Harm.

349. The Registration Statement also failed to disclose the known uncertainty of Ardent's material liability for Erasmus's malpractice, the infant and maternal deaths and injuries at Lovelace Women's Hospital, and pervasive contamination issues in Idaho.

350. As detailed above, by the time of the IPO, Erasmus had already been sued dozens of times for malpractice with $19.47 million in settlements paid out; passed out in the middle of surgery; nearly killed another patient and left others paralyzed; been deemed "UNFIT FOR DUTY" in a third-party evaluation; and lost his license to practice medicine. Ardent and Lovelace had been sued for delaying medically necessary C-sections at Lovelace Women's Hospital, leading to infant deaths and injuries. Several of the lawsuits had reached advanced stages at the time of the IPO. And concerns about contaminated surgical instruments (caked with dried blood and biological residue) and resulting patient infections at Ardent's PMC facility in Idaho were documented and reported to hospital leadership.

351. These facts were known to Bonick, Lumsdaine, and other senior leadership because Bonick received weekly reports on serious safety events and infections and actively monitored those metrics, while Bonick and Lumsdaine discussed them in weekly executive leadership team meetings; Ardent's Trideo system catalogued adverse events and provided automated alerts, notifications, and analytics; hospital leadership tracked and monitored adverse events, and Lovelace Women's Hospital was specifically required to track fetal deaths; and the Sentinel Event Policy required Ardent's hospitals to notify leadership, immediately investigate, and comprehensively analyze all safety events that caused death or severe patient harm. The SEC had also cautioned Bonick shortly before the IPO to make "specific disclosures" of "matters that may be material," including "[d]isclosures for the amount or range of reasonably possible loss in the aggregate," as ASC 450 requires.

352. Under the two-step test above, Item 303 required disclosure.

353. First, the known uncertainty was likely to come to fruition—and, at minimum, Ardent's management had no basis to conclude that it was "not reasonably likely to occur." At the

time of the IPO, Ardent and Lovelace faced at least five pending lawsuits from a patient paralyzed by Erasmus, other Erasmus victims, and the parents of a baby who died at Lovelace Women's Hospital, and several had reached an advanced stage.

354. Second, objectively evaluating the consequences of the known uncertainty confirms that it was "reasonably likely to have" a material impact on Ardent's financial condition or operations.

355. As detailed above, Ardent's liability arose from serious misconduct and patient harm, including infant and maternal deaths and paralyzed patients. Since Item 303 requires management to "evaluate objectively the consequences of the known" uncertainty "on the assumption that it will come to fruition"—and Ardent was directly responsible for paying the first $7.5 million in liability in each case—its management had no basis to determine "that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur."

356. Indeed, shortly after the Class Period, Ardent belatedly admitted that "ongoing litigation associated with unresolved professional liability claims . . . could have a material adverse effect on its business, financial condition, results of operations or liquidation." And when Ardent ultimately increased its accruals by $54 million, it sharply reduced the Company's net income to just $1.2 million in the third quarter of 2025 (compared to $46 million in the third quarter of 2024).

357. Nonetheless, in violation of Item 303, the Registration Statement entirely omitted the known, material uncertainty of Ardent's liability—and even omitted the existence of the five lawsuits pending at the time of the IPO.

### B. The Individual Defendants Failed to Perform Reasonable Diligence in Connection with the IPO

358. As the issuer, Ardent is strictly liable under the Securities Act and has no defenses to liability. The Individual Defendants are also liable under the Securities Act because they acted negligently and cannot establish any due diligence defense to liability.

359. The Individual Defendants could not have believed (and had no reasonable ground to believe) that the Registration Statements contained no materially false or misleading statements or omissions. Defendants Bonick and Lumsdaine were officers of Ardent (as its CEO and CFO), were privy to reporting on the issues described herein, and had significant experience in the healthcare industry, including with respect to AR, payor denials, and professional liability accruals. Further, the SEC specifically cautioned Bonick shortly before the IPO to make "specific disclosures" of "matters that may be material," including "[d]isclosures for the amount or range of reasonably possible loss in the aggregate," underscoring that Bonick had no reasonable basis to believe that the Registration Statement could omit all loss contingencies and any estimate of the possible loss or range of losses.

360. The Individual Defendants failed to perform a reasonable investigation. A reasonable investigation would have uncovered the materially false and misleading statements described herein, which should have been carefully reviewed by the Individual Defendants in the exercise of reasonable care. A reasonable investigation would also have revealed that the Registration Statement omitted known trends and uncertainties in violation of SEC requirements.

### C. Ardent's Share Price Collapses by the Time of Suit

361. On January 8, 2026, the date the initial complaint in this Action was filed, Ardent's share price opened at $9.03—a 45.6% decline from the $16.00 offering price in the IPO.

## VII. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

**COUNT I**

**Section 11 of the Securities Act**
**(Against All Defendants)**

362. Plaintiffs repeat, incorporate, and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.

363. This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless, or otherwise fraudulent intent.

364. The Registration Statement contained untrue statements of material fact, omissions of material fact necessary to make the statements therein not misleading, and omissions of known, material trends and uncertainties in violation of Item 303, as specified in Section VI.A above.

365. Defendants were responsible for the content and dissemination of the Registration Statement. The Individual Defendants signed the Registration Statement.

366. As the issuer and registrant for the IPO, Ardent is strictly liable for the material misstatements and omissions in the Registration Statement.

367. The Individual Defendants acted negligently in that none of them conducted a reasonable investigation or had reasonable grounds to believe that the Registration Statement was true and not misleading as to all material facts and did not omit any material facts required to be stated therein or necessary to make the statements therein not misleading.

368. Plaintiffs and others similarly situated acquired Ardent common stock pursuant and/or traceable to the Registration Statement and have sustained damages. The value of Ardent's common stock has declined substantially subsequent to and due to Defendants' violations.

## COUNT II

### Section 15 of the Securities Act
### (Against the Individual Defendants)

369. Plaintiffs repeat, incorporate, and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.

370. This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that the Individual Defendants acted with intentional, reckless, or otherwise fraudulent intent.

371. At all relevant times, the Individual Defendants were officers and/or directors of the Company and controlling persons of Ardent within the meaning of Section 15 of the Securities Act.

372. The Individual Defendants, by virtue of their positions of control and authority and their direct participation in and/or awareness of Ardent's operations and finances, possessed the power to, and did, direct or cause the direction of the management and policies of Ardent, its Board, and its employees, and caused Ardent to issue, offer, and sell Ardent common stock pursuant to the defective Registration Statement.

373. The Individual Defendants had the power to, and did, control the decision-making of Ardent, including the content and issuance of the statements contained in the Registration

Statement; they were provided with or had unlimited access to copies of the Registration Statement alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued, and had the power to prevent the issuance of the statements or omissions or to cause them to be corrected; and they were directly involved in or responsible for providing false or misleading information contained in the Registration Statement and/or certifying and approving that information. The Individual Defendants each signed the Registration Statement.

374. The Individual Defendants acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the Registration Statement was true and not misleading as to all material facts and did not omit any material facts required to be stated therein or necessary to make the statements therein not misleading.

375. Plaintiffs and others similarly situated acquired Ardent common stock pursuant and/or traceable to the Registration Statement and have sustained damages. The value of Ardent's common stock has declined substantially subsequent to and due to Defendants' violations.

## VIII. EXCHANGE ACT ALLEGATIONS

### A. Exchange Act False and Misleading Statements

376. The misstatements that Plaintiffs allege to be actionable under the Exchange Act are included in this section.

#### 1. Materially False and Misleading Statements Concerning Ardent's Safety, Quality and Professional Liability.

377. Plaintiffs reallege each and every materially false and misleading statement in the Registration Statement concerning safety, quality, and professional liability accruals, identified above at Paragraphs 316-323, as violative of the Exchange Act, as if fully set forth herein.

378. Ardent's August 14, 2024 2Q24 Form 10-Q, signed by Lumsdaine and certified under the Sarbanes-Oxley Act ("SOX") by both Bonick and Lumsdaine, stated that "[t]he

Company records accruals for such contingencies to the extent that the Company concludes it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. The Company does not believe that it is party to any proceeding that, either individually or in the aggregate, in the opinion of management, could have a material adverse effect on the business, financial condition, results of operations or liquidity."

379. Ardent's November 7, 2024 3Q24 Form 10-Q, signed by Lumsdaine and certified under SOX by both Bonick and Lumsdaine, stated that "[t]he Company records accruals for such contingencies to the extent that the Company concludes it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. The Company does not believe that it is party to any proceeding that, either individually or in the aggregate, in the opinion of management, could have a material adverse effect on the business, financial condition, results of operations or liquidity."

380. Ardent's February 27, 2025 2024 Form 10-K, signed and certified under SOX by both Bonick and Lumsdaine, stated that "[a]t December 31, 2024, the Company's accrual for professional and general liability asserted and unasserted claims was $240.0 million and the Company's related costs for professional and general liability claims for the year ended December 31, 2024 was $63.0 million."

381. The 2024 Form 10-K stated: "We maintain professional malpractice liability insurance and general liability insurance in amounts we believe are sufficient to cover claims arising out of the operations of our facilities."

382. The 2024 Form 10-K further stated: "At Ardent, ***culture, safety, quality, and compliance represent the foundation of our platform***."

383. The 2024 Form 10-K further stated that Ardent was "***improving [patient] outcomes based on our safety of care***, readmission, and mortality rates."

384. The 2024 Form 10-K also stated: "Over our more than 20 years of experience, ***we have developed a core competency*** for efficiently and effectively operating healthcare facilities and physician groups to provide ***high-quality patient care that exceeds CMS benchmarks***."

385. The 2024 Form 10-K also stated (emphasis in original): "***Commitment to delivering the highest quality patient care in a consumer-centric ecosystem***[.] Our consumer-centric ecosystem drives better patient experience by improving safety of care, readmission, and mortality rates and ensuring the patient is seen at the appropriate site of care."

386. The 2024 Form 10-K also stated: "We maintain ***company-wide compliance and quality assurance programs*** and use patient care evaluations and other ***assessment methods*** to support and monitor quality of care standards and meet accreditation and regulatory requirements."

387. Ardent's May 5, 2025 1Q25 Form 10-Q, signed by Lumsdaine and certified under SOX by both Bonick and Lumsdaine, stated that "[t]he Company records accruals for such contingencies to the extent that the Company concludes it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. The Company does not believe that it is party to any proceeding that, either individually or in the aggregate, in the opinion of management, could have a material adverse effect on the business, financial condition, results of operations or liquidity."

388. Ardent's August 6, 2025 2Q25 Form 10-Q, signed by Lumsdaine and certified under SOX by both Bonick and Lumsdaine, stated that "[t]he Company records accruals for such contingencies to the extent that the Company concludes it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. The Company does not believe

that it is party to any proceeding that, either individually or in the aggregate, in the opinion of management, could have a material adverse effect on the business, financial condition, results of operations or liquidity."

389. The statements identified in Paragraphs 377-388 were materially false because:

(1) Patients suffered from serious, pervasive "safety, quality, and compliance" violations at multiple Ardent-owned hospitals across different states, including patients who were paralyzed or nearly killed by Erasmus; infants and mothers who were killed or brain-damaged at Lovelace Women's Hospital; and patients who were infected by contaminated surgical instruments at PMC in Idaho;

(2) Ardent did not "provide high-quality patient care," deliver "the highest quality patient care," "improv[e] safety of care, readmission, and mortality rates," or "improv[e] [patient] outcomes based on our safety of care," but instead repeatedly cut corners and disregarded patient safety;

(3) Ardent lacked adequate "company-wide compliance and quality assurance programs" and "assessment methods," including as to testing doctors' fitness to practice, performing medically necessary C-sections, and sterilizing surgical instruments;

(4) Ardent did not maintain professional malpractice liability insurance in amounts "sufficient to cover claims arising out of [its] operations";

(5) Ardent did not "provide an accrual representing the estimated ultimate costs of all reported and unreported claims incurred and unpaid," and its "professional and general liability accrual for asserted and unasserted claims" was at least $54 million too low, because Ardent accrued nothing to cover its large legal liability resulting from Erasmus, infant and maternal mortality, and patient infections, including in multiple pending malpractice and wrongful death lawsuits, in violation of ASC 450;

(6) Ardent failed to record at least $54 million in accruals when it was "probable that a liability ha[d] been incurred and the amount of the loss [could] be reasonably estimated"; and

(7) Ardent was a party to multiple legal proceedings that "could have a material adverse effect on [its] business, financial condition, results of operations or liquidity" but were neither disclosed nor reflected in Ardent's professional liability accruals, both in violation of ASC 450.

390. The statements identified in Paragraphs 377-388 were also materially misleading because they emphasized Ardent's safety, quality, compliance, quality assurance, and the

adequacy of the Company's accruals and the disclosure of all material legal proceedings, while omitting these existing, material, negative facts, which were necessary to make the statements not misleading in the context in which they were made.

### 2. Materially False and Misleading Statements Concerning Accounts Receivable.

391. Plaintiffs reallege each and every materially false and misleading statement in the Registration Statement concerning accounts receivable, identified above at Paragraphs 326-332, as violative of the Exchange Act, as if fully set forth herein.

392. Ardent's 2Q24 Form 10-Q provided the Company's accounts receivable as of June 30, 2024 as follows:

| | June 30, 2024 (1) | December 31, 2023 (1) |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 334,538 | $ 437,577 |
| Accounts receivable | 720,989 | 775,452 |

393. The 2Q24 Form 10-Q also stated that "[s]ubsequent adjustments that are determined to be the result of an adverse change in the patient's or the payor's ability to pay are recognized as bad debt expense. Bad debt expense for the three and six months ended June 30, 2024 and 2023 was not material to the Company."

394. Ardent's 3Q24 Form 10-Q provided the Company's accounts receivable as of September 30, 2024 as follows:

| | September 30, 2024 (1) | December 31, 2023 (1) |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 563,142 | $ 437,577 |
| Accounts receivable | 705,747 | 775,452 |

395. The 3Q24 Form 10-Q also stated that "[s]ubsequent adjustments that are determined to be the result of an adverse change in the patient's or the payor's ability to pay are

recognized as bad debt expense. Bad debt expense for the three and nine months ended September 30, 2024 and 2023 was not material to the Company."

396. Ardent's 2024 Form 10-K provided the Company's accounts receivable as of December 31, 2024 as follows:

| | | December 31, 2024 (1) | | December 31, 2023 (1) |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 556,785 | $ | 437,577 |
| Accounts receivable | | 743,031 | | 775,452 |

397. The 2024 Form 10-K also stated that "[s]ubsequent adjustments that are determined to be the result of an adverse change in the patient's or the payor's ability to pay are recognized as bad debt expense. Bad debt expense for the years ended December 31, 2024, 2023, and 2022 was not material to the Company."

398. The 2024 Form 10-K further stated:

> We rely on the results of detailed reviews of historical collections at facilities that represent a majority of our revenues and accounts receivable (the "hindsight analysis") as a primary source of information in estimating the collectability of our accounts receivable. We perform the hindsight analysis utilizing twelve-month rolling accounts receivable collection data.

399. The 2024 Form 10-K further stated:

> We routinely review accounts receivable balances by monitoring historical cash collections as a percentage of trailing net operating revenue, as well as by analyzing current period revenue and admissions by payor, aged accounts receivable by payor, days revenue outstanding, and the composition of self-pay receivables.

400. The 2024 Form 10-K further stated:

> Our collection procedures are followed until such time that management determines the account is uncollectible, at which time the account is written off.

401. Ardent's 2024 Annual Report to Stockholders filed with the SEC on April 8, 2025, which included a cover letter signed by Bonick and enclosed the 2024 Form 10-K, stated that:

> We routinely review accounts receivable balances by monitoring historical cash collections . . . ***We rely on the results of detailed reviews of historical collections*** at facilities that represent a majority of our revenues and accounts receivable (the 'hindsight analysis') ***as a primary source of information in estimating the collectability of our accounts receivable***.
>
> We perform the hindsight analysis utilizing twelve-month rolling accounts receivable collection data.

402. Ardent's 2024 Annual Report to Stockholders also stated that "[t]he Company manages its patient accounts receivable by regularly reviewing its accounts and contracts and by providing appropriate allowances for uncollectible amounts."

403. Ardent's 1Q25 Form 10-Q provided the Company's accounts receivable as of March 31, 2025 as follows:

| | March 31, 2025 (1) | December 31, 2024 (1) |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 495,044 | $ 556,785 |
| Accounts receivable | 776,519 | 743,031 |

404. The 1Q25 Form 10-Q also stated that "[s]ubsequent adjustments that are determined to be the result of an adverse change in the patient's or the payor's ability to pay are recognized as bad debt expense. Bad debt expense for the three months ended March 31, 2025 and 2024 was not material to the Company."

405. Ardent's 2Q25 Form 10-Q provided the Company's accounts receivable as of June 30, 2025 as follows:

| | June 30, 2025 (1) | December 31, 2024 (1) |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 540,629 | $ 556,785 |
| Accounts receivable | 758,641 | 743,031 |

406. The 2Q25 Form 10-Q also stated that "[s]ubsequent adjustments that are determined to be the result of an adverse change in the patient's or the payor's ability to pay are recognized as bad debt expense. Bad debt expense for the three and six months ended June 30, 2025 and 2024 was not material to the Company."

407. The statements identified in Paragraphs 391-406 were materially false because:

(1) Ardent did not "rely on the results of detailed reviews of historical collections" based on "twelve-month rolling accounts receivable collection data" in determining collectability of accounts receivable, but instead admittedly "utilized a 180-day cliff" policy that simply treated all accounts receivable as fully collectible for 180 days, regardless of historical collections or any other factors;

(2) Ardent did not determine its accounts receivable "by monitoring historical cash collections as a percentage of trailing net operating revenue" or "by analyzing current period revenue and admissions by payor, aged accounts receivable by payor, days revenue outstanding, and the composition of self-pay receivables," but instead admittedly "utilized a 180-day cliff" policy that simply treated all accounts receivable as fully collectible for 180 days, regardless of historical collections or any other factors;

(3) Ardent's "management" did not "determine[] [when an] account [wa]s uncollectible, at which time the account is written off" or "provid[e] appropriate allowances for uncollectible amounts," but instead treated all accounts as fully collectible for 180 days;

(4) Ardent did not "consider[]" any "changes in payor mix, business office operations, economic conditions or trends in federal and state governmental healthcare coverage" in determining the collectability of accounts receivable;

(5) Ardent materially overstated its accounts receivable, which were inflated with aged, uncollectible amounts;

(6) Bad debt expense was "material to the Company," and Ardent did not recognize bad debt expense upon "an adverse change in the patient's or the payor's ability to pay"; instead, the 180-day cliff policy allowed Ardent to delay recognizing losses on amounts that should have been written off as bad debt; and

(7) Ardent needed to take a substantial AR writedown, as Lumsdaine admitted to Ensemble in March 2025, which was quantified as $43 million by April 2025 (FE-2).

408. The statements identified in Paragraphs 391-406 were also materially misleading because they touted various procedures that Ardent purportedly used to determine its accounts receivable while omitting the existing, material, negative facts that were necessary to make the statements not misleading in the context in which they were made, including that (1) Ardent did not use such procedures; (2) Ardent's "180-day cliff" policy simply treated all accounts receivable as fully collectible for 180 days, regardless of historical collections or any other factors; and (3) Ardent needed to take a substantial AR writedown, as Lumsdaine admitted to Ensemble in March 2025, which was quantified as $43 million by April 2025 (FE-2).

### 3. Materially False and Misleading Statements Concerning Payor Denials.

409. On November 7, 2024, the Company held an earnings call to discuss its third quarter 2024 financial results. During the 3Q24 earnings call, Bonick stated that "[i]mportantly, the year-over-year impact to revenue and earnings from denials activity ***did not accelerate during the third quarter***."

410. During the same call, Lumsdaine stated: "And while to Marty's earlier comments, while ***there hasn't been an acceleration in denial activity***, it continues to be very high, certainly higher than we believe it should be."

411. On May 7, 2025, the Company held an earnings call to discuss its first quarter 2025 financial results. In his opening remarks, Lumsdaine stated that "[t]he growth rate was impacted by a notable increase in payer claim denials when compared to the first quarter of 2024. ***To be clear, we aren't seeing a significant increase in denials compared to the back half of 2024***, but it does create a year-over-year headwind. That said, we expect underlying EBITDA growth to accelerate as we lap this dynamic in the back half of the year."

412. During the question-and-answer portion of the 1Q25 earnings call, Leerink Partners analyst Whit Mayo stated that he wanted to "follow up on the [e]levated denials," asking whether "this is a continuation of what you saw from last year or are there new changes in payer behavior or dispute resolution[?]" Lumsdaine responded, stating in pertinent part that "[y]es, it's a continuation of last year, we really saw that step up happen in the middle of the year . . . There has been a continuation of a slowdown in payments even on clean claims. That's maybe, again, while ***denials have not accelerated***, there's maybe been a bit of an acceleration from just length of time to pay a clean claim, and that's certainly showing up -- impacting our cash flow numbers."

413. On May 14, 2025, Bonick participated in the Bank of America Global Healthcare Conference on behalf of Ardent. During the conference, BofA Securities analyst Joanna Gajuk noted that Bonick had mentioned "some increase in denials" and asked whether the Company expected them to accelerate or improve. Bonick responded, stating in pertinent part that "***they're holding right now***, but it is something that we're watching very closely. And ***the very, very vast majority of these are getting paid***. ***It's turning in more into a slow pay versus not getting paid***. And so our revenue cycle partners are, again, key in battling that, ***making sure we've got clean claims going off*** [sic] ***the door that we've got good documentation to support that***."

414. On May 20, 2025, Lumsdaine participated in the RBC Global Healthcare Conference on behalf of Ardent. In response to an analyst question, Lumsdaine stated: "To be clear, ***we haven't seen a significant acceleration [in] denial activity as we look at our sequential progress with the payers***."

415. On September 4, 2025, Lumsdaine participated in the Wells Fargo Healthcare Conference on behalf of Ardent and stated that "[w]e really saw denials start spiking in the middle of last year, so about we'll say end of Q2 of 2024. They've continued to increase this year, albeit

at a slower pace than last year. Now, that's initial denials. ***Final denials have increased at a much slower pace, which is indicative of our efforts. We believe most of the denial activity is around requests for information*** which takes time to document and, oh, get the denial of return. But ***ultimately, we do get paid for the services we're providing largely***."

416. On September 8, 2025, Bonick participated in the Morgan Stanley Global Healthcare Conference on behalf of Ardent and commented with respect to Ensemble that "we're seeing the benefits of th[eir systems], everything from the preop process to the denial adjudication process, and just ***making sure we've got clean claims going out the door more accurate and better coding***, all of those things are helpful and continuing to deal in this challenged payor landscape that we work in."

417. On September 29, 2025, Bonick participated in the Jefferies Healthcare Services Conference on behalf of Ardent, and stated that "our partnership with Ensemble Health . . . ***has allowed us to stay ahead of a lot of these payer challenges*** . . . and really just getting ahead of the system and ***making sure we've got good clean bills that can go out the door and then capture the moneys due for the services rendered***."

418. The statements identified in Paragraphs 409-417 were materially false because:

(1) Ardent's payor denials continuously increased throughout 2024 and 2025;

(2) Contrary to Defendants' claims that denials "did not accelerate," "there hasn't been an acceleration in denial activity," and "we haven't seen a significant acceleration [in] denial activity as we look at our sequential progress with the payers," Ardent admittedly experienced "a sharp increase in denials beginning in the second quarter of 2024" and "elevated trends that started roughly in late Q2" of 2024, and in April 2025, Bonick and Lumsdaine attended a Board meeting where Ensemble indicated that Ardent's denials had experienced a very significant increase in both first pass denials and level of care denials, and the data from Ensemble did not indicate that Ardent's denials had stabilized (FE-2);

(3) The "very vast majority" of Ardent's claims were not "getting paid," and Ardent was not "largely" getting "paid for the services [it was] providing";

(4) Claims were not "turning [] more into a slow pay versus not getting paid," final denials had not "increased at a much slower pace," and "most of the denial activity" was not "around requests for information"; instead, Ardent and Ensemble were submitting incomplete, improperly coded claims with no review, leading to a large amount of denials, then repeatedly re-submitted the same denied claims instead of fixing the problems, leading to claims being denied as duplicative (FE-3, FE-4, FE-5, FE-6, FE-9); and

(5) Ensemble was not generating "clean claims going out the door [with] more accurate and better coding" or "clean and accurate bills and thorough bills," was not "making sure [that] clean claims [were] going o[ut] the door" with "good documentation," was not providing "the documentation that makes it harder for a claim to get denied," and was not "captur[ing] the moneys due for the services rendered"; instead, Ardent and Ensemble submitted incomplete, improperly coded claims with no review, leading to a large number of denials, then repeatedly re-submitted the same denied claims instead of fixing the problems, while Ardent failed to provide medical records necessary to resolve many payor denials, and Ensemble failed to timely follow up on payors' denials of large claims of over $100,000 (FE-3, FE-4, FE-5, FE-6, FE-9).

419. The statements identified in Paragraphs 409-417 were also materially misleading because they touted Ardent's purportedly stabilizing or improving denials while omitting these existing, material, negative facts, which were necessary to make the statements not misleading in the context in which they were made.

#### 4. Materially False and Misleading Statements Concerning Professional Fees.

420. On August 15, 2024, the Company held an earnings call to discuss its second quarter 2024 financial results. During the 2Q24 earnings call, Lumsdaine stated with respect to professional fees that "overall, we believe that ***the subsidy dynamic has largely normalized*** relative to the significant increases we saw throughout 2023."

421. On January 14, 2025, Lumsdaine participated in the J.P. Morgan Healthcare Conference on behalf of Ardent and stated that professional fee growth was "***not accelerating*** beyond what we saw in 2024," and that "a continued pressure for the types of increases we saw in

2024 . . . ***will be embedded in our guidance***." Lumsdaine emphasized: "We do want to be ***conservative*** as it's our first full year as a public company establishing guidance."

422. On February 27, 2025, the Company held an earnings call to discuss its fourth quarter 2024 financial results. During the 4Q24 earnings call, speaking to increased professional fees, Bonick stated that "we did see the hospital-based physician subsidies moderate from 2023 to 2024. And from 2024 to 2025, we expect it to be somewhere in that similar range. ***It has come down from the peak*** in 2023, but it's still running slightly above inflation from what we would have otherwise expected. ***We are seeing good movement with our renegotiations***."

423. On the May 7, 2025 1Q25 earnings call, Bonick stated "we are encouraged that [professional fee growth] ***is, moderating from the peak in 2023***."

424. On May 20, 2025, Bonick participated in the RBC Global Healthcare Conference on behalf of Ardent and stated that "[w]e talk[ed] coming into the year about the headwind of physician subsidies that Q1 year-over-year, I think we're up about 6%, which actually has been a ***slowdown in the rate of growth***. We are still expecting that to be a headwind. But again . . . ***it's certainly*** within, ***well within our expectations so far***."

425. On September 4, 2025, Bonick participated in the Wells Fargo Healthcare Conference on behalf of Ardent and, when asked about "pressure" Ardent was experiencing in "professional fees" and Ardent's "professional fee expectations," Bonick responded that "[p]hysician services, as you mentioned, is still elevated compared to normal inflationary levels, but ***moderating from that peak in 2023*** where we did see about 130 basis point drag on the business. ***That's been coming down.*** We expect that to continue to be a bit of a headwind, but a ***lessening headwind*** compared to what it's been over the last couple of years."

426. The statements identified in Paragraphs 420-425 were materially false because:

(1) Ardent's professional fees consistently increased throughout 2024 and 2025, with significant increases for the vast majority of Ardent's business locked in by mid-2025 (or earlier) (FE-7, FE-8), and Ardent was not "seeing good movement with our renegotiations" in light of these locked-in professional fee increases;

(2) Ardent's professional fee growth was accelerating throughout the Class Period, including in the second half of 2024 and the first three quarters of 2025; and

(3) Ardent had not "embedded" the accelerating professional fee growth in its 2025 guidance, which was not "conservative," and the continued fee acceleration was foreseeable and known to Defendants in light of Ardent's locked-in fee increases.

427. The statements identified in Paragraphs 420-425 were also materially misleading because they touted Ardent's purportedly "moderating" and "normalized" professional fees, and that Ardent had purportedly issued "conservative" guidance, while omitting these existing, material, negative facts, which were necessary to make the statements not misleading in the context in which they were made.

**5. Materially False and Misleading Statements Affirming Guidance.**

428. During the May 7, 2025 1Q25 earnings call, Bonick stated that Ardent was "***firmly on track*** to meet our full year 2025 financial guidance, which we are reaffirming today."

429. On August 6, 2025, the Company held an earnings call to discuss its second quarter 2025 financial results. During the 2Q25 earnings call, Bonick summed up his opening remarks by stating, "***[a]ll of this puts us on track to meet our full year 2025 financial guidance, which we are reaffirming today***."

430. The statements identified in Paragraphs 428-429 were materially false because:

(1) Ardent had accrued nothing to cover its large legal liability resulting from Erasmus, infant and maternal mortality, and patient infections, including in multiple pending malpractice and wrongful death lawsuits, in violation of ASC 450;

(2) Ardent needed to take a substantial AR writedown, as Lumsdaine admitted to Ensemble in March 2025, which was quantified as $43 million by April 2025 (FE-2);

(3) Ardent's payor denials continuously increased throughout 2024 and 2025, and in April 2025, Bonick and Lumsdaine attended a Board meeting where Ensemble indicated that Ardent's denials had experienced a very significant increase in both first pass denials and level of care denials, and the data from Ensemble did not indicate that Ardent's denials had stabilized (FE-2);

(4) Ardent's professional fees consistently increased throughout 2024 and 2025, with significant increases for the vast majority of Ardent's business locked in by mid-2025 (or earlier) (FE-7, FE-8); and

(5) As a result, Ardent was not "on track" to meet its 2025 guidance.

431. The statements identified in Paragraphs 428-429 were also materially misleading because they touted that Ardent was purportedly "on track" to meet its guidance while omitting these existing, material, negative facts, which were necessary to make the statements not misleading in the context in which they were made.

**B. Additional Allegations of Scienter**

432. Together with the above-alleged facts, the Individual Defendants acted with scienter in that each knew or recklessly disregarded the true facts in making the materially false and misleading statements identified in Section VIII.A above. The key allegations that support a strong inference of scienter are summarized below and include that:

(1) ***Defendant Bonick personally received "weekly" reporting of "key metrics,"*** including Ardent's Serious Safety Event Rate (SSER) and Healthcare-associated infections (HAIs), and "actively monitor[ed] company-wide quality metrics";

(2) ***Bonick and Lumsdaine attended weekly executive leadership team meetings where they discussed quality metrics***, SSER, and HAIs at Ardent-owned hospitals, as well as Ardent's material, unaccrued liability, increasing payor denials, uncollectible AR, and accelerating professional fees;

(3) ***Bonick and Lumsdaine attended monthly close meetings—focused on consolidated trends and the impact and reasons for any variances from Ardent's budget***—where they received monthly reporting packages that included key performance indicators, actual results for the current month, and forecasts for the next month;

(4) ***Bonick and Lumsdaine were repeatedly warned by Walton and other senior executives that Ensemble was increasing Ardent's denial rate,*** backed up by slides

showing the denial rate was significantly higher in the markets Ensemble currently managed;

(5) Bonick and Lumsdaine knew from ***attending Ensemble's April 2025 Board presentation that Ardent's denials had experienced a very significant increase and were not stabilizing***;

(6) ***Bonick and Lumsdaine knew by April 2025 that Ardent needed to take a $43 million AR writedown***, which they concealed from investors for at least seven months;

(7) ***Lumsdaine received weekly dashboards*** that tracked Ardent's denial rates, aged AR, and other metrics;

(8) Bonick and Lumsdaine had access to ***detailed 30-page presentations from regional and hospital-specific Monthly Operating Review (MOR) meetings*** with current numbers, forecasts, headwinds and tailwinds, collections, denials, and write-offs;

(9) Ensemble held monthly meetings with Lumsdaine and quarterly meetings with Bonick and Lumsdaine;

(10) Ensemble's contract required it to provide Ardent's leadership with exhaustive monthly reporting on KPIs and metrics, including denials, collections, and AR;

(11) Ensemble provided further information—including about Ardent's coding and claims denials—in numerous weekly meetings with Ardent senior leadership, including Haun and President of Hospital Operations Schultz (who reported directly to Bonick and attended the weekly executive leadership team meetings);

(12) ***Bonick and Lumsdaine had access to databases with exhaustive, real-time information about Ardent's business***, including the Epic system, which contained detailed claims and remittance information exchanged with payors and real-time data on payor denials, revenue, aged and outstanding amounts, and collections;

(13) ***Ardent's Trideo system catalogued adverse events and provided automated alerts, notifications***, and analytics, while the Sentinel Event Policy required Ardent's hospitals to notify leadership, immediately investigate, and comprehensively analyze all safety events that caused death or severe patient harm;

(14) Adverse events were tracked and monitored by hospital leadership, and Lovelace Women's Hospital was specifically required to track fetal deaths;

(15) ***The SEC cautioned Bonick shortly before the IPO to make "specific disclosures" of "matters that may be material,"*** including "[d]isclosures for the amount or range of reasonably possible loss in the aggregate," as ASC 450 requires;

(16) ***Defendants' own statements confirm their knowledge and monitoring of the issues***, including Bonick's statements that he watched payor denials "***very closely***"

and Lumsdaine's admission that a trend of "significant social inflationary pressure in medical malpractice cases" was "***not new***" and Bonick and Lumsdaine's statement that they "***routinely review***" Ardent's accounts receivable;

(17) Several misstatements were made in ***close temporal proximity to corrective events*** in November 2025;

(18) Defendants offered ***false and misleading explanations after the fraud collapsed***;

(19) ***Bonick and Lumsdaine were motivated to boost the value of their stock-based compensation, secure (and inflate the value of) nearly $17 million in PRSUs, and protect Bonick's lucrative seat on Ensemble's board***;

(20) The misstatements concern ***Ardent's core operations***—patient services that account for over 98% of revenue;

(21) Ardent's IPO required the Individual Defendants to closely review and approve the Registration Statement and motivated them to misrepresent Ardent's business;

(22) ***Defendants used complex accounting techniques to obscure Ardent's aged, uncollectible AR and its negative implications***; and

(23) ***Defendant Bonick and executive Ethan Chernin were terminated*** after the fraud collapsed.

**1. Former Employee Allegations Support a Strong Inference of Scienter.**

433. The information from former Ardent and Ensemble employees (the FEs) summarized in Section V above supports the strong inference that Defendants acted with scienter in making the alleged materially false and misleading statements.

**2. The Individual Defendants Disregarded the Most Current Factual Information Before Making Statements.**

434. The Individual Defendants' post-Class Period admissions establish their knowledge or reckless disregard of the true facts when they made false and misleading statements to investors.

435. First, Bonick admitted on November 13, 2025, that Ardent had experienced "***a sharp increase in denials beginning in the second quarter of 2024***," and reiterated on November 18, 2025, that Ardent had experienced "***elevated trends*** [in denials] that started roughly in late ***Q2 of last year*** [2024]." Thus, Bonick admittedly knew about Ardent's "sharp increase"

and "elevated trends" in denials—directly contradicting his November 7, 2024 statement that "denials activity ***did not accelerate*** during the third quarter," and Lumsdaine's November 7, 2024, statement that "***there hasn't been an acceleration in denial activity***."

436. Second, on November 13, 2025, Lumsdaine stated that Ardent's $54 million increase in professional liability accruals "relates to the New Mexico market where ***we have seen significant social inflationary pressure in medical malpractice cases the past several years. So this is not new***." Thus, Lumsdaine admitted that Ardent had known for "the past several years" of a trend of "significant social inflationary pressure in medical malpractice cases" that was "not new." Lumsdaine's admissions establish scienter for Defendants' prior statements that Ardent was not "party to any proceeding that, either individually or in the aggregate, in the opinion of management, could have a material adverse effect," that Ardent "records accruals for . . . contingencies to the extent that the Company concludes it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated," and that Ardent maintained "professional malpractice liability insurance and general liability insurance in amounts we believe are sufficient to cover claims arising out of the operations of our facilities." Notably, Defendants had understated Ardent's professional liability accrual just three months before Lumsdaine's admissions, in the Company's 2Q25 Form 10-Q, filed on August 6, 2025.

437. Third, on May 6, 2026, Lumsdaine admitted longstanding knowledge of Ardent's increasing professional fees, stating that "the pro fees have been a pressure point now for a number of years, right? We're ***into really our third year of really significant elevation in the rate of increase***." This admitted knowledge of three years of "really significant elevation in the rate of increase" of Ardent's professional fees directly contradicts Defendants' prior statements that professional fee growth was moderating, including Lumsdaine's August 15, 2024, statement that

"the subsidy dynamic has largely normalized," Bonick's May 7, 2025, statement that professional fee growth was "moderating from the peak," Bonick's May 20, 2025, statement claiming a "***slowdown in the rate of growth***," and Bonick's September 4, 2025 statement that the growth in professional fees had "***been coming down***."

**3. Internal Reports Diverged from Defendants' External Statements on the Same Subjects.**

438. The divergence between internal reports and Defendants' external statements on the same subjects strongly supports scienter.

439. Before and during the Class Period, the Individual Defendants received or had access to material non-public information that contradicted their public statements about Ardent's safety and quality, liability accruals, payor denials, AR collectability, and professional fees.

440. As detailed below, the Individual Defendants were privy to detailed information about these topics through extensive reporting from both Ensemble and internal sources.

441. <u>Bonick Actively Monitored and Received Weekly Reporting of Key Metrics, Including Serious Safety Events and Infections</u>: Ardent has admitted that CEO Bonick "actively monitor[ed] company-wide quality metrics and discusses these metrics in his weekly executive leadership meetings," and that "key metrics are reported to the CEO on a weekly basis," including Ardent's Serious Safety Event Rate (SSER) and Healthcare-associated infections (HAIs). As detailed above, the SSER includes patient deaths and moderate to severe injuries, capturing Erasmus's paralysis of patients at Lovelace and the deaths and serious injuries of infants and mothers at Lovelace Women's Hospital; the HAI includes infections contracted at Ardent's hospitals, including the infections at PMC.

442. <u>Weekly Executive Leadership Team Meetings</u>: Bonick and Lumsdaine knew the truth about Ardent's unsafe and low-quality care from Bonick's active monitoring, receiving

weekly reporting of the quality metrics, SSER, and HAIs at Ardent-owned hospitals, and attending weekly executive leadership discussions. The weekly executive leadership team meetings also apprised Bonick and Lumsdaine of Ardent's material, unaccrued liability, increasing payor denials, uncollectible AR, and accelerating professional fees.

443. Monthly Close Meetings: Bonick and Lumsdaine also knew about Ardent's safety and quality failures; the material, unaccrued liability that resulted; increasing payor denials; substantial aged, uncollectible AR; and accelerating professional fees from attending the monthly close meetings described above, which "focused on consolidated trends, drivers," and the "impact" of and "reasons for the variance[s]" to Ardent's budget. As Ardent told the SEC, Bonick personally reviewed "variances" to Ardent's budget to understand "significant trends," and the monthly reporting packages for these meetings included key performance indicators, actual results for the current month, and forecasts for the next month.

444. Internal Warnings That Ensemble Was Increasing Ardent's Denial Rate: Henry, Walton, and other executives presented Bonick and Lumsdaine with PowerPoint slides with side-by-side comparisons that showed Ardent's in-house revenue cycle team was significantly outperforming Ensemble, including with respect to billing, cash collections and denial rates. (FE-1.) Walton and Henry also specifically informed Bonick about Ensemble's overstatements of actual revenue, across-the-board 10% price increases, and unrealistic forecasts. (FE-1.) In addition, FE-1 attended meetings with Lumsdaine that flagged that Ensemble was not using Ardent's Epic system as its data source and that Ensemble's results were significantly different than the results from Ardent's in-house revenue cycle team.

445. Bonick and Lumsdaine Knew by April 2025 That Ardent's Denial Rate Had Increased, Not Stabilized: Bonick and Lumsdaine knew from attending Ensemble's April 2025

Board presentation that Ardent's denials had experienced a very significant increase in both first pass denials and level of care denials, which was causing a significant slowdown in Ardent's cash collections. (FE-2.) The data from Ensemble did not indicate that Ardent's denials had stabilized in the first part of 2025 (FE-2), directly contrary to the Individual Defendants' public statements made shortly after the April 2025 Board presentation they attended.

446. Bonick and Lumsdaine Knew Ardent Faced a $43 Million AR Writedown: Bonick and Lumsdaine knew from Lumsdaine's March 2025 text message to Ensemble, and attending Ensemble's April 2025 presentation to Ardent's Board, that Ardent needed to take a $43 million AR writedown. (FE-2.) After the April 2025 Board presentation, Lumsdaine was personally involved in monitoring the writedown via monthly recorded meetings with Latina, Haun, FE-2, and others where he saw PowerPoint presentations that quantified and explained the $43 million figure. (FE-2.) Nonetheless, while knowing about the $43 million writedown, Bonick and Lumsdaine concealed it from investors for at least seven months—even as they signed and certified Ardent's SEC filings that overstated its AR balance, falsely claimed that its "bad debt expense" was immaterial, and touted the rigorous, data-driven process that Ardent purportedly used to calculate and determine the collectability of accounts receivable.

447. Weekly Dashboards to Lumsdaine Detailed Ardent's Denial Rates and Aged AR: As detailed above, Defendant Lumsdaine received weekly dashboards that tracked Ardent's denial rates, aged AR, and other metrics based on the HFMA MAP Keys. (FE-1.) Those metrics included Ardent's remittance denial rate and denial write-offs as a percentage of net patient service revenue—both of which illustrated Ardent's trend of increasing denials. Indeed, HFMA described them as "[t]rending indicator[s]."

448. The metrics reported to Lumsdaine also included Ardent's net days in accounts receivable and aged A/R as a percentage of total billed A/R. These metrics informed Lumsdaine that Ardent had a substantial amount of aged, uncollectible AR. In particular, the aged A/R as a percentage of total billed A/R metric, which HFMA described as a "[t]rending indicator of receivable aging and collectability," calls for breaking down Ardent's percentage of total billed AR in each aging category: 0-30 days; 31-60 days; 61-90 days; 91-120 days; >120 days. This breakdown made clear to Lumsdaine that Ardent's 180-day cliff policy resulted in a significant amount of AR that was aged over 90 days, much of which was uncollectible.

449. Monthly Operating Reviews: Ardent conducted monthly regional MOR meetings (also attended by Haun) with presentations of approximately 30 pages each—covering current numbers, forecasts, headwinds and tailwinds—that were emailed in advance. (FE-1, FE-6.)

450. The MOR packages, which addressed collections, denials, and write-offs, were available to Bonick and Lumsdaine from an Ardent shared drive folder, which FE-1 believed was titled "Monthly Operating Review packets" and included the reports organized by month.

451. Ardent's hospital-specific and regional MOR meetings ensured that safety and quality issues—including Erasmus's malpractice, the infant and maternal deaths and injuries at Lovelace Women's Hospital, the infections in Idaho, and the material liabilities that resulted—were timely conveyed to the Individual Defendants and the rest of Ardent's senior leadership.

452. Reporting from Ensemble: Pursuant to Ensemble's "partnership governance" model, Ensemble held monthly meetings with Lumsdaine and quarterly meetings with both Bonick and Lumsdaine. (FE-2.) Notably, Ensemble claims to have "one of the largest healthcare data footprints in the U.S. to ***uncover patterns that traditional reporting can't see***." The Individual Defendants regularly boasted about having access to this data set, confirming that they knew about

Ensemble's data. For example, on Ardent's 3Q25 earnings call, Lumsdaine claimed that he had compared Ardent to "national statistics" and "the national benchmarks with Ensemble." On Ardent's 2Q26 earnings call, Lumsdaine stated that "a decent amount of our data comes through our relationship with Ensemble . . . our biggest sample set today is off of data that we work with Ensemble." The Individual Defendants' review of data from Ensemble further supports scienter and indicates that Defendants intentionally ignored patterns and trends they had known about for multiple quarters.

453. The Individual Defendants were also aware of Ardent's MSA with Ensemble (which Lumsdaine signed) and related SOWs that required Ensemble to provide exhaustive monthly reporting to Ardent's leadership on KPIs and various metrics. Former employees detailed this information and confirmed that Ensemble reported monthly to Ardent on denials, collections, AR, and other metrics. (FE-2, FE-4, FE-6.) For example, Ensemble provided approximately 30-page presentations, with detailed breakdowns of AR and collections (such as showing the percentages of AR collected within 45 days and 90 days) and breakdowns of denial rates by type and payor, for hospital-specific MOR meetings attended by Haun and other Ardent executives. (FE-6.) These presentations specifically called out Ardent's increasing denials from UnitedHealthcare. (FE-6.)

454. Ensemble provided further information—including about Ardent's coding and claims denials—in numerous weekly meetings with Ardent senior leadership, including Haun and President of Hospital Operations Schultz (FE-4), who reported directly to Bonick.

455. <u>Uniform Policies and Procedures for Management Reporting</u>: The Registration Statement explained that Ardent maintains "***systematic policies and procedures*** at each hospital we acquire," including "quality assurance," "safety and compliance programs," and "personnel

management," and stated that "***[t]hese uniform policies and procedures are designed to provide [Ardent] with consistent management and financial reports for all our facilities*** and facilitate the performance evaluation of each facility." These "systematic" and "uniform policies and procedures" to provide "management and financial reports" for each Ardent-owned facility further confirm that the Individual Defendants were aware of Ardent's safety and quality issues, increasing payor denials and professional fees, and aged, uncollectible AR.

456. Access to Epic and Other Databases: The Individual Defendants had access to Ardent's databases with exhaustive, real-time information about the business, including detailed claims and remittance information exchanged with payors and real-time access to payor denials through Epic. (FE-3.) Epic also included data on Ardent's revenue, aged and outstanding amounts, and collections, which was reviewed in Ardent's end-of-month meetings with Ensemble. (FE-4.) On September 29, 2025, Defendant Bonick demonstrated his knowledge of Epic, boasting that "It's our clinical operating system. It is that financial background. It does provide ***visibility into our entire system*** from scheduling, registering and making sure we've got good documentation."

457. Access to Other Information About Safety and Quality Violations: Bonick also had access to information about deaths, serious injuries, and infections at Ardent's hospitals because he was "entitled to participate" in meetings of Ardent's Board-level Patient Safety and Quality of Care Committee, which were required to be held at least twice annually.[15] This committee was required to "maintain communication between the Board and the members of senior management with management responsibility for the operations and integrity of the Company's clinical

[15] https://s204.q4cdn.com/127897503/files/doc_downloads/governance/8-Patient-Safety-and-Quality-of-Care-Committee-Charter.pdf

operations and service lines" and to "review matters concerning or relating to the quality of medical care delivered to patients" and "patient safety." In addition, the SEC cautioned Bonick shortly before the IPO to make "specific disclosures" of "matters that may be material," including "[d]isclosures for the amount or range of reasonably possible loss in the aggregate," as ASC 450 requires, underscoring Bonick's knowledge or recklessness in touting Ardent's safety and quality while denying any material liability.

458. The Individual Defendants had access to further information about patient deaths, injuries, and infections from Ardent's Trideo system; hospital-level tracking and monitoring; the tracking of fetal deaths at Lovelace Women's Hospital pursuant to a $10 million settlement; and the notifications, investigation, and analysis of all safety events that caused death or severe patient harm pursuant to the Sentinel Event Policy.

459. Given the Individual Defendants' positions within the Company and their direct involvement in, receipt of, and access to internal reports and information concerning the matters addressed in their public statements, the Individual Defendants knew, or recklessly disregarded, that their challenged statements were inconsistent with the true facts.

#### 4. The Individual Defendants Claimed to Have Specific Personal Knowledge of Ardent's Payor Denials, Professional Fees, Accounts Receivable, and Professional Liability Accruals.

460. In SEC filings and conference calls, the Individual Defendants repeatedly spoke in detail about Ardent's professional fees, payor denials, accounts receivable, and professional liability accruals, confirming their personal knowledge of these issues. These statements support a strong inference that the Individual Defendants knew or had access to the material facts that they misrepresented and concealed from investors, or that they were reckless in failing to investigate the issues they repeatedly spoke about in detail.

461. For example, during the Bank of America Global Healthcare Conference on May 14, 2025, Bonick asserted that Ardent's rate of payor denials was "holding right now," and that it was "***something that we're watching very closely***," underscoring his personal knowledge and involvement in monitoring Ardent's payor denials.

462. The Individual Defendants also personally touted Ensemble's "lift" to the Company and referenced their personal knowledge of Ardent's payor denials and collections. For example, at the March 19, 2025 KeyBanc Healthcare Forum, Bonick stated that "we've seen great lift" from Ensemble and that its system was "helping to drive down denials," indicating Bonick's personal knowledge of Ardent's denial rates and related trends.

463. The Individual Defendants also claimed to conduct detailed reviews of Ardent's accounts receivable balances based on extensive data, including with respect to the aging of AR and days outstanding. The Registration Statement and the 2024 Form 10-K—each signed by Bonick and Lumsdaine—stated: "We ***routinely review accounts receivable balances*** by monitoring historical cash collections as a percentage of trailing net operating revenue, as well as by analyzing current period revenue and admissions by payor, aged accounts receivable by payor, days revenue outstanding, and the composition of self-pay receivables."

464. Lumsdaine also had direct knowledge of the significance of poor collections, bad debt, and revenue cycle deficiencies from his former company, Quorum, where he blamed those factors for Quorum's bankruptcy.

465. Further, as Ardent's CFO, Lumsdaine publicly boasted about his access and ability to analyze large volumes of data and "inform what will happen," confirming that he knew about (or recklessly disregarded) Ardent's worsening trends in payor denials, professional fees, professional liability, and uncollectible AR long before the third quarter of 2025. A May 16, 2025

article published by HFMA (the Healthcare Financial Management Association) quoted Lumsdaine:

> "Our industry, like most, is increasingly data driven, and ***the CFO [and their] teams have to have the ability to analyze and interpret large volumes of data for decisions to help drive decision-making***," Lumsdaine said. As economic pressures, changing consumer behaviors and changes in healthcare policy both increase risk and affect risk tolerance, ***CFOs need to use data to help inform what will happen, not what has happened, he said***.

**5. Defendants Made False Statements Close in Time to the Later Disclosure of Inconsistent Information.**

466. Further supporting scienter, several of Defendants' false and misleading statements were made in close temporal proximity to the revelation of their falsity in November 2025.

467. For example, Ardent's 2Q25 Form 10-Q, filed on August 6, 2025, overstated the Company's AR balance and falsely stated that Ardent was not a party to any legal proceeding that "could have a material adverse effect." Bonick assured on August 6, 2025, that "[a]ll of this ***puts us on track*** to meet our full year 2025 financial guidance, which we are reaffirming today." On September 4, 2025, Bonick asserted that pressure in professional fees was "***coming down***," and on September 29, 2025, Bonick stated that Ardent's work with Ensemble "has allowed us to stay ahead of a lot of these payer challenges" to claims.

468. Just a few weeks later, however, on November 12, 2025, Ardent suddenly slashed its adjusted EBITDA guidance by 8.8% (or $52.5 million), reported weak 3Q25 earnings, wrote off $43 million in AR, and increased its professional liability accruals by $54 million.

469. None of these developments suddenly arose in the short period between Defendants' public statements and November 12, 2025. For example, Defendants did not suddenly discover in November 2025—after the third quarter was completed—that Ardent was off track to meet 2025 guidance by 8.8% of adjusted EBITDA, especially since Bonick and Lumsdaine

participated in weekly executive leadership team meetings and monthly close meetings that focused on the "impact" of and "reasons for" Ardent's "budget to actual variances," and included reporting of key performance indicators, actual results for the current month, and forecasts for the next month. Nor did Defendants suddenly realize in late 2025 that Ardent faced $54 million in probable and reasonably estimable liability from lawsuits that had been pending for years.

470. In reality, Defendants had long known about Ardent's safety and quality failures, inadequate accruals, and payor denials and professional fees that had been trending upward for multiple quarters. Defendants also knew from Lumsdaine's March 2025 text message to Ensemble, and attending Ensemble's April 2025 presentation to Ardent's Board, that Ardent needed to take a $43 million AR writedown. (FE-2.) Yet Defendants sat on these issues for as long as possible while falsely telling investors that Ardent was "on track" and seeing positive trends. The proximity between Defendants' positive public statements as late as September 29, 2025, and their sudden reversal in November 2025 supports a strong inference of scienter.

#### 6. Defendants Offered False and Misleading Explanations After the Fraud Collapsed.

471. Further confirming scienter, Defendants offered false and misleading explanations after the fraud collapsed.

472. On Ardent's November 13, 2025 earnings call, Bonick stated that payor denial "***trends largely stabilized through the first half of 2025***, consistent with our outlook. However, these payer pressures moved higher again in the third quarter." That was simply false: In April 2025, Ensemble told Bonick, Lumsdaine, and Ardent's Board that Ardent's payor denials had experienced a very significant increase, and the data from Ensemble did ***not*** indicate that Ardent's denials had stabilized in the first part of 2025. (FE-2.) There was no stabilization.

473. On November 18, 2025, Bonick claimed that Ardent had lacked "visibility" into its increasing radiology professional fees, asserting that "those things ***did sort of creep up*** as the quarter was going and ***without really having the visibility*** . . . ***we just didn't have the ability to see that there was a underlying problem***." That was false: as detailed above, Ardent's radiology professional fees for each provider were fixed and known to Ardent for the next several years, with the vast majority locked in by mid-2025 (or earlier).

474. To the extent Ardent in fact lacked "visibility" into increasing professional fees and "didn't have the ability to see that there was a underlying problem," as Bonick claimed, Defendants' specific assurances to investors that such fees had "normalized" and were "moderating" and "coming down," such that Ardent was "firmly on track" to meet its "conservative" guidance, were at minimum reckless.

**7. The Individual Defendants' Self-Interested Motivation to Secure Additional Compensation and Keep Their Jobs Reinforces the Inference of Scienter.**

475. Further supporting scienter, the Individual Defendants had a self-interested motivation to maintain Ardent's inflated share price to achieve additional compensation, retain their jobs, and satisfy the private equity backers that hired them.

476. Bonick and Lumsdaine's compensation was substantially tied to Ardent's share price. As set forth in Ardent's April 8, 2026 proxy statement, the majority of each Individual Defendant's total compensation in 2024 and 2025 was via equity-based compensation awards (shown below as "Stock Awards"):

| Name and Principal Position | Year | Salary | Bonus [1] | Stock Awards [3] | Non-Equity Incentive Plan Compensation [4] | All Other Compensation [5] | Total |
|---|---|---|---|---|---|---|---|
| **Marty Bonick** *President and Chief Executive Officer* | 2025 | $ 1,076,000 | $ — | $ 5,000,004 | $ — | $ 14,000 | $ 6,090,004 |
| | 2024 | $ 1,060,485 | $ — | $ 4,520,272 | $ 1,345,300 | $ 13,200 | $ 6,939,257 |
| | 2023 | $ 988,623 | $ — | $ — | $ 1,207,454 | $ 13,200 | $ 2,209,277 |
| **Alfred Lumsdaine** *Chief Financial Officer* | 2025 | $ 650,235 | $ 50,000 | $ 2,000,010 | $ — | $ 14,000 | $ 2,714,245 |
| | 2024 | $ 622,632 | $ — | $ 2,220,890 | $ 571,192 | $ 13,200 | $ 3,427,914 |
| | 2023 | $ 594,314 | $ — | $ 278,800 | $ 431,120 | $ 13,200 | $ 1,317,434 |

477. For example, the $5 million value of Bonick's stock awards in 2025 outweighed his $1,076,000 salary by over 4-to-1 and amounted to 82% of his total compensation. Similarly, Lumsdaine's $2 million in stock awards in 2025 outweighed his $650,235 salary by 3-to-1, amounting to 74% of his total compensation. This motivated Bonick and Lumsdaine to commit fraud to boost the value of their stock-based compensation.

478. Bonick and Lumsdaine's stock awards were comprised of both Restricted Stock Units ("RSUs") and PRSUs. Importantly, while PRSUs were ***granted*** to Bonick and Lumsdaine in 2024 and 2025, the PRSUs were only ***earned*** upon Ardent's "achievement of Adjusted EBITDAR and net revenue goals," with 60% of the targets based on Adjusted EBITDAR and 40% based on net revenue.

479. Specifically, Bonick and Lumsdaine would earn 0% of their PRSUs if the Company fell below so-called "threshold" performance levels, 50% for meeting threshold levels, 100% for meeting "target" levels, and 200% for meeting "maximum" levels. Performance targets for the 2024 PRSUs were based on 2024 and 2025 performance, while targets for the 2025 RSUs were based on 2025 only.

480. At the "maximum" performance level, Bonick and Lumsdaine would earn PRSUs with grant date fair values of ***nearly $17 million***, as follows:

| **Defendant** | **2024 PRSUs** | **2025 PRSUs** | **Total** |
|---|---|---|---|
| **Bonick** | $5,876,352 | $6,500,002 | $12,376,354 |
| **Lumsdaine** | $1,837,696 | $2,600,012 | $4,437,708 |

481. As a result, Bonick and Lumsdaine had a powerful motive to overstate Ardent's financial performance—and delay or avoid taking any actions to reduce its reported revenue or EBITDA—so they could reap nearly $17 million in PRSUs. Specifically, Bonick and Lumsdaine were incentivized not to write off uncollectible AR, not to record adequate professional liability accruals, and not to recognize Ardent's higher payor denials and professional fees. Each PRSU allowed the holder to receive one share of Ardent common stock, giving Bonick and Lumsdaine further incentive to maintain Ardent's inflated share price.

482. Ultimately, Bonick and Lumsdaine received over $8 million in PRSUs. For the 2024 PRSUs, Ardent claimed that its "[a]djusted EBITDAR achievement was 100.2% of target and net revenue achievement was 115.6% of target, resulting in a weighted achievement of 106.4% of target," while "[p]erformance for the 2025 PRSU grant resulted in an achievement of 90.1% of target." Thus, Bonick received $3.12 million in PSRUs for 2024 and $2.93 million for 2025; Lumsdaine received $977,231 for 2024 and $1.17 million for 2025.

483. Further supporting scienter, Bonick had a personal financial incentive to obscure Ensemble's underperformance to protect his lucrative seat on Ensemble's Board, which paid him hundreds of thousands of dollars per year (likely amounting to approximately half of his salary from Ardent). Bonick obtained the Ensemble Board seat as a quid pro quo in exchange for Ardent awarding Ensemble the full revenue cycle engagement. Even before Ardent signed the contract

with Ensemble, Ardent employees were discussing how Bonick would obtain a seat on Ensemble's Board after Ardent signed. (FE-1.)

484. Moreover, after the IPO, Ardent's private equity owners sought to exit their positions and cash out. Less than three months before the corrective disclosure that sharply reduced Ardent's stock price, EGI and other large shareholders registered to unload more than 80% of the Company's common stock, further supporting an inference of scienter.

### 8. The Core Operations Doctrine Supports Scienter.

485. Further bolstering the strong inference of scienter, the misstatements at issue concern Ardent's core operations: providing health care at hospitals and clinics. Ardent reports only one segment that accounts for 100% of its revenue, healthcare services. Ardent's 2024 Form 10-K states that: "The Company has one reportable segment: healthcare services. The healthcare services segment generates revenues by delivering care to its customers, or patients, through its integrated network of hospitals, ambulatory facilities, and physician practice." Over 98% of Ardent's reported revenue comes from payments for patient services.

486. The safety and quality of Ardent's services relate directly to these core operations. Not only did Ardent state that "culture, safety, quality, and compliance represent the foundation of our platform," but any safety and quality violations risk highly material financial liability for Ardent, especially since Ardent is directly responsible for paying the first $7.5 million per claim. Ardent's $54 million increase in professional liability accruals at the end of the Class Period confirms that safety and quality are core operations of the Company.

487. Ardent's calculation and collection of accounts receivable likewise relate to core operations of the Company. As Defendants stated in the Registration Statement, "[t]he collection of accounts receivable, primarily from Medicare, Medicaid, managed care payors, other third-party payors, and patients, is ***critical to our operating performance***."

488. Ardent's payor denials also relate to core operations, since denials directly reduce the Company's revenue, reduce its margins, and significantly affect its financial performance and ability to meet guidance. Over 90% of Ardent's revenue comes from third-party payors, including Medicare, Medicaid, and private insurers.

489. Finally, professional fees relate to Ardent's core operations. Such fees comprised Ardent's second-largest expense during the Class Period and directly affect Ardent's net income, EBITDA and margins.

490. The importance of safety and quality, accounts receivable, payor denials, and professional fees to Ardent's core business indicates that the Individual Defendants were aware of the failures and negative trends affecting the Company's core operations, yet disregarded that information in their public statements to investors.

**9. The Company's IPO Reinforces the Inference of Scienter.**

491. Defendants made several misstatements in the Registration Statement issued to investors in connection with Ardent's IPO. The IPO process, and the extensive due diligence surrounding it, required the Individual Defendants to closely review and approve the Registration Statement, thereby supporting a strong inference that Defendants knew, or recklessly disregarded, that the challenged statements were materially false or misleading when made.

492. What's more, because the IPO was a significant capital-raising event that generated substantial proceeds for the Company, Defendants had compelling reasons to ensure its success. To appeal to potential investors in the IPO, Defendants were motivated to buoy Ardent's financial results and paint a rosy picture of the Company. By concealing the true state of affairs, as discussed above, Defendants artificially inflated Ardent's value and lured investors into providing it much needed funds. The Individual Defendants—who were brought in by Ardent's private equity owners—were pressured to prop up Ardent's stock price to advance this endeavor. Notably,

Ardent's Compensation Committee—four of whose five members were employed by, affiliated with, or designed to the Board by EGI—awarded Defendant Lumsdaine a "discretionary $100,000 one-time cash bonus" (on top of his base salary and other incentive compensation) for his role "in connection with the successful completion of [Ardent's] IPO in 2024."

**10. Defendants Disclosed Accounting Information in Such a Way that Its Negative Implications Could Only Be Understood by Someone with a High Degree of Sophistication.**

493. Further supporting scienter, Defendants used complex accounting techniques to obscure Ardent's aged, uncollectible AR and its negative implications.

494. Accounts that were belatedly written off from the AR balance were not classified as "bad debt," which obscured the fact that Ardent had failed to collect them. Instead, the write-offs were (i) dumped into a catch-all category such as "Other Operating Expenses," and/or (ii) deducted from total revenue, which was reported on a net basis. These maneuvers obscured Ardent's AR write-offs and made it impossible to tell if fluctuations in the AR balance were due to write-offs or collections.

**11. Executive Terminations Support Scienter.**

495. Bonick's sudden termination after the end of the Class Period further supports a strong inference of scienter. On June 2, 2026, Bonick suddenly departed from his positions as CEO and a director on Ardent's Board, with Ardent's press release vaguely stating that Bonick "stepped down to pursue other opportunities." Caspers—who had most recently worked for a pool care company before joining Ardent—replaced Bonick as CEO.

496. Bonick's abrupt, unusual departure was not voluntary. Rather, after the fraud's collapse and the resulting hit to Ardent's stock price, Bonick was terminated at the behest of Ardent's private equity controllers.

497. Bonick's separation agreement confirms that he was terminated, since it provides that Bonick was terminated "under Section 13 of the Employment Agreement," which provides Ardent—but not Bonick—with the "right at any time to terminate [Bonick's] employment without Cause, effective immediately or upon such date as specified by [Ardent] in its sole discretion." Underscoring that Bonick's departure was not planned, his separation agreement with Ardent was not signed until June 26, 2026, nearly a month after his departure.

498. Ardent also terminated its President of Hospital Services, Ethan Chernin, shortly after the Class Period on March 24, 2026. Again, this departure was not voluntary. Ardent's Schedule 14A Proxy filed with the SEC on April 8, 2026 indicated that Chernin's departure was classified as a "qualifying termination," meaning that Chernin was terminated "by the executive for Good Reason or by the Company without Cause."

499. Chernin had served a key role at Ardent: in a May 21, 2024 press release, Ardent stated that "Chernin will oversee Ardent's physician practices and clinic operations, ambulatory strategy and development, and support its continued evolution toward value-based care through strategic growth efforts that address local healthcare needs." Given his role overseeing Ardent's physician practices and clinic operations, it is likely that Chernin knew about (or recklessly disregarded) Ardent's systemic quality and safety failures, rapidly increasing professional fees, and other negative facts contrary to Defendants' public statements. The timing of Chernin's termination—only four months after these issues led to a significant guidance cut and earnings miss, followed by a large decline in Ardent's stock price—suggests that Chernin was terminated for his role in the fraud, supporting scienter.

**12. Corporate Scienter.**

500. As alleged above, Defendants Bonick and Lumsdaine, both of whom acted with scienter, were Ardent's most senior officers, had actual and apparent authority over Ardent and

acted within the scope of their apparent authority in making the misstatements at issue. Their scienter is imputed to the Company.

### C. Loss Causation

501. Defendants' materially false and misleading statements directly and proximately caused Plaintiffs and the Class to suffer substantial losses as a result of purchasing or acquiring Ardent common stock at artificially inflated prices during the Class Period.

502. Relying on the integrity of the market price for Ardent common stock, Plaintiffs and the Class purchased Ardent common stock at prices that were artificially inflated and/or maintained by Defendants' fraudulent statements, and were damaged thereby.

503. When the truth that Defendants misstated and concealed became known to the market through corrective events and/or materializations of concealed risk, the price of Ardent common stock significantly declined, causing Plaintiffs and the Class to suffer economic loss, *i.e.*, damages, under the federal securities laws. Specifically:

504. On November 12, 2025, after market hours, Ardent recorded a $54 million increase in professional liability accruals "arising from a limited set of claims between 2019 and 2022 in New Mexico for a single provider" as well as "consideration of broader industry trends, including social inflationary pressures."

505. Ardent's increase in professional liability accruals resulted directly from the material, negative facts that Defendants had misstated and concealed. Lumsdaine stated in the earnings call the following morning, November 13, 2025, that the increase in professional liability accruals "relates to the New Mexico market where we have seen significant social inflationary pressure in medical malpractice cases the past several years," adding that the accrual "represents our best estimate for our liability for this market, for the adjustment for those pressures, and for an

individual provider who was with Ardent between 2019 and 2022, and who is no longer employed by Ardent [*i.e.*, Erasmus] and for whom the statute of limitations has expired."

506. On November 12, 2025, after market hours, Ardent also slashed its 2025 adjusted EBITDA guidance by $52.5 million, or about 8.8%, at the midpoint; slashed its 2025 net income guidance by 39.4% at the midpoint; and reported weak 3Q25 earnings, including revenue, adjusted EBITDA, adjusted EBITDA margin, and GAAP net income that were significantly below the prior quarter.

507. Ardent's weak earnings and guidance reduction resulted directly from the material, negative facts that Defendants had misstated and concealed. During Ardent's 3Q25 earnings call on November 13, 2025, CEO Bonick attributed the guidance reduction to "industry-wide cost pressures, particularly those around professional fees and payer denials that have proven more durable than anticipated," admitting that "payer pressures moved higher again in the third quarter" and that professional fee growth "accelerated to 11% in the third quarter."

508. Last, on November 12, 2025, after market hours, Ardent revealed a $43 million decrease in third quarter 2025 revenue due to revised determinations of accounts receivable collectability after the Company transitioned to a new revenue accounting system and from purported "recently completed hindsight evaluations of historical collection trends."

509. Ardent's AR write-off and corresponding revenue decrease resulted directly from the material, negative facts that Defendants had misstated and concealed. During the 3Q25 earnings call, Lumsdaine revealed that the new system "recognizes reserves earlier in an account's life cycle" compared to the Company's prior collectability framework, which "had utilized a 180-day cliff at which time an account became fully reserved."

510. On this news, the price of Ardent stock fell $4.75 per share, or nearly 34%, from $14.05 per share on November 12, 2025, to close at $9.30 per share on November 13, 2025, on unusually heavy trading volume.

511. As detailed above at Paragraphs 299-302, analysts attributed Ardent's immediate, large share price decline to the new, negative information revealed on November 12 and 13, 2025, and indicated that it resulted from Company-specific information, not industry-wide trends.

**D. Presumption of Reliance**

512. At all relevant times, the market for Ardent's common stock on the NYSE was an efficient market for the following reasons, among others:

A. Ardent's shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

B. As a regulated issuer, Ardent filed periodic public reports with the SEC;

C. Ardent regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D. Ardent was followed by securities analysts employed by major brokerage firms who wrote reports that were published, distributed, and entered the public domain.

513. As a result of the foregoing, the market for Ardent securities promptly digested current information regarding Ardent from all publicly available sources and reflected such information in the price. Under these circumstances, all purchasers of Ardent's securities during the Class Period suffered similar injury through their purchases at artificially inflated and/or maintained prices, and the presumption of reliance applies.

## IX. EXCHANGE ACT CLAIMS FOR RELIEF

### COUNT III

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

514. Plaintiffs repeat, incorporate, and reallege each and every allegation above relating to the Exchange Act claims as if fully set forth herein.

515. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially inflated market prices for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

516. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Ardent's business, as specified herein.

517. During the Class Period, Defendants made the false and misleading statements specified in Section VIII.A above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

518. Defendants had actual knowledge of the false and misleading statements of material fact, or recklessly disregarded the true facts that were available to them. Defendants engaged in

this misconduct to conceal the truth about the Company's business, as specified herein, from the investing public and to support the artificially inflated prices of the Company's securities.

519. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated and/or maintained prices for Ardent common stock. Plaintiffs and the Class would not have purchased or otherwise acquired Ardent common stock at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated and/or maintained by Defendants' fraudulent statements and course of conduct.

520. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of Ardent common stock during the Class Period.

521. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT IV

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

522. Plaintiffs repeat, incorporate, and reallege each and every allegation above relating to the Exchange Act claims as if fully set forth herein.

523. The Individual Defendants acted as controlling persons of Ardent within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading

statements. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

524. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

525. As described above, the Company and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases or acquisitions of Ardent common stock during the Class Period.

## X. CLASS ACTION ALLEGATIONS

526. Plaintiffs bring this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who: (i) purchased or otherwise acquired Ardent common stock during the Class Period of July 18, 2024 to November 12, 2025, both inclusive, and were damaged thereby; and/or (ii) purchased Ardent common stock pursuant and/or traceable to the Registration Statement (the "Class").

527. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) present and former officers, directors, and/or control persons of Ardent, and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17

C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) the underwriters for Ardent's IPO (including J.P. Morgan Securities LLC; BofA Securities, Inc.; Morgan Stanley & Co. LLC; Stephens Inc.; Citigroup Global Markets Inc.; Leerink Partners LLC; RBC Capital Markets, LLC; Truist Securities, Inc.; Mizuho Securities USA LLC; Capital One Securities, Inc.; and Loop Capital Markets LLC); (vi) Defendants' liability insurance carriers; (vii) Ardent's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (viii) the legal representatives, parents, subsidiaries, affiliates, heirs, successors-in-interest, or assigns of any person or entity in the preceding seven categories, in their capacities as such.

528. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Members of the Class can be identified from records maintained by Ardent or its transfer agent(s) and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

529. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A. Whether Defendants violated the Securities Act;

B. Whether Defendants violated the Exchange Act;

C. Whether Defendants omitted and/or misrepresented material facts;

D. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

E. Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

F. Whether the price of Ardent's securities was artificially inflated or maintained;

G. Whether Defendants' conduct caused the members of the Class to sustain damages; and

H. The extent of damage sustained by Class members and the appropriate measure of damages.

530. Plaintiffs' claims are typical of those of the Class because Plaintiffs and all Class members sustained damages from Defendants' wrongful conduct.

531. Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in securities class actions. Plaintiffs have no interests that conflict with those of the Class.

532. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI. INAPPLICABILITY OF STATUTORY SAFE HARBOR

533. The statutory safe harbor and any analogous doctrines applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and misleading statements alleged herein.

534. None of the statements complained of herein was a forward-looking statement. Instead, each challenged statement relates to then-existing facts and conditions. Ardent's "Safe Harbor" warnings during the Class Period thus cannot shield the statements at issue from liability.

535. To the extent there were any forward-looking statements, the statutory safe harbor does not apply to statements "made in connection with an initial public offering." 15 U.S.C. § 77z-2(b)(2)(D). Any other forward-looking statements were not sufficiently identified as such at the time they were made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Ardent were not sufficient to insulate Defendants from liability for their materially false and/or misleading statements.

536. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was made by or authorized and/or approved by an executive officer of Ardent who knew that the statement was false.

## XII. JURY DEMAND

537. Plaintiffs, on behalf of themselves and the Class, demand a jury trial.

## XIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages and equitable relief in favor of Plaintiffs and other members of the Class against all Defendants, jointly and severally, for all

damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

Dated: August 12, 2026

Respectfully submitted,

**SANFORD HEISLER SHARP MCKNIGHT, LLP**

*/s/ Kevin H. Sharp*
Kevin H. Sharp (BPR No. 016287)
Kristi Stahnke McGregor (GA Bar No. 674012)
Kasi Wautlet (BPR No. 038688)
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7001
Facsimile: (615) 434-7020
ksharp@sanfordheisler.com
kmcgregor@sanfordheisler.com
kwautlet@sanfordheisler.com

*Local Co-Counsel for Lead Plaintiff Dhruv Postiwala and Named Plaintiff Jodi Yost*

**BLEICHMAR FONTI & AULD LLP**
Joseph A. Fonti (*pro hac vice* forthcoming)
Evan A. Kubota (*pro hac vice* forthcoming)
Thomas F. Allen (*pro hac vice* forthcoming)
300 Park Avenue, Suite 1301
New York, New York 10022
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jfonti@bfalaw.com
ekubota@bfalaw.com
tallen@bfalaw.com

-and-

Adam C. McCall (*pro hac vice*)
15301 Ventura Boulevard, Suite U1
Sherman Oaks, California 91403
Telephone: (415) 445-4003
Facsimile: (212) 205-3960
amccall@bfalaw.com

*Lead Counsel for Lead Plaintiff Dhruv Postiwala, Named Plaintiff Jodi Yost, and the Class*

## CERTIFICATE OF SERVICE

I certify that on August 12, 2026, the foregoing was filed electronically with the Clerk of Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.


**Britt K. Latham**
Bass, Berry & Sims PLC (Nashville Office)
21 Platform Way South
Suite 3500
Nashville, TN 37203
615-742-6200
Email: blatham@bassberry.com

**James W Miller**
Bass, Berry & Sims PLC (Nashville Office)
21 Platform Way South
Suite 3500
Nashville, TN 37203
615-742-6261
Email: james.miller@bassberry.com

**Margaret V. Dodson**
Bass, Berry & Sims PLC (Nashville Office)
21 Platform Way South
Suite 3500
Nashville, TN 37203
615-742-7712
Email: margaret.dodson@bassberry.com

**Paul Kent Bramlett**
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116
Email: pknashlaw@aol.com

**Jessica Perry Corley**
King & Spalding LLP (Atlanta Office)
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309-3521
(404) 572-4717
Email: jpcorley@kslaw.com

**Lisa R. Bugni**
King & Spalding LLP (Atlanta Office)
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309-3521
(404) 572-4677
Email: lbugni@kslaw.com

**Matthew B. Rosenthal**
King & Spalding LLP (Atlanta Office)
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309-3521
(404) 572-4600
Email: mrosenthal@kslaw.com

**Wade B. Cowan**
Wade B. Cowan, Attorney
P.O. Box 50617
Nashville, TN 37205
615-390-6652
Email: wcowan@dhhrplc.com


*<u>/s/ Kevin H. Sharp</u>*
Kevin H. Sharp (BPR No. 016287)

# EXHIBIT A

# CERTIFICATION

I, Dhruv Postiwala, hereby certify as follows:

1. I have reviewed the Amended Complaint against Ardent Health, Inc. ("Ardent") and others alleging violations of the federal securities laws and have authorized its filing.

2. I did not purchase or sell securities of Ardent at the direction of counsel, or in order to participate in any private action under the federal securities laws.

3. I am willing to serve as a lead plaintiff on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

4. My transactions in the Ardent securities that are the subject of the Amended Complaint during the class period specified therein are reflected in Schedule A, attached hereto.

5. Other than the instant action, I have not served as a lead plaintiff in a class action filed under the federal securities laws in the last three years.

6. Beyond my *pro rata* share of any recovery, I will not accept payment for serving as a lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Dated: 7/24/2026

Signed by:
Dhruv Postiwala
08C2ADA7ED5B468...
Dhruv Postiwala

**SCHEDULE A**
TRANSACTIONS IN
ARDENT HEALTH, INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 11/12/2025 | 1,644.00 | 14.32 | ($23,542.08) |
| Purchase | 11/12/2025 | 1,470.00 | 14.30 | ($21,021.00) |
| Purchase | 11/12/2025 | 4,000.00 | 14.29 | ($57,160.00) |

# EXHIBIT B

# CERTIFICATION

I, Jodi Yost, hereby certify as follows:

1. I have reviewed the Amended Complaint against Ardent Health, Inc. ("Ardent") and others alleging violations of the federal securities laws and have authorized its filing.

2. I did not purchase or sell securities of Ardent at the direction of counsel, or in order to participate in any private action under the federal securities laws.

3. I am willing to serve as a representative party on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

4. My transactions in the Ardent securities that are the subject of the Amended Complaint during the class period specified therein are reflected in Schedule A, attached hereto.

5. Other than the instant action, I have not served as a representative party in a class action filed under the federal securities laws in the last three years.

6. Beyond my *pro rata* share of any recovery, I will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Dated: Jul 24, 2026

Jodi Yost
Jodi Yost (Jul 24, 2026 12:54:46 PDT)
Jodi Yost

**SCHEDULE A**
TRANSACTIONS IN
ARDENT HEALTH, INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 10/31/2024 | 2.765486 | 18.08 | ($50.00) |
| Purchase | 11/06/2024 | 3.275082 | 16.64 | ($54.50) |